IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| DERRICK WHEATT and LAURESE GLOVER, | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | No. 1:17-CV-377 |
| CITY OF EAST CLEVELAND, MICHAEL C. PERRY, VINCENT K. JOHNSTONE, D.J. MIKLOVICH, PATRICIA LANE, CHARLES TEEL, JOHN C. BRADFORD, TERRENCE DUNN, CARMEN  MARINO, DEBORAH NAIMAN, and CUYAHOGA COUNTY, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

Now come Plaintiffs, DERRICK WHEATT and LAURESE GLOVER, by their

attorneys, Loevy & Loevy, and complain of Defendants CITY OF EAST

CLEVELAND, former East Cleveland Police Detective Sergeant MICHAEL C.

PERRY, former East Cleveland Police Detective VINCENT K. JOHNSTONE,

former East Cleveland Police Detective D.J. MIKLOVICH, former East Cleveland

Police Detective Sergeant PATRICIA LANE, former East Cleveland Police

Commander CHARLES TEEL, former East Cleveland Police Lieutenant JOHN C.

BRADFORD, former East Cleveland Police Sergeant TERRENCE DUNN, former

First Assistant at the Cuyahoga County Prosecutor's Office CARMEN MARINO,

former Assistant County Prosecutor at the Cuyahoga County Prosecutor's Office

DEBORAH NAIMAN, and CUYAHOGA COUNTY, as follows:

1

## Introduction

1.      Plaintiffs, Derrick Wheatt and Laurese Glover, spent two decades wrongfully incarcerated in prison for a murder that they did not commit. Arrested as teenagers, they, along with their former co-defendant Eugene Johnson, were wrongfully convicted for the 1995 murder of Clifton Hudson in East Cleveland, Ohio.

2.      Plaintiffs served over 20 years of their sentences before they were exonerated in 2015.

3.      Plaintiffs were exonerated after exculpatory evidence came to light in police reports that had never previously been disclosed to them. It was only after their post-conviction counsel obtained the police reports through a public records request in 2013 that this exculpatory evidence came to light. On the basis of this new evidence, which had been suppressed in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), the state court vacated the convictions of Mr. Wheatt, Mr. Glover, and Eugene Johnson, a third alleged assailant, and granted them a new trial in 2015. The charges against Plaintiffs remained pending and Plaintiffs remained on bond until August 2016, when all charges were finally dismissed.

4.      It was misconduct by East Cleveland police detectives and those working in concert with them that led to Plaintiffs' wrongful convictions. This misconduct included but was not limited to witness manipulation; unduly suggestive witness identifications and photo lineups; and fabrication, destruction, and suppression of evidence. In addition, after Plaintiffs were wrongfully convicted,

2

misconduct by former Cuyahoga County prosecutors Carmen Marino and Deborah Naiman in preventing the release of the suppressed police reports caused Plaintiffs to be denied timely post-conviction relief and resulted in their continued incarceration.

5.     Plaintiffs therefore bring this action pursuant to federal and Ohio law seeking redress for the wrongs done to them, as well as to deter future misconduct.

## Jurisdiction and Venue

6.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, and over their state-law claims pursuant to 28 U.S.C. § 1367.

7.     Venue is proper because the individual defendants reside within this district, and all of the events giving rise to the claims asserted herein occurred within this district.

## Parties

8.     Plaintiff Derrick Wheatt is a 39 year-old resident of Euclid, Ohio. At the time of his arrest in February 1995, he was just 17 years old and living with his family in East Cleveland, Ohio.

9.     Plaintiff Laurese Glover is a 38 year-old resident of Cleveland, Ohio. At the time of his arrest in February 1995, he was just 16 years old and living with his family in East Cleveland, Ohio.

10.     Defendant City of East Cleveland (the "City") is an Ohio municipal corporation that operates the East Cleveland Police Department (the

3

"Department"). The City is liable for all state law torts committed by the Defendant Officers while employed by the City pursuant to the doctrine of *respondeat superior*. The City is additionally responsible for the policies and practices of the City and Department that caused the violation of Plaintiffs' constitutional rights.

11.    Defendant Michael C. Perry was at all times relevant to this Complaint an East Cleveland Police Detective Sergeant.

12.    Defendant Vincent K. Johnstone was at all times relevant to this Complaint an East Cleveland Police Detective.

13.    Defendant D.J. Miklovich was at all times relevant to this Complaint an East Cleveland Police Detective.

14.    Defendant Patricia Lane was at all times relevant to this Complaint an East Cleveland Police Detective Sergeant.

15.    Defendant Charles Teel was at all times relevant to this Complaint an East Cleveland Police Commander.

16.    Defendant John C. Bradford, #017, was at all times relevant to this Complaint an East Cleveland Police Lieutenant.

17.    Defendant Terrence Dunn was at all times relevant to this Complaint an East Cleveland Police Sergeant.

18.    At all times relevant herein, Defendants Perry, Lane, Teel, and Bradford supervised Defendants Johnstone and Miklovich.

19.    Defendants Perry, Johnstone, Miklovich, Lane, Teel, and Bradford are collectively referred to as the "Defendant Officers." At least one of the Defendant

Officers and/or Defendant Dunn was, at all times relevant, a final policymaker, or had been delegated such authority, for the Defendant City.

20.     At all times relevant, Defendants Perry, Johnstone, Miklovich, Lane, Teel, Bradford, and Dunn acted under color of law and within the scope of their employment for the Defendant City and the Department. They are sued in their individual capacities.

21.     Defendant Carmen Marino was at all times relevant to this Complaint a First Assistant with the Cuyahoga County Prosecutor's Office ("Prosecutor's Office"). Defendant Marino was, at all times relevant, a final policymaker, or had been delegated such authority, for the Defendant County, with respect to the subject areas relevant to his acts as alleged herein.

22.     Defendant Deborah Naiman was at all times relevant to this Complaint an Assistant County Prosecutor with the Cuyahoga County Prosecutor's Office. Defendant Naiman was, at all times relevant, a final policymaker, or had been delegated such authority, for the Defendant County, with respect to the subject areas relevant to her acts as alleged herein.

23.     At all times relevant, Defendants Marino and Naiman acted under color of law and within the scope of their employment for the Cuyahoga County Prosecutor's Office and Cuyahoga County. They are sued in their individual capacities.

24.     Defendant Cuyahoga County ("County") is a governmental entity in the State of Ohio. The County is liable for all state law torts committed by

5

Defendants Marino and Naiman while employed by the County and the Prosecutor's Office pursuant to the doctrine of *respondeat superior*. The County is additionally responsible for the policies and practices of the County and Prosecutor's Office that caused the violation of Plaintiffs' constitutional rights.

## Background

25.     Derrick Wheatt was born in Cleveland, Ohio, and grew up in East Cleveland.

26.     Laurese Glover was born in Cleveland, Ohio, and grew up in Cleveland and East Cleveland.

27.     Mr. Wheatt, Mr. Glover, and Eugene Johnson were friends, and they knew each other from living in the same neighborhood.

28.     In February 1995, Mr. Wheatt was 17 years old, Mr. Glover was 16 years old, and Mr. Johnson was 17 years old. Plaintiffs were students at Shaw High School in East Cleveland.

## The Murder of Clifton Hudson

29.     In the early evening hours of February 10, 1995, 19 year-old Clifton Hudson was shot and killed outside 1706 Strathmore Avenue in East Cleveland, Ohio.

30.     The man who shot and killed Mr. Hudson fled on foot and has never been apprehended.

31.     Neither Plaintiffs nor Mr. Johnson had anything to do with the murder of Clifton Hudson. All three of them are completely innocent.

32.     Plaintiffs and Mr. Johnson were merely witnesses to the shooting. They were traveling in Mr. Glover's black GMC Jimmy north on Strathmore when Mr. Glover stopped at a stop sign next to a post office parking lot, before the bridge at Strathmore and Manhattan Avenues. They saw the shooter approach Mr. Hudson on foot. The shooter fired shots at Mr. Hudson. Scared, Plaintiffs and Mr. Johnson drove away from the scene.

33.     A 14 year-old girl named Tamika Harris was also a witness to the shooting. Ms. Harris witnessed the shooting from the other side of the bridge from where Plaintiffs and Mr. Johnson were. She saw the shooter approach Mr. Hudson on foot, but her view of where the shooter came from was obscured by Mr. Glover's vehicle.

**Defendant Officers' Manipulation and Fabrication of Tamika Harris's Statement**

34.     The police, including Defendants Perry, Johnstone, Miklovich, Teel, and Lane, arrived at the scene soon after the shooting.

35.     Almost immediately after arriving on the scene, police spoke with Ms. Harris. Ms. Harris was taken to the police station.

36.     Defendant Lane interviewed Ms. Harris very shortly after the shooting on February 10, 1995.

37.     In that interview, Ms. Harris reported that there was a black 4x4-type vehicle at the scene and that she thought the shooter came from the vehicle.

7

38.     Ms. Harris did not identify the make or model of the vehicle.

39.     Ms. Harris stated that she did not see and could not describe the persons in the vehicle.

40.     Ms. Harris gave a description of the shooter that did not match Plaintiffs or Eugene Johnson.

41.     When asked by Defendant Lane if she could identify this person, Ms. Harris responded with words to the effect of, "No. I didn't see his face that clear."

42.     Based on Ms. Harris's initial statement, East Cleveland police began searching for a 4x4-type vehicle.

43.     Later in the evening on February 10, 1995, one or more of the Defendant Officers saw Mr. Glover's GMC Jimmy parked in the driveway of his home a few blocks away from the scene and just one block away from the police station.

44.     Based on nothing other than Ms. Harris' statement that she saw a black 4x4-type vehicle at the scene of the shooting, and the fact that Mr. Glover had a 4x4-type vehicle, the Defendant Officers, including Defendants Johnstone, Miklovich, and Perry, arrested Plaintiffs very late at night.

45.     There was no probable cause to arrest Plaintiffs.

46.     The Defendant Officers impounded the GMC Jimmy and took a photo of it.

47.     Mr. Wheatt and Mr. Glover were handcuffed, placed into separate police cars, and transported to the police station to be interrogated.

8

48.     The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, interrogated Plaintiffs separately at the police station in the late evening hours of February 10, 1995 and early morning hours of February 11, 1995.

49.     Even though Mr. Glover was a juvenile, the Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, interrogated him without a parent present.

50.     During the interrogations, Plaintiffs each separately denied involvement in the crime.

51.     During the interrogations, the Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, repeatedly tried to get Plaintiffs to falsely confess to the shooting, by, among other things: falsely telling them that they had numerous eyewitnesses implicating them in the shooting; falsely telling them that their friends had implicated them; and asking them the same questions over and over again in an attempt to force them into admitting to a crime they did not commit.

52.     Plaintiffs did not confess, because they were innocent.

53.     Instead, Plaintiffs each separately and independently told the Defendant Officers, including Defendants Perry, Johnstone, Miklovich, and Lane, that they were only witnesses to the shooting.

54.     The Defendant Officers arrested Eugene Johnson on the morning of February 11, 1995, and they brought him to the police station for interrogation. There was no probable cause for Mr. Johnson's arrest, either, because all Defendant

9

Officers knew at that point was that Mr. Wheatt, Mr. Glover, and Mr. Johnson were witnesses to the crime.

55.     During his interrogation, Mr. Johnson conveyed the same thing to the Defendant Officers that Plaintiffs did: the three boys did not commit the murder, but they were witnesses to it.

56.     The Defendant Officers took photos of Mr. Wheatt, Mr. Glover, and Mr. Johnson in the police station.

57.     In those photos, Plaintiffs and Mr. Johnson were wearing the same clothes they were wearing when they were arrested, and they were standing in front of lockers in the police station. These photos taken by Defendant Officers made it obvious that Plaintiffs and Mr. Johnson were in police custody.

58.     After the Defendant Officers had arrested Mr. Wheatt, Mr. Glover, and Mr. Johnson, Ms. Harris was brought to the police station on February 11, 1995 and questioned again by the Defendant Officers, including Defendants Perry, Johnstone, and Miklovich.

59.     The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, engaged in unduly suggestive, coercive and manipulative questioning of Ms. Harris. Their improper conduct toward Ms. Harris, included, but was not limited to, asking her leading questions, providing information about the crime that she did not know, and providing information tending to identify Mr. Wheatt, Mr. Glover, and Mr. Johnson.

60.     The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, showed Ms. Harris the impounded GMC Jimmy in the police station garage and asked her to identify it. In order to manipulate her into identifying the vehicle as the one she saw at the scene of the shooting, it was the only vehicle that they showed her, and the Defendant Officers told her that it was the vehicle of the suspects they already had in custody.

61.     As a result of their unduly suggestive identification procedure, Ms. Harris was manipulated into identifying the GMC Jimmy as the vehicle she saw at the scene.

62.     During their interview with Ms. Harris, Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, provided information to her, which she did not know and had not provided, and which tended to inculpate Plaintiffs and Mr. Johnson. The information that the Defendant Officers provided to Ms. Harris was designed to falsely implicate Plaintiffs.

63.     The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, engaged in unduly suggestive, coercive, and manipulative questioning of Ms. Harris, including but not limited to feeding her information about the crime in order to falsely implicate Plaintiffs and Mr. Johnson and fabricate evidence against them.

64.     Furthermore, even though Ms. Harris said that she did not see the shooter's face, Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, created an unduly suggestive photo array for her to view.

11

65.  The Defendant Officers intentionally set out to make this photo array misleading because the only photos in it were the pictures of Plaintiffs and Mr. Johnson that had been taken at the police station. These three photos were the only photos of potential suspects that Ms. Harris was shown; she was not shown any other photos.

66.  Moreover, when the Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, showed the photos of Plaintiffs and Mr. Johnson to Ms. Harris, they told her words to the effect that they had the right suspects in custody, and that she just needed to pick one out as the shooter.

67.  The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, also conveyed to Ms. Harris before they showed her the photo spread that they knew what was going on and said words to the effect that "these guys did it" and they "had them in jail."

68.  Defendant Perry or one of the other Defendant Officers pointed to Mr. Johnson's photo to get Ms. Harris to identify him as the shooter, despite the fact that he did not match Ms. Harris's description of the shooter and she had already said that she did not see the shooter's face.

69.  The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, also falsely told Ms. Harris words to the effect that "the other two," referring to Mr. Wheatt and Mr. Glover, had "gunpowder on them."

70.  All of this was done to manipulate Ms. Harris and ensure that she would select and identify Mr. Johnson and falsely implicate all three boys. Because

12

of this improper and unduly suggestive photo array, Ms. Harris picked Mr. Johnson's photo.

71.     The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, interviewed Ms. Harris and had her sign a statement falsely implicating Plaintiffs and Mr. Johnson in the absence of a parent or guardian, even though she was only 14 years old.

72.     The Defendant Officers' misconduct relating to Ms. Harris included but was not limited to the fabrication of her statement falsely implicating Plaintiffs and Mr. Johnson.

73.     As a supervisor, Defendant Perry knew about, participated in, encouraged, and condoned the actions of Defendants Miklovich and Johnstone, as described above. Other supervisors, including Defendants Teel and Lane, also knew about, encouraged, and condoned the conduct of other Defendant Officers.

74.     The Defendant Officers, including Defendants Perry, Johnstone, Miklovich, Teel, and Lane, withheld information concerning their misconduct, including but not limited to the fabrication of Ms. Harris's statements, the unduly suggestive photo array, and the manipulation of Ms. Harris, from the Plaintiffs, Mr. Johnson, their defense counsel, and prosecutors.

75.     The Defendant Officers never disclosed any of this obviously exculpatory evidence to Plaintiffs, Mr. Johnson, defense counsel, or prosecutors, and these individuals did not know about this exculpatory evidence until after Plaintiffs' trials and convictions.

### The Defendant Officers Withheld Exculpatory Evidence
### Obtained from One or More of the Petty Brothers

76.     On or about February 12, 1995, Defendant Bradford received

information from a woman named Monica Salters, who was the mother of two boys

named Eddie Dante Petty and Gary Petty. Ms. Salters and her sons lived near the

scene of the crime.

77.     Defendant Bradford learned from Ms. Salters that Dante witnessed

the shooting; specifically, that as Dante was walking north on Strathmore, he saw

the shooter come out of the post office parking lot on the east side of Strathmore,

walk towards the victim who was standing on the other side of the street, take a

gun out of his pocket, and begin shooting at the victim. According to Defendant

Bradford's police report, Dante further stated that he had seen the suspect before,

when the suspect was visiting a female classmate at his school, and that the suspect

was or may have been the brother of the female classmate.

78.     Defendant Bradford documented this exculpatory information in a

police report dated February 12, 1995.

79.     Defendant Bradford placed this police report in the investigative file

relating to the Hudson murder.

80.     Defendant Bradford communicated the information from Ms. Salters to

the other detectives investigating the crime, including Defendants Johnstone,

Perry, Miklovich, and their supervisors, Defendants Lane and Teel.

81.     Defendant Johnstone knew about the information that Ms. Salters had

provided to Lt. Bradford.

14

82.    Defendant Miklovich knew about the information that Ms. Salters had provided to Lt. Bradford.

83.    Defendant Perry knew about the information that Ms. Salters had provided to Lt. Bradford.

84.    Defendant Lane knew about the information that Ms. Salters had provided to Lt. Bradford.

85.    Defendant Teel knew about the information that Ms. Salters had provided to Lt. Bradford.

86.    Defendant Johnstone saw Lt. Bradford's report dated February 12, 1995.

87.    Defendant Miklovich saw Lt. Bradford's report dated February 12, 1995.

88.    Defendant Perry saw Lt. Bradford's report dated February 12, 1995.

89.    Defendant Lane saw Lt. Bradford's report dated February 12, 1995.

90.    Defendant Teel saw Lt. Bradford's report dated February 12, 1995.

91.    On or about February 15, 1995, Defendants Miklovich and Johnstone went to the home of Ms. Salters and her sons to interview them regarding what they knew about the crime and what they told Defendant Bradford.

92.    During this interview, one of the Petty brothers told Defendants Miklovich and Johnstone that: on the day of the shooting, he was walking towards 1706 Strathmore when he saw a man exit the driveway of the post office parking lot, walk across the street towards another man, and shoot him.

93.     This evidence was apparently exculpatory because one or more of the Petty brothers had a clear view to the shooting, from the opposite side of the bridge embankment as Tamika Harris, and their view was not blocked by the GMC Jimmy stopped at the stop sign next to the post office parking lot. Unlike Ms. Harris, one or more of the Petty brothers had a clear view of the post office parking lot and the rear of the GMC Jimmy and could see that the shooter came from the post office parking lot and not the vehicle.

94.     Defendants Miklovich and Johnstone documented this exculpatory evidence from their interview with Ms. Salters and her son in a police report dated February 15, 1995.

95.     Defendant Perry saw Miklovich and Johnstone's report dated February 15, 1995 and signed it.

96.     Defendants Miklovich, Johnstone, and Perry placed this report dated February 15, 1995 in the investigative file relating to the Hudson murder.

97.     Defendants Miklovich, Johnstone, and Perry communicated this exculpatory evidence to Defendants Lane and Teel.

98.     Defendant Lane saw Miklovich and Johnstone's report dated February 15, 1995.

99.     Defendant Teel saw Miklovich and Johnstone's report dated February 15, 1995.

100.    Defendant Lane knew about the information from one of the Petty brothers contained in the report dated February 15, 1995.

16

101.    Defendant Teel knew about the information from one of the Petty brothers contained in the report dated February 15, 1995.

102.    However, Defendants Miklovich, Perry, Johnstone, Lane, and Teel withheld the report dated February 15, 1995, Defendant Bradford's report dated February 12, 1995, and the related exculpatory evidence from the Plaintiffs, Mr. Johnson, the defense counsel, and prosecutors.

103.    Defendant Bradford withheld his February 12, 1995 report and the information he learned from Ms. Salters from the Plaintiffs, Mr. Johnson, the defense counsel, and prosecutors.

104.    Additionally, Defendants Teel and Lane, who were supervisors of the other Defendant Officers, knew about, condoned, and approved of Defendants Miklovich, Perry, Johnstone, and Bradford's actions.

105.    The Defendant Officers agreed amongst themselves to withhold the apparently exculpatory evidence from Ms. Salters and one or more of the Petty brothers from Plaintiffs, Mr. Johnson, the defense counsel, and prosecutors.

106.    Plaintiffs, Mr. Johnson, the defense counsel, and prosecutors did not know of the exculpatory information provided by one or more of the Petty brothers until long after Plaintiffs' trial and convictions.

### The Defendant Officers Withheld Exculpatory Evidence Obtained from Derek Bufford

107.    On or about February 13, 1995, Defendants Lane and Teel interviewed Derek Bufford, Clifton Hudson's brother.

108.    According to Defendants' Lane and Teel's police report, Mr. Bufford told Defendants Lane and Teel that both he and his brother Clifton had recently been threatened by unknown men. Mr. Bufford told them that some men had pulled a shotgun on Mr. Hudson just a day before the shooting. Mr. Bufford also told Defendants Lane and Teel that a few days before the shooting, some unknown men in a grey Chevy Cavalier pulled up to him and started shooting at him, and that he escaped by ducking into a local retail store. This shooting occurred only blocks away from where Mr. Hudson was murdered the next day.

109.    Defendants Lane and Teel believed that these incidents were related to Mr. Hudson's murder, because these unknown men had threatened and attempted to kill Mr. Hudson and Mr. Bufford within days of the murder.

110.    Defendants Lane and Teel showed Mr. Bufford pictures of Plaintiffs, Mr. Johnson, and the GMC Jimmy. Mr. Bufford did not identify the Plaintiffs or Mr. Johnson as the individuals who had shot at him.

111.    Neither Plaintiffs nor Mr. Johnson had a Chevy Cavalier.

112.    The information provided by Mr. Bufford was apparently exculpatory because it indicated that Mr. Hudson had been involved in an ongoing feud with persons other than Plaintiffs or Mr. Johnson.

113.    Defendants Lane and Teel documented the information from Mr. Bufford in a police report dated February 13, 1995.

114.    Defendants Lane and Teel placed this police report in the investigative file relating to the Hudson murder.

18

115.    Defendants Lane and Teel communicated this information to the other detectives investigating the crime, including Defendants Johnstone, Perry, and Miklovich.

116.    Defendant Johnstone saw Defendants Lane and Teel's report dated February 13, 1995.

117.    Defendant Perry saw Defendants Lane and Teel's report dated February 13, 1995.

118.    Defendant Miklovich saw Defendants Lane and Teel's report dated February 13, 1995.

119.    Defendant Johnstone knew about this information from Mr. Bufford.

120.    Defendant Perry knew about this information from Mr. Bufford.

121.    Defendant Miklovich knew about this information from Mr. Bufford.

122.    However, Defendants Lane, Teel, Miklovich, Perry, and Johnstone withheld the February 13, 1995 report and the related exculpatory evidence from the Plaintiffs, Mr. Johnson, the defense counsel, and prosecutors.

123.    The Defendant Officers agreed amongst themselves to withhold the apparently exculpatory evidence from Mr. Bufford from the Plaintiffs, Mr. Johnson, the defense counsel, and prosecutors.

124.    Plaintiffs, Mr. Johnson, the defense counsel, and prosecutors did not know of the exculpatory information provided by Derek Bufford until long after Plaintiffs' trial and convictions.

125. None of the Defendant Officers ever investigated any of the information they received from one or more of the Petty brothers or Mr. Bufford.

**The Wrongful Convictions of Derrick Wheatt and Laurese Glover**

126. Mr. Wheatt, Mr. Glover, and Mr. Johnson were tried for the murder of Clifton Hudson in January 1996. The prosecution's case was weak, and the key piece of evidence against them was the fabricated testimony of Tamika Harris.

127. The State's case was so weak that, during trial, the prosecution offered Mr. Wheatt and Mr. Glover a plea bargain in exchange for their cooperation in testifying against Mr. Johnson, including probation for Mr. Wheatt and complete dismissal of all charges against Mr. Glover. Plaintiffs rejected the plea offer and continued to maintain their innocence, even though they were teenagers facing life imprisonment if they were convicted.

128. Plaintiffs and Mr. Johnson were wrongfully convicted of murder on January 18, 1996 as a result of Defendant Officers' misconduct. Mr. Glover was sentenced to 15 years to life imprisonment, and Mr. Wheatt and Mr. Johnson were sentenced to 18 years to life imprisonment.

129. Throughout the conviction and sentencing, Plaintiffs and Mr. Johnson maintained their innocence.

130. Had the Defendant Officers disclosed their misconduct, including but not limited to their withholding of exculpatory evidence and fabrication of evidence to prosecutors, Plaintiffs, or their counsel, the prosecution would not have been pursued and Plaintiffs would not have been convicted.

20

131.    If the exculpatory evidence described above had not been withheld during trial, the State's case at trial would have been thoroughly undermined, and the result of the trial would have been different.

132.    At all times leading up to and prior to Plaintiffs' trial, it was the policy of the attorneys in the Cuyahoga County Prosecutor's Office to disclose all exculpatory evidence of which they were aware by communicating it to the defense counsel prior to trial.

133.    The only prosecutor who worked on Plaintiffs' trial was Michael Horn.

134.    The exculpatory evidence described in the preceding paragraphs was not provided by Defendant Officers or any member of the East Cleveland Police Department to Mr. Horn prior to trial or Plaintiffs' convictions.

135.    The exculpatory evidence described in the preceding paragraphs was not provided by Defendant Officers or any member of the East Cleveland Police Department to any member of the Prosecutor's Office prior to trial or Plaintiffs' convictions.

## Post-Trial Misconduct By Defendants Marino, Naiman, and Dunn

136.    In 1998, as part of an initial post-conviction investigation, Plaintiffs sent a public records request to the City of East Cleveland. The request sought copies of all police and investigatory records related to the murder of Clifton Hudson.

137.    At this time, Plaintiffs' criminal convictions had become final. Plaintiffs' convictions had been affirmed by the state court of appeals, and the Ohio

21

Supreme Court had denied review. No motion for new trial or petition for post-conviction relief had been filed. There was nothing pending in court in Plaintiffs' criminal cases.

138.   The Defendant Officers learned about the 1998 public records request to the City of East Cleveland.

139.   The Defendant Officers informed Defendants Marino and Naiman about the public records request.

140.   Neither Defendants Marino nor Naiman had any involvement with the prosecution or trial of Plaintiffs or Mr. Johnson. Nor did they have any involvement with any post-conviction or habeas proceedings of Plaintiffs or Mr. Johnson.

141.   After learning of the 1998 public records request, Defendant Officers, Defendant Dunn, Defendant Marino, and Defendant Naiman conferred and agreed with each other to withhold the exculpatory police reports from Plaintiffs and prevent the disclosure of all police and investigatory records in response to the request.

142.   In June 1998, Defendants Marino and Naiman sent a letter to Defendant Dunn at the East Cleveland Police Department directing him not to release the police or investigatory records relating to the murder of Clifton Hudson. Defendants Marino and Naiman "directed" the Department to turn over all copies of the police file to the Prosecutor's Office.

143.   Pleading additionally and in the alternative: Upon learning of the public records request to the City of East Cleveland, Defendants Marino and

22

Naiman, then prosecutors at the Cuyahoga County Prosecutor's Office, intervened to stop the City and the Department from releasing any records.

144.   Defendant Dunn turned over a copy of the police reports and investigatory records to Defendants Marino and Naiman, as Defendants Marino and Naiman had "directed" in their June 1998 letter.

145.   Defendants Marino and Naiman reviewed the police reports and investigatory records.

146.   Defendants Marino and Naiman saw the information provided by the Petty brothers and Derek Bufford, which they knew was exculpatory.

147.   Defendants Marino and Naiman took these actions despite the fact that they had no authority under state law—or any law—to direct the Department not to release records in response to a public records request.

148.   Defendants Marino and Naiman took these actions despite the fact that they had no authority under state law—or any law—to direct the Department to turn over all copies of the police file to the Prosecutor's Office.

149.   Defendants Marino and Naiman had no authority whatsoever to interfere with the response of a separate and independent governmental entity (the East Cleveland Police Department and the City of East Cleveland) to a public records request. Nor were Defendants Marino or Naiman enforcing any law when they took these actions.

150.   In addition, Defendants Marino and Naiman, in their letter to the East Cleveland Police Department, advised the Department that "said police file and its

23

contents are not public record, thus any release could constitute a willful [sic] violation of the law."

151. It would not have been a violation of the law for the City or the Department to release the records.

152. As a result of Defendants Marino and Naiman's actions, the City and the Department did not release the file relating to the Hudson murder, which contained the exculpatory reports relating to the Petty brothers and Derek Bufford.

153. Defendants Marino and Naiman did not disclose any of this information to the Plaintiffs or Mr. Johnson, their counsel, the original trial prosecutor, Michael Horn, or to any court.

154. As a result of Defendants' actions, Plaintiffs spent an additional 17 years wrongfully imprisoned before these reports and the exculpatory information therein finally came to light.

## The Exculpatory Police Reports Finally Come to Light

155. In 2013, Plaintiffs' post-conviction counsel submitted a public records request to the East Cleveland Police Department requesting all documents related to the murder of Clifton Hudson.

156. Subsequently, the Department responded and produced to Plaintiffs and their counsel, for the first time, police reports relating to the investigation.

157. The police reports finally produced by the Department included the exculpatory police reports containing information from one or more of the Petty brothers and Derek Bufford.

24

158.    Apparently, the Department had kept copies of at least some of the police reports, despite Defendants Marino and Naiman's 1998 letter.

159.    Because of Defendant Officers, Marino, Naiman, and Dunn's misconduct, Plaintiffs were deprived of newly discovered, exculpatory evidence that they could use to successfully litigate motions for new trial, post-conviction petitions, and petitions for habeas relief from 1998 through 2013.

160.    Prior to 2013, Plaintiffs filed and litigated motions for new trial, post-conviction petitions, and petitions for habeas relief which were unsuccessful because they did not have the exculpatory police reports and evidence from the Petty brothers and Derek Bufford.

### Plaintiffs' Exoneration

161.    After Plaintiffs obtained the exculpatory police reports, Plaintiffs and Mr. Johnson filed a new motion for new trial and petition for post-conviction relief in Ohio state court.

162.    On the basis of the newly discovered evidence, which was found to have been withheld from Plaintiffs and Mr. Johnson in violation of their due process rights, Plaintiffs' and Mr. Johnson's convictions were vacated in 2015 and they were granted a new trial.

163.    Plaintiffs and Mr. Johnson remained on bond and GPS monitoring while the charges were pending against them until the dismissal of the charges on August 2016.

## Plaintiffs' Injuries

164.    In serving two decades behind bars, Mr. Wheatt and Mr. Glover were wrongfully deprived of a significant portion of their youth and adult lives. Imprisoned as teenagers and released in their late 30s, Plaintiffs must now attempt to make lives for themselves outside of prison without the benefit of the years of life experiences which ordinarily equip adults for that task.

165.    Additionally, the emotional pain and suffering caused by losing 20 years in the prime of life has been enormous. During their wrongful incarceration, Plaintiffs were stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. They missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to fall in love and marry and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being. Plaintiffs both lost important family members during their wrongful incarceration.

166.    As a result of the foregoing, Plaintiffs have suffered tremendous damage, including physical sickness and injury and emotional and economic damages, all proximately caused by Defendants' misconduct.

## Count I: Federal Law – Fourteenth Amendment
## Due Process

167.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

26

168.    In the manner described more fully above, the Defendants, while acting individually, jointly, and in conspiracy with each other, deprived Plaintiffs of their constitutional rights to due process and a fair trial.

169.    In the manner described more fully above, the Defendant Officers deliberately failed to disclose and withheld and/or suppressed exculpatory evidence from Plaintiffs, their counsel, and prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiffs.

170.    In the manner described more fully above, the Defendant Officers knowingly fabricated false evidence, including but not limited to the statements and testimony of Tamika Harris and police reports, thereby misleading and misdirecting the criminal prosecution of Plaintiffs.

171.    In the manner described more fully above, the Defendant Officers violated Plaintiffs' constitutional right to be free from identification procedures so unnecessarily suggestive and conducive to irreparable mistaken identification that the identification's use violates due process of law.

172.    The Defendant Officers' misconduct directly resulted in the unjust criminal convictions of Plaintiffs, thereby denying them their constitutional rights to due process and a fair trial guaranteed by the U.S. Constitution. By their actions, the Defendant Officers thereby misled and misdirected the criminal prosecution of Plaintiffs. Absent this misconduct, the prosecution of Plaintiffs could not and would not have been pursued, and there is a reasonable probability that they would not have been convicted.

27

173.   The constitutional injuries complained-of herein were also proximately caused by the intentional misconduct of the supervisory defendants, including Defendants Teel and Lane, or when they were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiffs' constitutional rights.

174.   Specifically, these supervisory defendants, including Defendants Teel and Lane, were aware of and facilitated, condoned, and oversaw the unconstitutional measures used by other Defendants to obtain Tamika Harris's false testimony, or were deliberately, willfully, or recklessly indifferent to their subordinates' unconstitutional tactics.

175.   Moreover, these supervisory defendants, including Defendants Teel and Lane, were aware of and facilitated, conducted, and oversaw the withholding of exculpatory evidence, but failed to disclose that information, or were deliberately, willfully or recklessly indifferent to their subordinates' unconstitutional actions in withholding exculpatory evidence.

176.   In the manner described more fully above, Defendants Marino Naiman, and Dunn deliberately failed to disclose and withheld and/or suppressed exculpatory evidence from Plaintiffs, their counsel, and prosecutors, among others, and prevented such evidence from being disclosed by the City of East Cleveland, after Plaintiffs' convictions became final and no adversarial proceedings were ongoing.

28

177.    Additionally, in the manner described more fully above, the Defendant Officers, Dunn, Marino, and Naiman violated Plaintiffs' rights to due process after trial. The withholding and suppression of the exculpatory police reports violated fundamental fairness and contravened fundamental principles of justice.

178.    The Defendants were acting under color of law and within the scope of their employment when they took these actions.

179.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

180.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that East Cleveland police officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by withholding and/or suppressing exculpatory evidence, fabricating evidence, feeding information to witnesses, engaging in use of unduly suggestive identification procedures, and engaging in leading, coercive and/or unduly suggestive questioning of witnesses, among other things. These were widespread, clear, and persistent patterns and practices of officers in the Department.

181.    These widespread practices were so well-settled as to constitute *de facto* policy in the East Cleveland Police Department, and they were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying them.

29

182.    Furthermore, the Defendant City and the Department declined to implement any or adequate policies or training on officers' obligation to preserve and disclose exculpatory and impeachment evidence, including notes, the fabrication of evidence or police reports, the obligation not to provide details of crimes to witnesses, interviews of juvenile witnesses, or unduly suggestive identification or photo array procedures, among other things, even though the need for policies and training on such topics was obvious, and the failure to do so would lead to violations of constitutional rights. The decision not to implement any or adequate policies or training in these areas also contributed to the widespread practices described above.

183.    The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment of officers who violated their obligations, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

184.    At all times relevant herein, final policymakers for the City and the Department knew of these problems, allowed them to continue, and made decisions not to implement adequate policies, training, supervision, or discipline.

185.    The constitutional violations complained of by Plaintiffs were a highly predictable consequence of a failure to equip East Cleveland police officers with the specific tools—including policies, training and supervision—to handle the recurring situations of how to handle, preserve and disclose exculpatory and impeachment evidence, how to conduct juvenile witness interviews, how to conduct witness

30

identification procedures, including photo arrays or lineups, and how to write police reports or notes of witness statements, among other things.

186.    In addition, the misconduct described herein was undertaken pursuant to the policy and practice of the Defendants City and County in that the violation of Plaintiffs' rights was committed by the relevant final policymaker for the City or County, or the persons to whom final policymaking authority had been delegated.

187.    Defendants City and County are liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, customs, and/or actions of final policymakers for these Defendants.

188.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

## Count II: Federal Law – Fourth and Fourteenth Amendments
## Due Process and Continued Detention Without Probable Cause

189.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

190.    In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, accused Plaintiffs of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to

institute and continue the judicial proceedings. The Defendant Officers made, instigated, influenced, or participated in the decision to prosecute Plaintiffs, and criminal proceedings were commenced against the Plaintiffs.

191.    There was no probable cause for the criminal prosecutions of Plaintiffs.

192.    In doing so, the Defendant Officers caused Plaintiffs to be unreasonably seized without probable cause and deprived of their liberty, in violation of their rights secured by the Fourth and Fourteenth Amendments. Plaintiffs suffered a continued deprivation of liberty apart from their initial seizures.

193.    Plaintiffs' criminal prosecution was terminated in their favor, in a manner indicative of innocence.

194.    Absent Defendant Officers' misconduct, there would have been no probable cause for Plaintiffs' continued detention, and the prosecution of Plaintiffs could not and would not have been pursued.

195.    This misconduct also caused Plaintiffs to be wrongfully convicted of crimes of which they are innocent.

196.    Additionally, the constitutional injuries complained-of herein were proximately caused by the intentional misconduct of the supervisory defendants, including Defendants Teel and Lane, or when they were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiffs' constitutional rights.

197.   Specifically, these supervisory defendants, including Defendants Teel and Lane, were aware of and facilitated, condoned, and oversaw the unconstitutional measures used by other Defendants or were deliberately, willfully, or recklessly indifferent to their subordinates' unconstitutional tactics.

198.   Additionally, in the manner described more fully above, the Defendant Officers, and Defendants Marino, Naiman and Dunn deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Plaintiffs' substantive due process rights under the Fourteenth Amendment.

199.   The Defendants were acting under color of law and within the scope of their employment when they took these actions.

200.   Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendants City and County, in the manner described more fully above.

201.   As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

### Count III: Federal Law – Denial of Access to Courts

202.   Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

33

203.    In the manner described more fully above, Defendants Marino, Naiman, Dunn, and Defendant Officers wrongfully and intentionally concealed information crucial to Plaintiffs' ability to obtain redress through the courts, and did so for the purpose of frustrating that right. Defendants Marino, Naiman, Dunn, and Defendant Officers' actions violated Plaintiffs' First, Fourth, Fifth, and Fourteenth Amendment rights, as well as Article IV of the Privileges and Immunities Clause of the U.S. Constitution.

204.    Defendants Marino, Naiman, Dunn, and Defendant Officers knew that Plaintiffs sought the police and investigatory records of the Hudson murder from the City of East Cleveland because they maintained their innocence and were trying to obtain information that would assist them in filing motions for new trial, post-conviction or habeas relief, or other redress in the courts.

205.    Defendants Marino, Naiman, Dunn, and Defendant Officers knew that without the evidence in the Department's file on the Hudson murder, Plaintiffs would not be able to obtain post-conviction, habeas, or other relief in the state or federal courts.

206.    Defendants Marino, Naiman, Dunn and Defendant Officers concealed this crucial information from Plaintiffs wrongfully and intentionally for the purpose of frustrating Plaintiffs' right to obtain post-conviction, habeas or other relief in the state and federal courts. This concealment and the delay engendered by it prevented Plaintiffs' obtaining the relief to which they were otherwise entitled for an additional 17 years.

34

207.    If it had not been for Defendants Marino, Naiman, Dunn, and Defendant Officers' interference with the City of East Cleveland's response to the public records request, the City of East Cleveland would have released the police reports and investigatory records back in 1998, just as it did when post-conviction counsel requested it in 2013.

208.    If Plaintiffs had received the exculpatory police reports at the time of their request in 1998, they could have filed motions for new trial and petitions for post-conviction relief alleging the violation of their due process rights based on the withholding of the police reports containing material, exculpatory evidence from the Petty brothers and Derek Bufford.

209.    If Plaintiffs had access to the evidence concealed from them by the Defendants, Plaintiffs' underlying claims would have been successful at that time, just as they were ultimately successful when they litigated a new trial motion using the exculpatory evidence.

210.    As a result of Defendants Marino, Naiman, Dunn, and Defendant Officers' misconduct, Plaintiffs suffered substantial prejudice to their ability to obtain relief in state and federal court. Plaintiffs lost motions for new trial, petitions for post-conviction relief, and petitions for habeas relief which they litigated from 1999 to 2013 without the exculpatory police reports. Defendants' misconduct rendered any available state court remedy ineffective.

211.    As a result of Defendants' misconduct, Plaintiffs spent an extra 17 years incarcerated until the City of East Cleveland released the reports in response

35

to Plaintiffs' public records request. The relief that Plaintiffs would have sought on their underlying due process claim is now otherwise unattainable because they can never regain those years that they lost. Plaintiffs' injury caused by Defendants Marino, Naiman, and Dunn can only be remedied completely through this denial-of-access claim against them seeking damages.

212.    The Defendants were acting under color of law and within the scope of their employment when they took these actions.

213.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendants City and County, in the manner described more fully above.

214.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

## Count IV: Federal Law – Failure to Intervene

215.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

216.    In the manner described more fully above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the opportunity to do so. That is, the Defendants observed or had reason to

know that Plaintiffs' constitutional rights were being or would be violated, and they had both the opportunity and the means to prevent harm from occurring.

217.    The Defendants were acting under color of law and within the scope of their employment when they took these actions.

218.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendants City and County, in the manner described more fully above.

219.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

## Count V: Federal Law – Conspiracy to Deprive Constitutional Rights

220.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

221.    Prior to Plaintiffs' conviction, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiffs for a crime they did not commit and thereby to deprive them of their constitutional rights, in the manner described more fully above. Together, through numerous conversations, the Defendant Officers fabricated evidence, withheld and destroyed evidence, manipulated witnesses' statements and testimony, and unlawfully undermined Plaintiffs' defenses.

37

222.    Defendants Marino and Naiman, acting in concert with other co-conspirators, known and unknown, including but not limited to the Defendant Officers and Defendant Dunn, reached an agreement among themselves to withhold exculpatory evidence from Plaintiffs, deny Plaintiffs' access to the courts, and deprive them of due process, thereby depriving them of their constitutional rights, in the manner described more fully above.

223.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiffs of these rights.

224.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity, in the manner described more fully above.

225.    The Defendants were acting under color of law and within the scope of their employment when they took these actions.

226.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

## Count VI: Ohio Law – Malicious Prosecution

227.    Each paragraph of this Complaint is incorporated as if restated fully herein.

228.    In the manner described more fully above, the Defendant Officers, acting maliciously, individually, jointly, and in conspiracy with each other, instituted or continued the prosecution of Plaintiffs without probable cause. As a consequence of the criminal prosecution, Plaintiffs were unlawfully seized, deprived of liberty, and wrongfully convicted of a crime of which they are innocent. Plaintiffs' criminal prosecution was terminated in their favor in a manner indicative of innocence.

229.    The Defendant Officers accused Plaintiffs of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

230.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

231.    Through the doctrine of *respondeat superior*, Defendant City is liable as principal for all state law torts committed by its employees or agents, including the misconduct by Defendant Officers described in this Count.

232.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering,

39

economic damages, and other grievous and continuing injuries and damages as set forth above.

## Count VII: Ohio Law – Intentional Infliction of Emotional Distress

233.    Each paragraph of this Complaint is incorporated as if restated fully herein.

234.    In the manner described more fully above, Defendants, acting individually, jointly, and in conspiracy with each other, intentionally or recklessly engaged in extreme and outrageous conduct that caused Plaintiffs serious, severe emotional distress as well as bodily harm. The Defendants' misconduct was the actual and proximate cause of Plaintiffs' emotional distress and bodily harm.

235.    The Defendants were acting under color of law and within the scope of their employment when they took these actions.

236.    Through the doctrine of *respondeat superior*, Defendants City and County are liable as principal for all state law torts committed by their employees or agents, including the misconduct by Defendants described in this Count.

237.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

## Count VIII: Ohio Law – Civil Conspiracy

238.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

239.    In the manner described more fully above, the Defendants, acting in concert with other known and unknown co-conspirators in a malicious combination, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

240.    In the manner described more fully above, in furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiffs, the intentional infliction of emotional distress upon them, the denial of their access to courts, and the deprivation of their due process rights.

241.    The Defendants were acting under color of law and within the scope of their employment when they took these actions.

242.    Through the doctrine of *respondeat superior*, Defendants City and County are liable as principal for all state law torts committed by their employees or agents, including the misconduct by Defendants described in this Count.

243.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

41

## Count IX: Ohio Law – Tortious Interference

244.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

245.    In the manner described more fully above, Defendants Naiman, Marino, Dunn, and Defendant Officers tortiously interfered with evidence and tortiously interfered with Plaintiffs' legal remedies because they withheld and concealed the exculpatory evidence discussed above, including the police reports on the Petty brothers and Derek Bufford, from Plaintiffs.

246.    At the time of Defendants' actions in 1998, there was probable litigation involving the Plaintiffs because they were conducting initial investigation into potential post-conviction claims by submitting a public records request to the East Cleveland Police Department; Defendants Naiman, Marino, Dunn, and Defendant Officers knew that such litigation was probable; Defendants Naiman, Marino, Dunn, and Defendant Officers willfully concealed or interfered with the disclosure of the exculpatory police reports, which was designed to disrupt Plaintiffs' case; and Plaintiffs' post-conviction and habeas litigation was disrupted as a result.

247.    In the manner described more fully above, Defendants Naiman, Marino, Dunn, and Defendant Officers did not merely withhold the exculpatory police reports, but they actively interfered with Plaintiffs' public records request to the City of East Cleveland in order to prevent the reports from being disclosed and to conceal the existence of the reports.

42

248. The Defendants were acting under color of law and within the scope of their employment when they took these actions.

249. Through the doctrine of *respondeat superior*, Defendants City and County are liable as principal for all state law torts committed by their employees or agents, including the misconduct by Defendants described in this Count.

250. As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

## Count X: Ohio Law – *Respondeat Superior*

251. Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

252. While committing the acts alleged in the preceding paragraphs, the Defendant Officers were employees and agents of the Defendant City, acting at all relevant times within the scope of their employment.

253. While committing the acts alleged in the preceding paragraphs, Defendants Marino and Naiman were employees and agents of the Defendant County, acting at all relevant times within the scope of their employment.

254. Defendants City and County are liable as principal for all state law torts committed by their agents.

43

## Count XI: Ohio Law – Indemnification

255.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

256.    Ohio law provides that the Defendants City and County are directed to pay any tort judgment for compensatory damages for which its employees are liable within the scope of their employment activities.

257.    The Defendants were employees of the Defendant City or County, as described above, and acted within the scope of their employment at all times relevant in committing the actions and omissions described herein.

WHEREFORE, Plaintiffs, DERRICK WHEATT and LAURESE GLOVER, respectfully request that this Court enter a judgment in their favor and against Defendants CITY OF EAST CLEVELAND, former East Cleveland Police Detective Sergeant MICHAEL C. PERRY, former East Cleveland Police Detective VINCENT K. JOHNSTONE, former East Cleveland Police Detective D.J. MIKLOVICH, former East Cleveland Police Detective Sergeant PATRICIA LANE, former East Cleveland Police Commander CHARLES TEEL, former East Cleveland Police Lieutenant JOHN C. BRADFORD, former East Cleveland Police Sergeant TERRENCE DUNN, former First Assistant at the Cuyahoga County Prosecutor's Office CARMEN MARINO, and former Assistant County Prosecutor at the Cuyahoga County Prosecutor's Office DEBORAH NAIMAN, and CUYAHOGA COUNTY, awarding compensatory damages, costs, and attorneys' fees against each Defendant, along

with punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiffs, DERRICK WHEATT and LAURESE GLOVER, hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,
DERRICK WHEATT and
LAURESE GLOVER

By: /s/ Elizabeth Wang
One of Plaintiffs' Attorneys

Michael Kanovitz
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: (312) 243-5900
mike@loevy.com
*Counsel for Plaintiffs*

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: (720) 328-5642
elizabethw@loevy.com