IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| DERRICK WHEATT and LAURESE GLOVER, | ) ) ) | No. 1:17-CV-377<br>No. 1:17-CV-611 |
| Plaintiffs | ) ) ) | Judge James S. Gwin<br>Magistrate Judge William H. Baughman, Jr. |
| v. | ) ) | |
| CITY OF EAST CLEVELAND, *et al.* | ) ) | **Plaintiffs' Joint Motion for Partial<br>Summary Judgment** |

Now come Plaintiffs, Derrick Wheatt, Laurese Glover, and Eugene Johnson, through their respective counsel, and pursuant to Federal Rule of Civil Procedure 56, hereby file this Joint Motion for Partial Summary Judgment against Defendants Perry, Johnstone, Miklovich, and Naiman. Plaintiffs were wrongfully convicted of a murder they did not commit and spent 20 years in prison before they were exonerated. Plaintiffs' conviction was the result of Defendants' unduly suggestive identification procedures and withholding of exculpatory evidence. In the absence of this misconduct, Plaintiffs would not have been prosecuted or convicted. It was only after the previously withheld exculpatory police reports came to light in 2013 that Plaintiffs were granted new trials. Plaintiffs would have obtained post-conviction relief much earlier, however, if it had not been for the misconduct of Defendant Naiman, who improperly directed the City of East Cleveland not to release the police file containing the exculpatory reports pursuant to a public records request submitted in 1998.

Because there is no genuine dispute of material fact on these issues, the Court should grant partial summary judgment: (1) against Defendants Johnstone, Miklovich, and Perry on Plaintiffs' Fourteenth Amendment due process claim of unduly suggestive identification; and (2) against Defendant Naiman on Plaintiffs' denial of access to courts claim.

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

**MEMORANDUM OF LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  The Murder of Clifton Hudson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Plaintiffs' Arrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  Defendants' Use of Unduly Suggestive Identification Procedures . . . . . . . . . . . . . . . . . . 3

IV.  Exculpatory Evidence Withheld from Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.  Exculpatory Evidence from Monica Salters and Petty Brothers . . . . . . . . . . . . . 7

      B.  Exculpatory Evidence from Derek Bufford . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      C.  The Exculpatory Evidence Was Not Disclosed to Plaintiffs, Their Trial Counsel, or the Trial Prosecutor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.  The Wrongful Convictions of Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VI.  Post-Trial Misconduct by Defendants Naiman and Marino . . . . . . . . . . . . . . . . . . . . . . 12

VII.  Exculpatory Police Reports Finally Come to Light . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VIII.  Plaintiffs' Exoneration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I.  There Is No Genuine Dispute of Material Fact on Plaintiffs' Due Process Claim for Unduly Suggestive Eyewitness Identification . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II.  Plaintiffs Are Entitled to Summary Judgment on their Denial of Access to Courts Claim (Count III) Against Defendant Naiman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

*Arizona v. Youngblood*, 488 U.S. 51 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Christopher v. Harbury*, 536 U.S. 403 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Flagg v. City of Detroit*, 715 F.3d 165 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Gregory v. Louisville*, 444 F.3d 725 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

*Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

*Howard v. Bouchard*, 405 F.3d 459 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Hutsell v. Sayre*, 5 F.3d 996 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Lott*, 366 F.3d 431 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*LaPointe v. United Autoworkers Local 600*, 8 F.3d 376 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . 7

*Manson v. Brathwaite*, 432 U.S. 98 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Neil v. Biggers*, 709 U.S. 188 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Perry v. New Hampshire*, 565 U.S. 228 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Simmons v. United States*, 390 U.S. 377 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*State v. Larkins*, 2003 WL 22510579 (Ohio Ct. App. Nov. 6, 2003) . . . . . . . . . . . . . . . . . . 14, 25

*State v. Glover*, 2010 WL 3442274 (Ohio Ct. App. Sept. 2, 2010) . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Johnson*, 2005 WL 1707012 (Ohio Ct. App. July 21, 2005) . . . . . . . . . . . . . . . . . . . . . 25

*State v. Johnson*, 2010 WL 3442282 (Ohio Ct. App. Sept. 2, 2010) . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Wheatt*, 2000 WL 1594101 (Ohio Ct. App. Oct. 26, 2000) . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Wheatt*, 2006 WL 439850 (Ohio Ct. App. Feb. 23, 2006) . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Wheat*, 2010 WL 3442286 (Ohio Ct. App. Sept. 2, 2010) . . . . . . . . . . . . . . . . . . . . . . . 25

*State ex rel. Caster v. City of Columbus*, __ N.E.3d __ 2016 WL 7448756
(Ohio Dec. 28, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*State ex rel. Steckman v. Jackson*, 639 N.E.2d 83 (Ohio 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 24

ii

*Stovall v. Denno*, 388 U.S. 293 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*United States v. Brownlee*, 454 F.3d 131 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Wade*, 388 U.S. 218 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## MEMORANDUM OF LAW

## STATEMENT OF FACTS

I.     **The Murder of Clifton Hudson**

On February 10, 1995, Clifton Hudson was shot and killed in East Cleveland. Ex. 1 (Johnson Dep.) at 10. Plaintiffs had nothing to do with his murder. Ex. 1 at 29–33; Ex. 2 (Glover Dep.) 29–33; Ex. 3 (Wheatt Dep.) at 20–22. Wheatt, Glover, and Johnson witnessed the shooting as they were in Glover's vehicle on Strathmore near a bridge at Manhattan. *Id.*; *see* Ex. 4 (State's Ex. 23). Hudson's body was found near the fire hydrant on Strathmore. Ex. 5 (Trial Tr.) at 652; Ex. 6 (Google Street View of fire hydrant). Plaintiffs drove away from the scene because they were scared. Ex. 1 at 33.

A 14-year-old girl named Tamika Harris also witnessed the shooting. Ex. 7 (9/17/04 Hrg. Tr.) at 7–8; Ex. 8 (Harris Dep.) at 7–10. Harris was walking up Strathmore towards Euclid when she heard gunshots and saw a man with a gun approaching another man. Ex. 7 at 9–10. She was standing on the opposite side of the bridge from Plaintiffs. Ex. 7 at 10; Ex. 9 (aerial map); Ex. 4 (State's Ex. 22); Ex. 5 at 650–51; Ex. 10 (Google Street View of Strathmore & Manhattan). From Harris's view, it appeared as if the shooter was coming from behind or around a 4x4. Ex. 7 at 10–11, 29–30; Ex. 8 at 9, 15. The shooter crossed the street, approached the victim, and fired shots. Ex. 7 at 12–13; Ex. 8 at 9, 16–17. After the shooting was over, Harris saw the shooter run towards Manhattan and turn right. Ex. 8 at 9. The SUV took off. *Id.* at 16. Harris could not see the shooter's face. *Id.* at 13, 17–18; Ex. 7 at 15, 28, 38. Harris needed glasses but was not wearing them that day. Ex. 7 at 20. Harris never saw the shooter get into or out of the SUV and did not hear any gunshots coming from it. *Id.* at 15–16; Ex. 8 at 14–16, 45–46.

1

After the shooter left, Harris walked over to the victim and waited for the police. *Id.* at 9–10. Harris told a police officer at the scene that she could not see the shooter's face clearly but was able to describe his clothing. *Id.* at 13, 17–18. When Harris was interviewed by Defendant Lane approximately 2 hours after the shooting, Harris stated again that she could not see the shooter's face that clearly. Ex. 11 (2/10/95 Harris statement) at 2; Ex. 7 at 39. She also described the shooter as "5'7" or taller." Ex. 11 at 2. Eugene Johnson is 6'2". Ex. 39 (Booking Record).

## II.     Plaintiffs' Arrest

Late in the evening on February 10, 1995, Wheatt and Glover were arrested by Defendants Johnstone and Perry. Ex. 5 at 752, 950–52, 954–55; Ex. 2 at 38–41; Ex. 3 at 37–39. Plaintiffs were arrested based on nothing other than the fact that Harris saw a 4x4-type vehicle at the scene of the shooting, and Glover had a 4x4-type vehicle. Ex. 12 (Perry Dep.) at 50. Glover's GMC Jimmy was impounded, and photos were taken of it. Ex. 5 at 954; Ex. 13 (Photos of vehicle). The detectives never searched Plaintiffs' homes for a gun or attempted to obtain a search warrant to search their homes for a gun. Ex. 12 at 51; Ex. 14 (Johnstone Dep.) at 96–100. No gun was ever recovered. Ex. 14 at 97. Wheatt and Glover were transported to the ECPD in separate uniform cars. Ex. 5 at 752–53.

Defendants Johnstone, Miklovich, and Perry interrogated Wheatt and Glover in the early morning hours of February 11, 1995. Ex. 15 (2/11/95 Johnstone report); Ex. 16 (2/11/95 Miklovich report); Ex. 5 at 754–64, 779–80, 792. Wheatt and Glover both told the detectives that they had been witnesses to the shooting, and that Johnson was with them. Ex. 5 at 754–64. Johnstone, Perry, and Miklovich arrested Johnson at his house later that morning. *Id.* at 764–67; Ex. 14 at 96. During their separate interrogations, each Plaintiff voluntarily told the Defendants they were witnesses to the shooting and denied involvement in the crime. Ex. 5 at 754–73, 781–

83; Ex. 15; Ex. 16; Ex. 17 (2/11/95 Johnstone report); Ex. 12 at 50. Perry took photos of the

Plaintiffs. Ex. 5 at 959–60; Ex. 18 (Photos of Pls.).

### III.  Defendants' Use of Unduly Suggestive Identification Procedures

After their interrogation of Plaintiffs, Perry, Johnstone, and Miklovich brought Harris

back to the police station for a second interview. Ex. 5 at 961–62; Ex. 19 (2/11/95 Harris

statement); Ex. 20 (2/11/95 Perry report); Ex. 7 at 46. Perry knew that Harris had been

interviewed by Lane the previous day, and he would have learned what Harris said to Lane

before he interviewed Harris. Ex. 12 at 46. Perry showed Harris photos of Glover's vehicle. Ex.

5 at 962; Ex. 13. After that, the Defendants took Harris to the police garage and showed her

Glover's vehicle. Ex. 5 at 962–63; Ex. 12 at 143. The Defendants did not show Harris any other

vehicles or photos of other vehicles. Ex. 12 at 143–44.

Then, Perry showed Harris the three photos of the Plaintiffs. Ex. 5 at 964; Ex. 18.

Johnstone and Miklovich were present. Ex. 12 at 59–60; Ex. 20. The three photos of the

Plaintiffs were the only photos Perry showed Harris. Ex. 12 at 55–56, 117; Ex. 7 at 18–19, 42–

43; Ex. 21 (4/29/04 Hrg. Tr.) at 8. Harris did not know the Plaintiffs. Ex. 7 at 22. Harris could

tell from the photos that the Plaintiffs were standing in front of lockers that they had in holding

cells. *Id.* at 18; Ex. 8 at 21–22. When the detectives showed her the three photographs, one of

them said, "out of the three here are three pictures of the suspects that we have in the shooting.

Can you identify one of them—any of them as a shooter." Ex. 7 at 43. When Harris reviewed the

photos, the detectives presented them to her "as suspects." *Id.* at 43–44. Harris picked out

Johnson's photo because the detective put his hand on it. Ex. 8 at 21; Ex. 21 at 26–27. The

detectives said, "these guys did it and they had them in jail." Ex. 7 at 31. By picking out

Johnson's photo, Harris thought that she was "just reaffirming what they [the detectives] already

knew." *Id*. She did not recognize Johnson's face. *Id*. at 19; Ex. 8 at 21. If she had been shown a photograph with a different black male wearing the same clothing, there is a possibility that she would have picked him. Ex. 7 at 19. Harris did not have a guardian with her when the detectives questioned her. *Id.* at 43–46; Ex. 8 at 19; Ex. 12 at 73, 111. Harris's February 11 statement stated that the shooter was 5'11" even though she described the shooter as four inches shorter the day before. Ex. 12 at 144. Harris's statement also claimed that Harris saw the shooter get out of and back into the SUV, even though she told the police that she only saw the shooter walk across the street from behind the vehicle, and that she did not see him get out of or into the vehicle. Ex. 8 at 45–46; *see* Ex. 19 at 1. This shows that Harris's statement contained fabrications.

After Harris picked Johnson from the three photos, the detectives said that the other two people had gunpowder residue on them. Ex. 8 at 26. This comment made Harris feel that the Plaintiffs "must have did it then." *Id*. at 27.

Harris's testimony is undisputed. Perry does not remember any of the following: what he said when he showed Harris the photos, Ex. 12 at 63; if he indicated there was a suspect in the photos, *id.*; if he put his hand on any of the photos when he showed them to Harris, or if any other detective did so, *id.* at 64–66; or if he, Johnstone, or Miklovich said anything about gunshot residue being found on anyone in the photos, *id.* at 65. Johnstone did not remember anything he said to Harris when the three photos were shown to her. Ex. 14 at 112. Perry agrees that when conducting a photo lineup or array, the detective should not indicate that there is a suspect in the lineup or array. Ex. 12 at 63. He admitted that if the detective tells a witness there's a suspect in the photos, it may cause the witness to simply pick the person who looks closest to what they think the suspect looks like. *Id.* at 64. He agreed that it would have been improperly suggestive if he had put his hand on Johnson's photo. *Id.* at 67.

4

Years after her testimony at Plaintiffs' criminal trial, during which she identified Johnson as the shooter, Harris testified that she never saw the shooter's face and could not identify Johnson. Ex. 22 (2004 Harris Aff.); Ex. 21 at 24; Ex. 7 at 47; Ex. 8 at 32–35. In 2004, Harris testified that she felt she was "led" to identify Johnson because she was only shown three photos, and the officer put his hand on Johnson's photo. Ex. 21 at 26–27. Harris continued, "I never really seen his face and I know for a fact if there were more people in the line-up, I never would have picked Eugene …." *Id.* at 29.

Perry, Johnstone, and Miklovich knew, in 1995, how to conduct a proper photo array that was not unduly suggestive. They knew a proper array had 5 or 6 photos; "filler" photos were to be similar to the suspect's photo; multiple suspects were not to be shown in the same array; and the reason for these procedures was to prevent unduly suggestive identifications. Ex. 12 at 10–15, 16–17, 24–25, 59, 119; Ex. 23 (Miklovich Dep.) at 55, 84–85; Ex. 14 at 24–25, 79–80, 116–17. Johnstone also admitted that telling a witness to try to identify someone in a photo array was unduly suggestive. Ex. 14 at 115–16. Having a sufficient number of photos gave the witness the opportunity to pick out of a group of people, so that the witness was identifying the person as accurately as possible. Ex. 12 at 24–25. These procedures were generally accepted police practice in 1995, and they were used to prevent mistaken eyewitness identifications. *See* Ex. 24 (Longo Report) at 20–22, 26–27; Ex. 25 (IACP Model Policy & Paper) at WG023261–65.

Despite his knowledge of how to conduct a proper photo array and the reasons why such procedures are necessary, Perry answered, "I don't know" when asked, "Why did you only show [Harris] photos of Wheatt, Glover, and Johnson?" Ex. 12 at 56. Perry agreed that showing Harris only the suspects' photos was inconsistent with his knowledge of how to conduct a proper array. *Id.* When asked whether he could think of any reason why he only showed Harris the three

photos, Perry speculated, "because they were juveniles," but he could not explain why what would have anything to do with how the array should be conducted. *Id.* at 56–57. Perry did not remember any training he had received informing him that the way to conduct an identification procedure with juveniles was just to show them photos of the suspects. *Id.* at 57. And, indeed, East Cleveland had no policies indicating that witnesses should be shown only the photos of the suspects if the suspects were juveniles. Ex. 26 (ECPD Policies). Perry could not recall any other case in which he showed a witness just the photos of the suspects. Ex. 12 at 61. Significantly, Perry admitted that "it's possible" that by showing Harris only the suspects' photos, he "did not give her the opportunity to choose somebody who was not a suspect in the crime." *Id.* at 61–62; *see also id.* at 118. Perry also could not think of any reason why he didn't create separate arrays for each suspect, as he had been trained, and he had no explanation for why he did not use any filler photos. *Id.* at 57–58, 62–63. Contrary to accepted practice, neither Perry nor Johnstone told Harris that the perpetrator may not be in the photo array. *Id.* at 117–18; Ex. 24 at 21.

Contrary to Perry and Miklovich's testimony, Johnstone claimed that proper photo array procedures were only used for adult suspects, not juveniles. Ex. 14 at 25–26, 82. He claimed that he was told during his training by other detectives (none of whom he could remember) that he could not use photo arrays for juvenile suspects, but he did not know of any law, regulation, or policy whatsoever that required him not to do photo arrays with juveniles. *Id.* at 28, 30–32, 82–85–86, 89.[1] In fact, Johnstone claimed that juveniles could be shown single photos ("showups") of a suspect, *id.* at 29, which were known well before 1995 to be improper and "widely condemned by the courts and by experts in law, law enforcement and law enforcement identification procedures." Ex. 25 at WG023260. Johnstone admitted that the photo array

---

[1] The ECPD Policies and Procedures Manual does not contain any instruction on photo arrays or lineups, and it does not instruct officers that they proper photo arrays are only for adults. *See* Ex. 26.

procedure for adults was to ensure fairness and prevent a "bad identification," but he claimed that this was not required for juveniles. Ex. 14 at 29–31. Johnstone could not think of any reason why proper photo arrays were required for adults but not juveniles. *Id.* at 87–88. In light of Perry and Miklovich's testimony, as well as Johnstone's own testimony about the proper way to conduct photo arrays with adults to ensure fairness, Johnstone's testimony that proper arrays were not used for juveniles does not give rise to a genuine dispute of material fact. "[T]he existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993) (internal quotation marks and citations omitted). In other words, no reasonable jury could return a verdict for Defendants on Plaintiffs' unduly suggestive identification claim based on Johnstone's testimony that proper photo arrays were not to be used with juvenile suspects.

## IV.  Exculpatory Evidence Withheld from Plaintiffs

### A.  Exculpatory Evidence from Monica Salters and Petty Brothers

On February 12, 1995, Defendant Bradford received a phone call from Monica Salters, the mother of two boys named Eddie Dante Petty and Gary Petty. Ex. 27 (Bradford Dep.) at 25–27; Ex. 28 (2/12/95 Bradford report). Salters told Bradford that Dante saw the shooting the previous day; specifically, that Dante saw the shooter come out of the post office parking lot on the east side of Strathmore, walk towards the victim on the other side of the street, take out a gun, and begin shooting at the victim. Ex. 28. Salters further told Bradford that Dante said that he had seen the suspect before, at his school, and that the suspect may have been the brother of the female classmate. *Id.* Bradford documented this information in his typed report immediately after his conversation with Salters. Ex. 27 at 27; Ex. 28. Bradford put the original report in the

7

mailbox in the patrol division designated for information directed to the detective bureau. Ex. 27 at 28–29, 31–32. Bradford did not put the report in the homicide case file because he was not in the detective bureau and did not have access to the case file. *Id.* at 30. Bradford put the report in the detectives' mailbox because it was information the detectives needed to know. *Id.* at 33. Bradford has no knowledge of whether the report was ever given to the Cuyahoga County Prosecutor's Office ("CCPO"), and nobody ever told him they had. *Id.* at 32, 35–36.

Johnstone, Miklovich, Perry, Lane, and Teel knew about the information that Salters had provided to Bradford and saw Bradford's report. Dkt. 21 (EC Defs.' Ans.) at ¶ 76 (admitting Compl. ¶¶ 81–90); Dkt. 1 (Compl.) ¶¶ 81–90; Ex. 23 at 25, 62, 69–71; Ex. 12 at 92. On February 13 and 14, 1995, Miklovich and Johnstone went to interview Eddie Dante Petty, but with no success. Ex. 23 at 19–25, 30, 62; Ex. 29 (2/13/95 Miklovich report); Ex. 30 (2/14/95 Miklovich report); Ex. 14 at 37, 41–42. After Miklovich typed his reports, he gave them to Perry to sign. Ex. 23 at 28–31. On February 15, 1995, Miklovich and Johnstone interviewed Petty. *Id.* at 31. (Miklovich's February 15 report indicates that he and Johnstone spoke with Gary Petty. Ex. 31 (2/15/95 Miklovich report). Miklovich does not remember if it is possible that he wrote down the wrong brother's name. Ex. 23 at 31, 33–34, 66; Ex. 14 at 43–44. Miklovich acknowledged that he and Johnstone had been attempting to interview Eddie, not Gary, Petty. Ex. 23 at 62–66.) Regardless of which Petty brother he interviewed, Miklovich's report accurately indicated what Petty said. *Id.* at 34–35, 66–67. Petty told Miklovich and Johnstone that as he was standing at Strathmore and Elderwood and walking toward 1706 Strathmore, he saw a male exit the post office parking lot driveway, walk across the street to another male, and shoot him. Ex. 31. Petty described the suspect as dark skinned, thin, and "as tall as his mother," who was 5'5". *Id.*

Miklovich gave his February 15 report to Perry (his supervisor) to sign, and Perry read the report before signing it. Ex. 23 at 67–68; Ex. 12 at 94, 149; Ex. 14 at 129. At that point, either Perry or Miklovich was responsible for putting the report in the case file. Ex. 23 at 28, 36. Sometimes, the supervisor would put a report in the case file, and sometimes the supervisor would give the report back to the detective to put in the case file. *Id.* at 29. In this instance, Miklovich does not remember if Perry gave his reports back to him to place in the case file. *Id.* at 68, 81. Miklovich does not know what he did with his February 15 report after Perry signed it. *Id.* at 68. Miklovich made no effort to give his February 15 report to the prosecutor, and he is not aware of any effort that anybody in the ECPD made to give the report to the prosecutor. *Id.* at 67.

Moreover, Miklovich did not take any action to put Bradford's report (or his reports from February 13 and 14) into the case file. *Id*. He does not know if anybody else took any action to put Bradford's report into the case file. *Id.* at 81. Miklovich does not know if Bradford's report was in the case file or ever turned in to the prosecutor. *Id*. at 81–82. Nor does he know if anybody made a copy of everything in the case file and gave it to the prosecutor. *Id.* at 82–83.

Perry was in charge of this investigation. Ex. 14 at 64. Perry probably would have been responsible for putting the reports in the case file after they were given to him to sign. *Id.* at 127–28. However, Perry does not remember any steps that he took to ensure that the trial prosecutor had all of the reports in the case file or to disclose the contents of the file to the prosecutor. Ex. 12 at 87–88. Perry does not remember if he gave Bradford's report to Michael Horn, the trial prosecutor, or to any prosecutor prior to the convictions in this case. *Id.* at 92. Perry does not know if the prosecutor was aware of Bradford's report at any time prior to the convictions. *Id.* at 93. Nor does he remember whether Bradford's report was in the case file, *id.* at 93, and he does

not know if Miklovich's February 15 report was in the case file, *id.* at 94–95. Perry does not

know if Miklovich or Johnstone placed the February 15 report into the case file. *Id.* at 95.

For his part, Johnstone did not place Bradford's report into the case file, and he does not

know if anybody else did. Ex. 14 at 125. Johnstone does not recall if he placed Miklovich's

February 15 report into the case file. *Id.* at 129.

Miklovich understood that, as a detective, he was required to turn over all his reports to

the prosecutor. Ex. 23 at 82. He knew that he had an obligation as a detective to document

everything, whether it was helpful or harmful to the defense, and give it to the prosecutor. *Id.* at

83–84. Perry and Miklovich agree that the information from Petty contradicted what Harris said

about how the shooting occurred, gave information of other suspects, and is information the

defense was entitled to. Ex. 12 at 93–94, 133–35; Ex. 23 at 37–41.

## B. Exculpatory Evidence from Derek Bufford

On February 13, 1995, Derek Bufford, Clifton Hudson's brother, was interviewed by

Defendant Lane. Ex. 32 (2/13/95 Lane report); Ex. 33 (Teel Dep.) at 29–30. According to Lane's

report, Bufford told Lane that he and his brother Clifton had recently been threatened by

unknown men in a Chevy Cavalier. Ex. 32 at 2–3. Bufford was shown photos of the suspects

(Plaintiffs) and their vehicle and he was unable to identify anyone or the vehicle. *Id.* at 3. Teel

reviewed the report and signed it. Ex. 33 at 29–30. He did not put the report into the case file

himself; he probably gave the report back to Lane to put into the case file. *Id.* at 31. However,

Teel does not know if Lane put the report into the case file. *Id.*

## C. The Exculpatory Evidence Was Not Disclosed to Plaintiffs, Their Trial Counsel, or the Trial Prosecutor

The information provided by the Pettys and Bufford, and the police reports relating to

them, were not disclosed to Plaintiffs or their attorneys prior to their convictions. Ex. 34

10

(Drucker Aff.) ¶¶ 1–8; Ex. 35 (Wheatt Aff.); Ex. 36 (Glover Aff.); Ex. 37 (Johnson Aff.); Ex. 38 (1/29/15 Hrg. Tr.) at 19–28, 31, 72; Ex. 40 (Drucker Dep.) at 17–19. Richard Drucker, Wheatt's trial attorney, explains that this information was exculpatory, and if the information had been disclosed to him prior to trial, he would have used it in his defense. Ex. 34 ¶¶ 9–17; Ex. 38 at 56, 58–62, 70–71, 76–77. The trial prosecutor, Michael Horn, agrees that the information from the Pettys and Bufford was exculpatory. Ex. 38 at 115–16, 131–33.

If Horn had exculpatory information, he would have disclosed it to the defense. *Id.* at 92, 94, 103, 125. Horn did not specifically recall what information he disclosed to the defense in this case, but he "most probably did" what he did in every other case, which was to give any exculpatory evidence to the defense. *Id.* at 94–95, 104–05. At the time, Cuyahoga County prosecutors disclosed exculpatory information from police reports by reading from the reports or giving summaries to the defense, rather than giving copies of the reports. *Id.* at 17–19, 93–94; Ex. 40 at 11–12. Further, Horn did not see the Pettys or Salters on any discovery list, Ex. 38 at 114–15, 117–18, which indicated that he did not know about them. Normally, the detective handling a case would bring the police file to Horn to review. *Id.* at 131. But Horn could only give to the defense what the police gave him. *Id.* at 118. Horn could not recall receiving the police reports with Petty's statement or reading Salters' statement before trial. *Id.* at 115, 131. Horn's response to discovery that he filed indicated, "[n]o exculpatory material is available to or in the possession of the Prosecuting Attorney." Ex. 41 (Resp. to Discovery) at 2. This indicated that he did not have the exculpatory evidence from Petty, Salters, or Bufford.

## V.    The Wrongful Convictions of Plaintiffs

Plaintiffs were tried for Hudson's murder in January 1996. *See* Ex. 5. The State's evidence consisted of Harris's testimony that Johnson was the shooter, that she had identified

him in the photo array, and testimony about alleged gunshot residue (GSR) on Wheatt's hands and a glove alleged to be Johnson's.[2] *See* Ex. 5 at 814–938 (Harris testimony); 1169–1204 (State's closing). Harris did an in-court identification of Johnson, Ex. 5 at 826, but she only identified him in court because she had seen him in the photo the police showed her, Ex. 7 at 20–21. The case against Plaintiffs was so weak that after the State's case, the State offered Wheatt probation and Glover dismissal of the charges *entirely* if they would testify against the other two. Ex. 5 at 1053–57. Wheatt and Glover rejected those plea offers. *Id.* On January 18, 1996, Johnson and Wheatt were convicted of murder and having a firearm during the commission of the murder, and Glover was convicted of murder. *Id.* at 1362–64. Plaintiffs were sentenced to 15 years to life and 18 years to life imprisonment. *Id.* at 1374–78.

## VI.  Post-Trial Misconduct by Defendants Naiman and Marino

By June 1998, Plaintiffs' convictions had become final, their direct appeals were over, and there was no litigation pending. Ex. 44 (Glover Docket) at 8; Ex. 45 (Wheatt Docket) at 9; Ex. 46 (Johnson Docket) at 10. There was concern in the community that Plaintiffs had been wrongfully convicted. *See* Ex. 47 (Onunwor Aff.) ¶¶ 2–3. On June 9, 1998, an attorney for Wheatt sent a letter to then-Mayor of East Cleveland Emmanuel Onunwor stating that he would "make arrangements to review the records regarding this case." Ex. 49 (6/9/98 Watson Ltr.). Onunwor was planning to turn over the police reports pursuant to the public records request. Ex. 47 ¶¶ 4–5; *see also* Ex. 38 at 129.

---

[2] The validity of the GSR evidence has since been called into question. *See* Ex. 42 (Kilty 2008 testimony) at 17–30, 54; Ex. 43 (Innocence Network amicus brief); Ex. 61 (Summary of FBI Lab Symposium) at 4–6 (discussing likelihood of GSR contamination from police vehicles and contact with armed officers). For instance, nothing was done to bag the Plaintiffs' hands to ensure that there was no contamination of their hands with GSR when they were transported to the police station or sitting at the police station. Ex. 14 at 55–56.

Before that occurred, however, someone from the ECPD called Defendant Naiman at the CCPO and told her about the public records request. Ex. 50 (Naiman Dep.) at 19, 36–37, 47–48.[3] This was completely out of the ordinary—East Cleveland's Law Director at the time, Helen Forbes Fields, states that if there were any concerns or questions about a public records request directed to the City, those were generally brought to her attention, but she has no recollection of this request ever being brought to her attention. Ex. 63 (Forbes Aff.). Naiman knew that the request was directed to East Cleveland and not the County or the CCPO. Ex. 50 at 54. The officer who called Naiman was concerned that the mayor was going to turn the file over to the mother of a defendant. *Id.* at 37–38, 40. The officer didn't say anything to Naiman indicating that he thought this was an improper criminal discovery request. *Id.* at 40. Naiman claims not to remember the specifics of her conversation, but she says that the officer must have told her what case it was in reference to. *Id.* at 39.  Naiman had nothing to do with the case. *Id.* at 18. She was not an attorney for East Cleveland, did not represent the City on anything, and she did not have any role in responding to public records requests directed to the City. *Id.* at 36. Cuyahoga County prosecutors were not legal counsel for the ECPD or the City of East Cleveland. Ex. 38 at 129.[4] At the time, Naiman was an attorney in the CCPO's child victim unit. Ex. 50 at 89–90. Nevertheless, Naiman asserts that she was concerned that the request was an "improper discovery technique" under Ohio Rule of Criminal Procedure 16. *Id.* at 40. Naiman knew that the

---

[3] Naiman testified that Defendant Dunn was the person from the ECPD who called her, but she did not specifically remember talking to him. She believed it was Dunn only because she addressed her 6/24/98 letter to him. Ex. 50 at 19; Ex. 51 (6/24/98 Ltr). At his deposition, Dunn claimed that he had never seen the 6/24/98 letter before, and that he did not take the police file to the CCPO, despite the CCPO receipt to the contrary, and despite his sworn interrogatory answer to the contrary. Ex. 62 (Dunn Dep.) at 22–25, 29–34; Ex. 54 (CCPO receipt). Dunn claimed that he did not play any role in public records requests between 1995 and 2003. Ex. 62 at 16.
[4] Even Horn could not explain why Marino or Naiman was giving legal advice to a city police department, telling them not to turn over records. Ex. 38 at 130. Nor could he say whether those police reports would have been public records. *Id.* at 137.

13

case was over, and that the appeals had been completed, but she claimed to be concerned about the potential for post-conviction proceedings. *Id.* at 41, 48.

Naiman decided to write a letter to the City directing it not to disclose the police file in response to the records request. *Id.* at 37; Ex. 51. Naiman did not consult Horn, her direct supervisor Melody White, or Prosecuting Attorney Stephanie Tubbs-Jones about this. Ex. 50 at 50, 69–70, 108. Instead, Naiman showed the letter to Carmen Marino,[5] the First Assistant at the time, who also had nothing to do with the underlying case and claims that he didn't really read it. Ex. 52 at 21–26, 51. Naiman's letter was addressed to Defendant Dunn. Ex. 51. It claimed that the "police file and its contents are not public record, thus any release could constitute a wilful [sic] violation of the law." *Id*. Naiman took no steps to figure out what in the file could be turned over under her reading of the law. Ex. 50 at 101–02. Naiman claims that she wanted to "protect the integrity … of the file" and "removing the file allowed the dust to settle and people to figure out what it is they were going to do." *Id.* at 42; *see also id.* at 60. She did not want the file being turned over to anyone. *Id.* at 42–43. But when asked who was going to decide what to do with the file later, Naiman did not know. *Id.* at 60–61, 81. She did not call East Cleveland's mayor or law director to discuss the file or any next steps. *Id.* at 66; *see also* Ex. 62 ¶ 6.

When asked why she wrote that release of the record would be a "willful violation of the law," Ex. 51, Naiman opined that public records requests could not be used as a way to get discovery in a criminal case. Ex. 50 at 55. But even Carmen Marino, the then-First Assistant of the CCPO disagreed with Naiman's claim that it would be a "willful violation of the law" for the City to disclose the police file. Ex. 52 (Marino Dep.) at 33, 35, 51. Even if the public records request were considered a criminal discovery request, Marino acknowledged that there was a

---

[5] Several courts have found that Marino suppressed exculpatory evidence as a prosecutor. *See In re Lott*, 366 F.3d 431, 433 n.1 (6th Cir. 2004); *State v. Larkins*, 2003 WL 22510579 (Ohio Ct. App. Nov. 6, 2003).

14

"pretty wide-ranging practice" throughout the State of Ohio on criminal discovery practices; some prosecutors' offices would give the defense their entire file, and others would not. *Id.* at 34–35. Prosecutors could be broader in giving discovery than what Rule 16 provided, but they could not be more restrictive. *Id.* at 49–50. It would not have been a violation of the law for the City to disclose the police file. *Id.* at 52. As Marino testified, "They could have done whatever they wanted." *Id.* Moreover, Marino agreed that Rule 16 is applicable only when the case is pending *prior to a verdict*. *Id.* at 59–60. There is a distinction, however, between a pretrial discovery request under Rule 16 and a public records request after the appeals have been exhausted. *Id.* at 59. Naiman claims that someone could have filed an "appropriate discovery request" for the file, but she could not even identify what discovery request could have been filed after all the appeals had been exhausted. Ex. 50 at 105, 110. When pressed on whether it would be a "violation of the law" for a municipality to give police records to a defendant, Naiman admitted, "I have no idea." *Id.* at 59; *see also id.* at 110. Naiman also claimed that she did not know what was in the file, and thus, she did not know whether every piece of paper that was in the file was something that she claimed the defendants were not entitled to under Rule 16. *Id.* at 65. She admitted that even under her interpretation of the law in 1998, there were certain documents that defendants were entitled to obtain through public records requests, and she did not know if any of those documents may have been in the file. *Id*. Naiman understood that prosecutors have an ongoing obligation to turn over exculpatory evidence after conviction. *Id.* at 106–07. And if there was a police report that showed an alternative reality as to how an event occurred that may exonerate a defendant, that would be self-evidently exculpatory. *Id.* at 108.

Naiman's letter also "directed" the City to turn over its entire file "forthwith" to the CCPO, including all copies. Ex. 51. She did this because she didn't want East Cleveland to have

15

any copy of the file to potentially turn over. Ex. 50 at 61–63. Removing file and all copies from East Cleveland ensured that it would not be released. *Id.* at 100, 114. She did not want the defendants to get the file because, in her opinion, she did not think that was an appropriate way to get discovery in a post-conviction proceeding, and she thought that the reason they were trying to get the file was for use in a post-conviction proceeding. *Id.* at 121–22.

There was no other instance in Naiman's 27-year career (or in Marino's 31-year career) in which either of them ever directed a municipality to turn over an original police file and all copies to the CCPO, even when there was the possibility of post-conviction litigation. *Id.* at 66, 68, 94, 96; Ex. 52 at 44, 55–56. Nor have they ever heard of another prosecutor doing anything similar. Ex. 50 at 101. It was not a practice of the CCPO to direct municipalities on how to respond to public records requests. *Id.* at 67. Nor was it a practice of the CCPO to direct municipalities to give the CCPO their entire files for "safe keeping" during the pendency of any potential post-conviction litigation. *Id.* at 67–68. To the contrary, the Ohio Records Retention Act in effect in 1998 provided that "[a]ll records are the property of the public office concerned and shall not be removed, … transferred, or otherwise … disposed of, in whole or in part …." O.R.C. § 149.351(A). Naiman was unaware of this law, and she did not research whether it would violate the law to tell East Cleveland to transfer its file to the CCPO. Ex. 50 at 83–86.

Naiman had her letter hand-delivered to East Cleveland by two CCPO investigators. *Id.* at 75. Although Onunwor had never received a request like this before, the City delivered the files to the CCPO "[i]n order to comply with the letter and so as not to violate what Marino and Naiman claimed was the law." Ex. 49 at ¶¶ 6–8. The file was delivered to the CCPO on June 26, 1998. Ex. 53 (Dunn's Interrog. Ans.) at #3; Ex. 54; Ex. 50 at 77–78. Because Naiman directed

the City to turn over "the entire department file" and "all copies," Ex. 51, the file turned over to the CCPO in 1998 would have contained the exculpatory police reports.

As Plaintiff's expert Michael O'Shea opines, it was improper for Naiman and Marino to interfere with a public records request submitted to a city. Ex. 55 (O'Shea Report) at 4–5; *see also* Ex. 38 at 137–39; Ex. 59 (3/26/15 Opinion) at WG14601. For the last 11 years, O'Shea has been the Assistant Law Director and Prosecutor for the City of Rocky River, Ohio. Ex. 55 (O'Shea CV) at 1. In that capacity, he has responded to public records requests directed to the municipality of Rocky River. Ex. 55 (O'Shea Report) at 1. O'Shea also spent three years as a felony prosecutor in the CCPO. *Id.* It was not a "violation of the law" to disclose police reports in response to a public records request, particularly when the direct appeals were over and there were no pending post-conviction proceedings. *Id.* at 5. Moreover, the City was legally required, under the Ohio Records Retention Act, to retain its own police file and not transfer it to the CCPO. *Id.* at 6. Defendant Naiman's directive to the City ordering it to turn the file and all copies over to the CCPO was a violation of the law. As a result of Naiman's letter, the City did not release the police file relating to the Hudson murder in 1998. Ex. 47 ¶ 8.

## VII.    Exculpatory Police Reports Finally Come to Light

In 2013, the Ohio Innocence Project ("OIP"), which represented Wheatt and Glover, submitted a public records request to the ECPD requesting all documents related to the murder of Hudson. *See* Ex. 56 (Godsey Aff.) ¶ 2; Ex. 48 (8/19/13 Gerhard fax with 4/8/13 OIP letter). The ECPD produced the police file, which, at that time, included the exculpatory police reports relating to Petty and Bufford. *See* Ex. 56 (police reports attached as Ex. B). The City and the ECPD asserted no objections to producing the file. *See* Ex. 48. Copies of the police reports were provided to Wheatt, Glover, and Johnson in 2014 by their counsel for their review. Ex. 2 at 44–

17

46; Ex. 3 at 15–16; Ex. 1 at 49–52. This was the first time that the Plaintiffs learned about the statements from Petty and Bufford. Ex. 35; Ex. 36; Ex. 37.

## VIII.  Plaintiffs' Exoneration

After the exculpatory evidence came to light, Plaintiffs filed motions for new trial. Ex. 57 (8/26/14 Mot. NT); Ex. 58 (12/5/14 Mot. NT). On March 26, 2015, the Court of Common Pleas granted Plaintiffs' motions, Ex. 59, which was affirmed on appeal. Ex. 60 (5/5/16 Opinion).

## ARGUMENT

### I.  There Is No Genuine Dispute of Material Fact on Plaintiffs' Due Process Claim for Unduly Suggestive Eyewitness Identification.

Plaintiffs have a constitutional right "to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Gregory v. Louisville*, 444 F.3d 725, 745–46 (6th Cir. 2006). Under a due process claim for unduly suggestive identification, "police officers must evaluate the totality of the circumstances and reach a reasoned conclusion as to whether an identification procedure is impermissibly suggestive or not." *Id*. (citing *Stovall v. Denno,* 388 U.S. 293, 302 (1967), and *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)). There is a two-step inquiry for analyzing whether a criminal defendant was denied due process of law: "First, we assess whether the identification was unnecessarily suggestive. If so, we then consider whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure." *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007).

Here, there is no genuine dispute of material fact that Harris's pretrial identification was procured by an unnecessarily suggestive photo array. First, Harris testified that Perry put his hand on Johnson's photo, which clearly suggested that he was the person Harris should identify as the shooter. Because Perry does not remember whether he put his hand on Johnson's photo,

18

Harris's testimony is undisputed. *Howard v. Bouchard*, 405 F.3d 459, 469–70 (6th Cir. 2005) (Gwin, J., sitting by designation) ("Unnecessary suggestiveness generally depends 'upon whether the witness's attention was directed to a suspect because of police conduct.'"). Second, Defendants Perry, Johnstone, and Miklovich used only the three photographs of the Plaintiffs, which were presented to Harris as the suspects. Defendants have no memory of what they said to Harris when they showed her the three photos. Thus, Harris's testimony that the photos were presented to her "as suspects" is undisputed. Perry even conceded that it was "possible" that the suspect-only photo array did not provide Harris a fair opportunity to choose someone who was not a suspect in the crime.[6] And, the photos themselves were suggestive because there were lockers in the background, which Harris took to mean the Plaintiffs were suspects in custody. Moreover, Plaintiffs' police practices expert opines that the procedure used by the Defendants was contrary to generally accepted police practices in 1995, and the Defendants themselves admit that they understood at the time that a proper photo array consisted of 5 or 6 photos, with only one suspect in each array, and with the fillers who had similar physical characteristics as the suspect. As a 1993 paper from the International Association of Chiefs of Police states:

> Of all investigative procedures employed by police in criminal cases, probably none is less reliable than the eyewitness identification. Erroneous identifications create more injustice and cause more suffering to innocence persons than perhaps any other aspect of police work. Proper precautions must be followed by officers if they are to use eyewitness identifications effectively and accurately.

Ex. 25 at WG023263. And finally, although Harris only picked out Johnson as the shooter from the three-photo array, Defendants' use of the unduly suggestive identification procedure violated Wheatt and Glover's due process rights as well because the Defendants knew that the three Plaintiffs were together in Glover's vehicle. Harris's selection of Johnson's photo implicated

---

[6] In any event, "what triggers due process concerns is police use of an unnecessarily suggestive identification procedure, whether or not they intended the arranged procedure to be suggestive." *Perry v. New Hampshire*, 565 U.S. 228, 232 n.1 (2012).

Wheatt and Glover in the crime. The prosecution used Harris's identification of Johnson against Wheatt and Glover as well as Johnson, to show that they acted together. *See* Ex. 5 at 1176–88, 1199–1201. Furthermore, by not presenting Harris with a photo array that contained photos of anyone other than the suspects, the Defendants ensured that she could not select someone other than one of the Plaintiffs. Showing only the photos of the three suspects is little different from a show-up (showing only a photo of one suspect), which is "inherently suggestive because, by its very nature, it suggests that the police think they have caught the perpetrator of the crime." *United States v. Brownlee*, 454 F.3d 131, 138 (3d Cir. 2006) (citing *Stovall*, 388 U.S. at 302).

Second, there is no genuine dispute of material fact on whether Harris's identification was nevertheless reliable despite the impermissible suggestiveness of the identification procedure. In judging reliability, the court must consider the totality of the circumstances, including "(1) the opportunity of the witness to view the defendant at the initial observation; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the level of certainty shown by the witness at the pretrial identification; and (5) the length of time between the initial observation and the identification." *Howard*, 405 F.3d at 472. These factors must be weighed against any "corrupting effect of the suggestive identification." *Id.* On balance, the factors point to the unreliability of Harris's identification. First, Harris did not have a good opportunity to see the shooter initially: she never saw the shooter's face, could only describe clothing, and was not wearing her glasses. Second, Harris may have had reason to be attentive, since she was witnessing a shooting, but she was also trying to hide behind the bridge at the same time. Third, Harris's original description of the defendant was not accurate— not only did she say to Lane that she did not see the shooter's face, but she described him as "5'7" or taller." Johnson is 6'2". Fourth, Harris was never certain of her identification of

20

Johnson; she told Lane that she did not see the shooter's face that clearly, and the next day, she told the detectives that she did not see the shooter's face and never saw the shooter get out of or get back into the SUV. She picked Johnson's photo because Perry's hand lingered on it and because of what Johnson was wearing in the photo. Fifth, there was not a great length of time between the initial observation and the identification.

There are additional factors that weigh against reliability. First, Harris and the Plaintiffs were strangers. *Haliym*, 492 F.3d at 706 (The "primary concern expressed in cases discussing the problems with eyewitness identification relates to a witness observing and subsequently identifying a stranger.") (internal quotation marks omitted); *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977) ( "Usually the witness must testify about an encounter with a total stranger under circumstances of emergency of emotional stress. The witness' recollection of the stranger can be distorted easily by the circumstances or by later actions of the police."); *see also United States v. Wade*, 388 U.S. 218, 228 (1967). Second, Harris was only 14 years old. "Studies show that children are more likely to make mistaken identifications than are adults." *Haliym*, 492 F.3d at 707 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 72 n.8 (1988) (Blackmun, J., dissenting)). Overall, these factors weigh against the reliability of Harris's identification. No reasonable jury could decide otherwise.

Harris's unduly suggestive identification was used against Plaintiffs at their trial, *see* Ex. 5 at 840–41, 964–65, and Harris's subsequent in-court identification of Johnson was tainted by the earlier suggestive photo identification, Ex. 7 at 20–21; Ex. 5 at 826. *See Simmons v. United States*, 390 U.S. 377, 383–84 (1968). Not only was the three-photo array of the Plaintiffs suggestive, but Defendants reinforced the suggestion that the Plaintiffs were the perpetrators by their comments to Harris after she picked out Johnson's photo. Defendants said that the "other

21

two" had gunpowder on them and that the Plaintiffs were the suspects they had in custody. Ex. 8 at 25–26. All of this caused Harris's false testimony against Plaintiffs at trial. Thus, Defendants Perry, Johnstone, and Miklovich violated Plaintiffs' core due process right to a fair trial. *See Gregory*, 444 F.3d at 746; *Hutsell v. Sayre*, 5 F.3d 996, 1005 (6th Cir. 1993).

## II.  Plaintiffs Are Entitled to Summary Judgment on their Denial of Access to Courts Claim (Count III) Against Defendant Naiman

In *Christopher v. Harbury*, 536 U.S. 403, 413–14 (2002), the Supreme Court explained that "backward-looking" denial of access to courts claims covers "claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." This includes the "loss of an opportunity to sue" or "seek some particular order of relief," *id.* at 414, such as the loss of Plaintiffs' ability to obtain post-conviction relief years earlier due to Defendant Naiman's obstructive acts in response to the 1998 public records request. As the Court explained, "[t]he ultimate object of these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future." *Id.*; *see Swekel v. City of River Rouge*, 119 F.3d 1259, 1262 (6th Cir. 1997) ("if a party engages in actions that effectively cover-up evidence and this action renders a plaintiff's state court remedy ineffective, they have violated his right of access to the courts."); *Flagg v. City of Detroit*, 715 F.3d 165, 173 (6th Cir. 2013) ("In backward-looking claims, such as those at issue in the instant case, the government is accused of barring the courthouse door by concealing or destroying evidence so that the plaintiff is unable to ever obtain an adequate remedy on the underlying claim."). In order to prevail on this denial of access to courts claim, Plaintiffs must prove: (1) a non-frivolous underlying claim; (2) obstructive actions by state actors; (3) substantial prejudice to the underlying claim that cannot be remedied by the state court; and (4) a

request for relief which the plaintiff would have sought on the underlying claim and is now otherwise unattainable. 715 F.3d at 174. There is no genuine dispute of material fact on Plaintiffs' denial of access to courts claim against Defendant Naiman.

First, Plaintiffs clearly had a non-frivolous underlying claim: the underlying claim upon which Plaintiffs won a new trial and release from prison in 2015 was the Fourteenth Amendment due process (*Brady*) violation caused by the withholding of the exculpatory police reports. Once Plaintiffs obtained the exculpatory evidence, they filed motions for new trial, which were granted and affirmed on appeal. The appellate court found the evidence was exculpatory and there is a reasonable probability that the outcome of the trial would have been different if the evidence had not been withheld. *See* Ex. 60 at WG014263–75. It cannot be disputed that this underlying Fourteenth Amendment due process claim is non-frivolous.

Second, Defendant Naiman, a state actor, admitted to taking obstructive actions to prevent Plaintiffs from obtaining the police file. She told the City that release of the file would be in "violation of the law" when it would not and directed the City to turn over the file and all copies. She admitted that she did this because she did not want the City to release the file, and she understood that the reason the Plaintiffs wanted the file was for use in potential post-conviction proceedings. According to both Marino and Plaintiffs' expert O'Shea, it would not have been a violation of the law for the City to release the file, and Naiman had no legal authority to direct the City how to respond to a public records request in the first place. The fact that Naiman denies knowing there was exculpatory evidence in the file is irrelevant. The question is whether Naiman took "obstructive actions" to prevent the file's release; she admits that she did, and there was no authority for her to do what she did. *See Swekel*, 119 F.3d at 1262 ("Several courts have found that a state official's actions in covering-up evidence amounted to a

23

denial of access to the courts."). Naiman obstructed Plaintiffs' efforts to vindicate their due process rights through judicial redress, which (in turn) interfered with their right of access to courts under the First and Fourteenth Amendments. *See id.* The Court of Common Pleas' findings regarding the Naiman/Marino letter are instructive: the

> letter is proof positive that the State (by and through Marino) was aware of the police reports it had suppressed; otherwise there would have been no need for the letter directing the East Cleveland Police Department to 1) willfully disregard any lawful request for public records and 2) additionally, send the reports only to the Cuyahoga County Prosecutor's Office Investigators. … the evidence herein supports the conclusion that Marino did have the exculpatory evidence and that he definitely concealed it from the defense, and may very likely have concealed it from Mr. Horn. …Circumstantially, one can conclude that indeed Marino knew about the exculpatory evidence, and that indeed he obstructed the legal process by concealing it from everyone, not only during the pendency of the pretrial phase and the trial, but also for years beyond, through his letter, in 1998.

*Id.* at WG14600–01.

Defendant Naiman may argue that under *State ex rel. Steckman v. Jackson*, 639 N.E.2d 83 (1994), post-conviction petitioners did not have a right to obtain police reports under the Ohio Public Records Act for use in post-conviction proceedings. Although *Steckman* allowed governmental entities to claim that police reports were exempt from disclosure under the Public Records Act as "investigatory work product," governments could—and did—disclose them if they wanted to. *See* Ex. 52 at 52. Mayor Onunwor wanted to and would have disclosed the police file if the City had not received that June 24, 1998 letter from Naiman. Thus, *Steckman* did not prevent Plaintiffs from obtaining the exculpatory police reports in 1998—Naiman did. Perhaps the best evidence of this is that the ECPD freely produced the police file to Plaintiffs when they submitted a new public records request in 2013, at a time when *Steckman* remained the law. (*Steckman* was not overturned until *State ex rel. Caster v. City of Columbus*, __ N.E.3d __ (2016), 2016 WL 7448756 (Ohio Dec. 28, 2016)). The difference in 2013 was that no one from the CCPO interfered with the City's response to the records request. Plaintiffs were allowed to

use police reports in support of their post-conviction claims, and they did, successfully. *See Larkins*, 2003 WL 22510579, at *3; Ex. 59, 60.

Third, Defendant Naiman's obstructive actions caused substantial prejudice to Plaintiffs' underlying claims for post-conviction relief. Before Plaintiffs filed their motion for new trial based on the exculpatory police reports in 2014, they had filed other, unsuccessful motions for new trial and petitions for post-conviction relief. *See* Exs. 44, 45, 46.[7] As this Court previously explained, "the state court cannot remedy this prejudice—Plaintiffs were unsuccessful in pursuing their claims without the exculpatory evidence for seventeen years." Dkt. 40 at 17 n.111.

Fourth, relief on the underlying claim (in state court) that Plaintiffs would have sought—post-conviction relief back in 1998—is now otherwise unattainable. As this Court previously explained, "Plaintiffs must (1) seek relief in this Court that (2) they would have sought in their state post-conviction case, but (3) cannot seek now." *Id.* at 17. Plaintiffs' state court remedy was rendered ineffective because they were frustrated in their ability to obtain state post-conviction or other relief using the exculpatory police reports until the reports were finally produced in 2013. *See id.* Plaintiffs seek damages for the additional 17 years they spent in prison due to Defendant Naiman's obstructive actions.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant summary judgment in their favor (1) against Defendants Johnstone, Miklovich, and Perry on their Fourteenth Amendment due process claim of unduly suggestive identification; and (2) against Defendant Naiman on their denial of access to courts claim.

---

[7] *See State v. Wheatt*, 2000 WL 1594101 (Ohio Ct. App. Oct. 26, 2000); *State v. Wheatt*, 2006 WL 439850 (Ohio Ct. App. Feb. 23, 2006); *State v. Wheat*, 2010 WL 3442286 (Ohio Ct. App. Sept. 2, 2010); *State v. Glover*, 2010 WL 3442274 (Ohio Ct. App. Sept. 2, 2010); *State v. Johnson*, 2005 WL 1707012 (Ohio Ct. App. July 21, 2005*); State v. Johnson*, 2010 WL 3442282 (Ohio Ct. App. Sept. 2, 2010).

Respectfully submitted,
s/ Elizabeth Wang

Michael Kanovitz                     Elizabeth Wang
LOEVY & LOEVY                        LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.         2060 Broadway, Ste. 460
Chicago, IL 60607                    Boulder, CO 80302
O: (312) 243-5900                    O: (720) 328-5642
mike@loevy.com                       elizabethw@loevy.com
*Counsel for Plaintiffs Derrick Wheatt and Laurese Glover*

s/ Michael B. Pasternak
Michael B. Pasternak                 Brett Murner
Park Center II, Suite 411            208 North Main Street
3681 South Green Road                Wellington, OH  44090
Beachwood, OH  44122                 O: (440) 647-9505
O: (216) 360-8500                    bmurner@yahoo.com
Mpasternak1@msn.com
*Counsel for Plaintiff Eugene Johnson*

26

## <u>CERTIFICATE OF SERVICE</u>

I, Elizabeth Wang, an attorney, hereby certify that on September 18, 2017, I served via CM/ECF the foregoing Plaintiffs' Motion for Partial Summary Judgment, which delivered it to all counsel of record via electronic service.

s/ Elizabeth Wang
Attorney for Plaintiff

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Memorandum complies with the 25-page limitation for the Memorandum of Law allowed by the Court's order dated August 24, 2017.

s/ Elizabeth Wang