IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| DERRICK WHEATT and LAURESE GLOVER, | ) ) ) | No. 1:17-CV-377<br>No. 1:17-CV-611 (consolidated) |
| Plaintiffs | ) ) | Judge James S. Gwin |
| v. | ) ) ) ) | **Plaintiffs' Joint Response to East Cleveland Defendants' Motion for Summary Judgment** |
| CITY OF EAST CLEVELAND, et al. | ) | |

Now come Plaintiffs, Derrick Wheatt, Laurese Glover, and Eugene Johnson, through

their respective counsel, and pursuant to Federal Rule of Civil Procedure 56, hereby file this

Joint Response to the East Cleveland Defendants' Motion for Summary Judgment.

Due to the misconduct of Defendants Perry, Johnstone, Miklovich, Teel and Lane,

Plaintiffs were wrongfully convicted and spent 20 years in prison for a murder they did not

commit. As discussed in detail in the Memorandum of Law that follows, Defendants violated

Plaintiffs' due process rights by withholding exculpatory evidence and fabricating evidence in

the form of Tamika Harris's identification of Eugene Johnson. Defendants also violated

Plaintiffs' Fourth Amendment right to be free from continued detention without probable cause.

Furthermore, Plaintiffs would have been released years earlier if Defendants Teel and Dunn had

not worked with Defendant Naiman to prevent the police file's release in response to a 1998

public records request. In taking those obstructive actions, Defendants denied Plaintiffs their

constitutional right to access to courts.

A trial is required on all of these claims. As discussed below, Defendants' motion for

summary judgment should be denied in part.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

**MEMORANDUM OF LAW** ..........................................................................................1

**STATEMENT OF FACTS** .............................................................................................1

**ARGUMENT** ...................................................................................................................1

I.      A Reasonable Jury Could Find for Plaintiffs on Their Unduly Suggestive Eyewitness
        Identification Claim against Defendants Perry, Miklovich, and Johnstone........................1

II.     A Reasonable Jury Could Find for Plaintiffs on Their Suppression of Evidence Claim
        against Defendants Perry, Johnstone, Miklovich, Lane, and Teel......................................4

        A.      A Reasonable Jury Could Conclude that the Exculpatory or Impeachment Value
                of the Petty Brothers' Statements Was Apparent, and that the Statements Were
                Material ..................................................................................................................5

        B.      A Reasonable Jury Could Conclude that Derek Bufford's Statement Was
                Withheld by Defendants Lane, Teel, Perry, Johnstone, and Miklovich ...............11

        C.      Defendants Perry, Johnstone, and Miklovich Suppressed the Extent of Their
                Manipulation of Tamika Harris, and These Facts Were Exculpatory
                And Material .........................................................................................................12

III.    A Reasonable Jury Could Find in Plaintiffs' Favor on Their Continued Detention
        without Probable Cause and State Law Malicious Prosecution Claims against
        Defendants Perry, Johnstone, and Miklovich ...................................................................13

IV.     A Reasonable Jury Could Find for Plaintiffs on Their Fabrication of Evidence Claim
        against Defendants Perry, Johnstone, and Miklovich.......................................................16

V.      A Reasonable Jury Could Find for Plaintiffs on Their Denial of Access to Courts
        Claim against Defendants Dunn and Teel ........................................................................18

VI.     Plaintiffs' Conspiracy, Failure to Intervene, Intentional Infliction of Emotional
        Distress, and Respondeat Superior Claims Should Not Be Dismissed.............................20

**CONCLUSION** ..............................................................................................................20

# TABLE OF AUTHORITIES

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017)........................................................20

*Ayers v. City of Cleveland*, 2013 WL 775359 (N.D. Ohio Feb. 25, 2013) ................................17

*Brady v. Maryland*, 373 U.S. 83 (1963) ......................................................................................4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................1

*In re Siggers*, 615 F.3d 477 (6th Cir. 2010)................................................................................13

*Edwards v. Honeywell*, 960 F.2d 673 (7th Cir. 1992) ..................................................................5

*Elkins v. Summit Cnty.*, 2009 WL 1150114 (N.D. Ohio. Apr. 28, 2009) ......................................4

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) ........................................................................13

*Flagg v. City of Detroit*, 715 F.3d 165 (6th Cir. 2013)................................................................18

*Giglio v. United States*, 405 U.S. 150 (1972) ...............................................................................4

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)...........................................13, 16, 17

*Halsey v. Pfeiffer*, 750 F.3d 273, 289 (3d Cir. 2014)................................................................. 17

*Harris v. Bornhorst*, 513 F.3d 503 (6th Cir. 2008)................................................................14 ,15

*Harris v. Lafler*, 553 F.3d 1028 (6th Cir. 2009) ..........................................................................9

*Howard v. Bouchard*, 405 F.3d 459 (6th Cir. 2005)....................................................................3

*King v. Harwood*, 852 F.3d 568 (6th Cir. 2017)........................................................................14

*Kyles v. Whitley*, 514 U.S. 419 (1995) ..........................................................................4, 8, 13

*Manuel v. City of Joliet*, 137 S. Ct. 911 (2017) ........................................................................13

*McPherson v. Kelsey*, 125 F.3d 989 (6th Cir. 1997)...................................................................20

*Miller v. Field*, 35 F.3d 1088 (6th Cir. 1994) ........................................................................3, 15

*Miller v. Maddox*, 866 F.3d 386 (6th Cir. 2017)............................................................. 1, 14, 15

*Mills v. Barnard*, __ F.3d __, 2017 WL 3687434 (6th Cir. Aug. 28, 2017)...............................14

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009)............................................................4

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546 (6th Cir. 2008).........................................................5

*Smith v. Cain*, 565 U.S. 73 (2012) .................................................................................................9

*Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999) ..................................................................16

*State ex rel. Steckman v. Jackson*, 639 N.E.2d 83 (Ohio 1994).....................................................20

*Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731 (7th Cir. 2006)...................................................5

*Sykes v. Anderson*, 625 F.3d 24 (6th Cir. 2010) ......................................................................13, 14

*United States v. Bagley*, 473 U.S. 667 (1985) ...............................................................................4

*Webb v. United States*, 789 F.3d 647 (6th Cir. 2015) ...................................................................16

## MEMORANDUM OF LAW

Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017). The East Cleveland Defendants failed to cite to any evidence and failed even to attach any exhibits to their Motion.[1] *See* Dkts. 84, 85. Having not presented any evidence that they are entitled to summary judgment, Defendants have not carried their initial burden, and the court could deny their motion on this basis alone.

## STATEMENT OF MATERIAL FACTS

Plaintiffs incorporate by reference the Statement of Facts in their Joint Motion for Partial Summary Judgment ("Joint Motion"), Dkt. 86, as well as their previously-filed Exhibits, Dkts. 79-1 to 79-63.[2] For ease of reference, Plaintiffs discuss their additional material facts that create a genuine dispute on each claim within the argument sections below.

## ARGUMENT

**I.    A Reasonable Jury Could Find for Plaintiffs on Their Unduly Suggestive Eyewitness Identification Claim against Defendants Perry, Miklovich, and Johnstone.**

Plaintiffs incorporate by reference the evidence and arguments on this claim presented in their Joint Motion. Dkt. 86. Plaintiffs are entitled to judgment on this claim against Defendants

---

[1] Defendants' assertion in their "Introduction" that Plaintiffs were gang members is utterly unsupported. Plaintiffs deny any involvement in a gang. Dkt. 79-1 (Johnson Dep.) at 28, 33; Dkt. 83-1 (Glover Dep.) at 25–26, 62. For his part, Defendant Johnstone does not recall if he knew anything about the Plaintiffs or Hudson, does not remember if Plaintiffs were part of any gang, and does not know if Hudson was even selling drugs when he was standing on Strathmore on February 10, 1995. Dkt. 79-14 (Johnstone Dep.) at 134–35.

[2] In preparing this Response, Plaintiffs' counsel realized that two versions of Plaintiffs' Exhibit 30 had been erroneously attached as Exhibits 30 and 31. *See* Dkts. 79-30 & 79-31. Exhibit 31 to Plaintiffs' Joint Motion was supposed to be Defendant Miklovich's February 15, 1995 report of his interview with Gary Petty (Bates CITY000468). Plaintiffs attach that report to this Response as Exhibit 65. The exhibits attached to this brief will be numbered consecutively to Plaintiffs' previously-filed exhibits. *See* attached Exhibit List.

1

Perry, Miklovich, and Johnstone. *See id.* at 22–26.[3] Even if the Court found that judgment for Plaintiffs is not warranted, there is at least a genuine dispute of material fact requiring trial.

First, Harris's pretrial identification was procured by an unnecessarily suggestive photo array. Dkt. 86 at 22–24. Not only is it undisputed that only the photos of Plaintiffs were used, and that this was unduly suggestive, Dkt. 79-12 (Perry Dep.) at 55–56; Dkt. 79-7 (9/17/04 Hrg. Tr.) at 18–19, 42–43; Dkt. 79-21 (4/29/04 Hrg. Tr.) at 8, but according to Harris, Perry put his hand on Johnson's photo, Dkt. 79-8 (Harris Dep.) at 21; Dkt. 79-21 at 26–27. Defendants also made suggestive comments, such as "these guys did it and they had them in jail," and Harris could tell from the photos that Plaintiffs were in custody. Dkt. 79-7 at 18, 31; Dkt. 79-8 at 21–22. A reasonable jury could find that the array was unduly suggestive, and that reasonable detectives knew this at the time. Dkt. 79-24 (Longo Report) at 20–22, 26–27; Dkt. 79-25 (IACP Model Policy & Paper) at WG023261–65; Dkt. 79-12 at 10–17, 24–25, 56–59, 61-63, 118–19; Dkt. 79-23 (Miklovich Dep.) at 55, 84–85; Dkt. 79-14 (Johnstone Dep.) at 24–25, 79–80, 116–17.

Second, a reasonable jury could conclude that Harris's identification was not reliable. *See* Dkt. 86 at 24–26. Defendants make no real effort to analyze the factors, and what little effort they make is difficult to follow and rooted in disputed facts. *See* Dkt. 84 at 8–10. For instance, Harris did not have an opportunity to view the shooter—she said in her statement to Lane that she did not see the shooter's face, could only describe clothing, and was not wearing her glasses. Dkt. 79-8 at 13, 17–18; Dkt. 79-7 at 15, 28, 38–39; Dkt. 79-11 (2/10/95 Harris statement) at 2. Harris also described the shooter as half a foot shorter than Johnson; she said to Lane that he was "5'7" or taller," but Johnson is 6'2". Dkt. 79-11 at 2; Dkt. 79-39 (Booking Record). Defendants

---

[3] Page citations to depositions and transcripts are to the page number of the transcript; page citations to other docket entries are to the page number of the docket entry in the file stamp at the top of the page.

argue that Harris identified Johnson, but they rely on disputed facts—Harris said she never saw the shooter's face, and she only picked out Johnson's photo because Perry put his hand on it.

Defendants argue that a statement by a witness named Lee Malone in a police report corroborates Harris's identification. *See* Dkt. 84 at 9. But this is legally and factually wrong. First, Defendants haven't even submitted to the police report to the court. Second, Malone's statement to a police officer as reflected in a police report is hearsay. *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994) (statements of witnesses contained within a police report constitute inadmissible hearsay). Third, the reliability inquiry is about whether the *witness* (Harris)'s identification was otherwise reliable, under the totality of the circumstances, despite any unduly suggestive identification procedure. *Howard v. Bouchard*, 405 F.3d 459, 469–70 (6th Cir. 2005). What other witnesses said is irrelevant, and Defendants haven't cited any cases supporting their position. Fourth, and perhaps most important, Malone *did not provide any statement corroborating an identification of Johnson as the shooter, or that anyone even got out of or into the SUV*. In fact, Malone testified for the defense at trial. He testified that when he was standing on Ardenall, he heard gunshots. Ex. 64 (Trial Tr.) at 1076. He saw an SUV (described as a "Bronco") drive down Ardenall and saw a man running *behind* the SUV, *put something into his pants*, and run up the railroad tracks. *Id.* at 1077, 1079–80, 1086–87, 1101. Malone testified that the man *did not get into the truck*, *id.* at 1080, and the man was not any of the Plaintiffs, *id.* at 1081, 1087, 1108–09. Malone also testified that he told Johnstone and Perry all of this when they interviewed him. *Id.* at 1081–85, 1087–88. However, Perry and Johnstone told Malone that they already "got three guys that they wanted." *Id.* at 1088, 1102. Johnstone has no recollection of this interview, but he confirmed that Malone didn't say to him or to any other officer in his presence that he saw anyone get out of the vehicle that was seen at the scene. Dkt. 79-14 at 133.

3

In sum, a reasonable jury could conclude that the photo array that Defendants Perry, Johnstone, and Miklovich used with Tamika Harris was unduly suggestive, and that Harris's identification of the shooter was not otherwise reliable. Defendants' motion for summary judgment on this claim must be denied.

## II.  A Reasonable Jury Could Find for Plaintiffs on Their Suppression of Evidence Claim against Defendants Perry, Johnstone, Miklovich, Lane, and Teel.

Government officers' suppression of exculpatory or impeachment evidence deprives the criminal defendant of his constitutional right to due process, if the suppression undermines confidence in the outcome of the trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In *Moldowan v. City of Warren*, the Sixth Circuit held that *Brady* imposes an obligation on the police to disclose apparently exculpatory evidence, and this right was clearly established prior to August 1990. 578 F.3d 351, 381–82 (6th Cir. 2009); *see also Elkins v. Summit Cnty.*, 2009 WL 1150114, at *3–*6 (N.D. Ohio. Apr. 28, 2009) (denying summary judgment to officers on *Brady* claim for failure to disclose exculpatory memo).[4]

Plaintiffs allege that Defendants suppressed the following pieces of apparently exculpatory or impeaching evidence: (1) the information provided by Monica Salters and Eddie Dante and Gary Petty; (2) the information provided by Derek Bufford; and (3) the Defendants' manipulation of Tamika Harris during the photo array. In seeking to dismiss Plaintiffs' suppression of evidence claims, Defendants argue only the following: (1) the Petty brothers' statements were not apparently exculpatory or material, and (2) Bufford's name was disclosed by

---

[4] Defendants cite an outdated case for the proposition that the criminal defendant must make a request for the evidence. Dkt. 84 at 10. This has not been the law since *Bagley*, 473 U.S. at 682 (no request required).

4

the prosecution, so Bufford's statement was not suppressed by the Defendants. *See* Dkt. 84 at

10–13. Defendants do not address (3). *Id.* Plaintiffs respond to Defendants' arguments below.[5]

A. **A Reasonable Jury Could Conclude that the Exculpatory or Impeachment Value of the Petty Brothers' Statements Was Apparent, and that the Statements Were Material.**

There is sufficient evidence for a reasonable jury to find in Plaintiffs' favor on this claim

against Defendants Perry, Johnstone, Miklovich, Lane, and Teel. Plaintiffs incorporate by

reference the evidence on this claim presented in their Joint Motion. Dkt. 86 at 7–12.

(Defendants Johnstone, Perry, Miklovich, Lane, and Teel knew of the information in Bradford's

2/12/95 report containing Monica Salters' statement, and all of them also knew of the

information in Miklovich's 2/15/95 report containing Petty's statement. *Id.*; *see also* Dkt. 21 (EC

Defs.' Answer) ¶¶ 76, 94 (admitting paragraphs 80–92 and 94–101 of Complaint); Dkt. 1

(Compl.) ¶¶ 80–92, 94–101.) None of Defendants' arguments have merit.

Defendants argue that prosecutor Michael Horn "was clearly aware of at the very least

the existence of Eddie Dante Petty as a witness" because his name appears on the same police

report as Leroy Malone's statement, and that police report was disclosed. Dkt. 84 at 11.

Defendants do not submit any evidence for this to the court. In any event, their argument fails for

several reasons. First, a reasonable jury could conclude that Defendants did not give the two

Petty-related police reports to Horn or otherwise disclose the information to Horn. Horn did not

recall knowing of the information from Salters or the Petty brothers prior to trial. Dkt. 79-38

(1/29/15 Hrg. Tr.) at 114–15, 131. He agreed that the information from the Pettys was

___

[5] "If the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not requires to present evidence on that point, and the district court should not rely on that ground in its decision." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006); *Edwards v. Honeywell*, 960 F.2d 673, 674 (7th Cir. 1992) ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not.") It will obviously be too late for Defendants to raise new arguments in reply. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

exculpatory. *Id.* at 115–16, 131–33. If he had exculpatory information, he would have disclosed it to the defense. *Id.* at 92, 94, 103, 125. Horn did not recall what information he disclosed in this case, but he "most probably did" what he did in every other case, which was to give any exculpatory evidence to the defense. *Id.* at 94–95, 104–05. But he could only give to the defense what information he had in his possession. *Id.* at 118. The Petty brothers were not on any witness list that Horn had seen, *id*. at 117–18, which indicated that Horn did not know about them.

Second, assuming that the 2/13/95 police report Defendants rely on was disclosed by the Defendants to Horn,[6] there is nothing on the report indicating what Petty knew. *See* Dkt. 79-29 (2/13/95 Miklovich report). This report states only, "detectives responded to 1754 Strathmore to conduct an interview with Eddie Petty … regarding the above incident. Detectives received no response at the residence, a card was left." *Id.* So even if Horn got this report, it was not a disclosure of the exculpatory evidence. Petty's exculpatory statement was contained in *two different reports*—Lt. Bradford's 2/12/95 report recounting his conversation with Monica Salters, and Miklovich's 2/15/95 report of his interview with Gary Petty.[7] Dkt. 86 at 11–12; Dkt. 79-28 (2/12/95 Bradford report); Ex. 65 (2/15/95 Miklovich report). This information was known to Defendants Johnstone, Miklovich, Perry, Lane, and Teel, but these two reports were never placed into the case file or otherwise disclosed to the prosecutor. *See* Dkt. 86 at 12–14.

Third, Defendants argue that the exculpatory value of the Petty statements was not apparent because they were "internally inconsistent." Dkt. 84 at 11. This argument has no merit. Perry himself admitted that the defense would have been entitled to Miklovich's 2/15/95 report

---

[6] Defendants assume that Horn learned of Malone's name from this police report, but they have presented no evidence for that. They have presented no evidence on how Horn learned of Malone's name.

[7] As explained at Dkt. 86 at 12, it is highly likely that Mikovich wrote down "Gary Petty" on his February 15 report when he and Johnstone had actually interviewed Eddie Dante Petty. Salters told Lt. Bradford on February 12, 1995 that Eddie Dante was the one who witnessed the shooting, and Miklovich's reports from February 13 and 14, 1995 indicate that they were trying to interview Eddie Dante. Dkts. 79-28, 79-29, 79-30. But regardless of which Petty brother it was, the information was exculpatory and not disclosed by the Defendants to the prosecutor.

of Gary Petty's statement, which Perry read, approved, and signed. Dkt. 79-12 at 94; Ex. 65. Miklovich also admitted that there were differences between Harris's version of events and Petty's. Dkt. 79-23 at 47, 49. He admitted that Harris mentions the shooter coming from a car with other people in it; Petty's statement does not reference the shooter coming from a car and only mentions one person. *Id.* at 49. Miklovich knew what Harris's version of events was, from reviewing her statements, and he knew it before speaking with Petty. *Id.* at 45–46, 49, 54. Harris's February 11 statement says, "I saw this Black Blazer and a black male was out of the blazer. I saw this guy shoot three more times at this guy that was on the sidewalk on Strathmore. … The guy that did the shooting then ran around the corner past me and to the Blazer and got into the Blazer." Dkt. 79-19 (2/11/95 Harris statement) at 1. Harris's statement repeatedly states that the shooter got out of and back into the Blazer. *Id.* at 1–2. The version of events from the Petty brothers is entirely different. According to the Bradford report, Eddie Dante Petty said, "suspect was … observed **exiting the Post Office parking lot**, and walking across the street towards the victim … As he neared the victim, he drew a pistol from his jacket pocket, and started shooting at the victim as he approached him." Dkt. 79-28 (emphasis added). Eddie also described the shooter as "about 5 Ft., very dark complexioned." *Id.* And, Eddie stated that he believed the suspect may be the brother of a female classmate. *Id.* Miklovich's report of his interview with Gary Petty on February 15 is similar. Petty said that "he observed a dark skinned male **exit the driveway of the Post Office parking lot**[,] walk across the street up to another male and shoot him." Ex. 65 (emphasis added). He described the suspect as "a dark skinned male, thin and about as tall as his mother (5-5)." *Id.*

There can be no serious dispute that the exculpatory value of the Pettys' statements would have been apparent to any police officer. According to Harris, the shooter came out of and

7

got back into the Blazer. According to Pettys, the shooter exited the Post Office parking lot and was on foot. The Pettys did not mention any Blazer, much less seeing the shooter come out of a Blazer. According to Harris's 2/11/95 statement, the shooter was 5'11". According to the Pettys, the shooter was around 5' or 5'5" tall. This evidence was favorable to the defense—it impeached Harris on whether the shooter came from the SUV. *See* Dkt. 79-60 (5/5/16 Opinion) at 22.

Defendants argue that the two Petty statements were "inconsistent" because the Bradford report indicated that Eddie Petty witnessed the crime, ran home and saw his brother Gary shoveling snow, but the Miklovich report indicated that Gary Petty was the one who witnessed the crime. Dkt. 84 at 12. Thus, Defendants assert, the exculpatory value of the reports was not apparent and they had no duty to disclose them. But even if these statements were "inconsistent," that would not lessen the exculpatory and impeachment value of the statements. It was not up to the Defendants to decide that neither Petty brother was credible and thus to suppress their statements. Moreover, it is likely that the witness was Eddie Petty and Miklovich erroneously wrote down Gary Petty's name in his February 15, 1995 report, given that the previous two days (February 13 and 14), he and Johnstone had been looking for Eddie Petty, and Bradford's report referenced Eddie Petty. *See* Dkts. 79-28, 79-29, 79-30; Ex. 65; Dkt. 79-23 at 62–66. Miklovich acknowledged the possibility that he wrote down the wrong name. Dkt. 79-23 at 31, 33–34, 66.

And finally, Defendants' argument that the evidence from the Petty brothers was not material, Dkt. 84 at 12–13, should be rejected. This evidence was clearly material. Evidence is material if there exists a "reasonable probability" that its disclosure to the defense would have changed the result of the trial. *Kyles*, 514 U.S. at 435. The question is whether, in the absence of the evidence, the Plaintiffs "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Bagley*, 473 U.S. at 682. The impeachment evidence provided by the

Pettys called this evidence into question. Impeachment evidence regarding the uncertainty of a witness is material, especially where other evidence is not strong enough to maintain the conviction alone. *Smith v. Cain*, 565 U.S. 73, 75 (2012); *Harris v. Lafler*, 553 F.3d 1028, 1034 (6th Cir. 2009); *Robinson v. Mills*, 592 F.3d 730, 736 (6th Cir. 2010).

The only evidence presented against Plaintiffs at their trial was the testimony of Tamika Harris and GSR evidence that the State claimed was found on a glove of Eugene Johnson's and Derrick Wheatt's hands, as well as the passenger side of the vehicle, where Wheatt was sitting. *See* Dkt. 79-5 at 814–938 (Harris testimony), 1169–1204 (State's closing). Harris admitted at trial that she did not actually see Johnson or anyone else get out of or back into the SUV. Dkt. 79-5 at 849. Instead, she explained that, while hiding by the bridge north of the railway embankment, she saw the shooter come out from "behind" the Blazer. *Id.* at 905. Harris could not have seen what happened on the opposite (south) side of the Blazer, and the State did not present any direct witness testimony of anyone who could.

The State did, however, argue to the jury about what *must* have happened, based on what it alleged to be GSR. The State argued that Wheatt shot at Hudson from the passenger side of the vehicle, then handed the gun to Johnson, who (somehow) climbed out of the two-door vehicle from the back seat, ran after Hudson on the street, and shot him dead. Ex. 64 at 408–11 (State's opening); Dkt. 79-5 at 1200–01 (State's closing). Even at the time, the defense tried to cast doubt on the reliability of the GSR evidence, pointing that it was prone to false positives and contamination. Ex. 64 at 425–26, 594–602, 610–14. But the defense could not produce any reliable witnesses who could confirm what happened on the south, rear-passenger side of the Blazer. In the end, the jury believed the State's theory of what must have happened out of Harris's line of sight, and as a result, it convicted all three Plaintiffs.

9

If the Plaintiffs had been given access to the Petty police reports, the jury would not have had to speculate about what happened out of Harris's view. The Pettys saw the shooting from the south, the back of the Blazer. They had a clear view of where the shooter actually came from— the Post Office parking lot. There were not two shooters, and the shooting did not start from the SUV. The shooter never got out of or back into the SUV. Between the Pettys, Harris, and Leroy Malone, someone saw where the shooter was at all times, and the shooter had no connection to Glover's SUV. Dkt. 79-28; Ex. 65; Dkt. 79-5 at 819–26, Ex. 64 at 905, 1074, 1079–81. With the Pettys, the State could not have asked the jury to assume what "must" have happened on the opposite side of the truck, away from Harris. If the Pettys' account is correct, then the shooter had nothing to do with Glover's SUV, and Plaintiffs were, as they have always maintained, innocent witnesses to the crime. *See* Dkt.79-60 at 24–27 (discussing materiality).

Moreover, the Pettys' account would have wholly undermined the State's argument that the GSR evidence was "scientific" evidence of Plaintiffs' guilt. The Pettys do not mention any shooting from a vehicle, and there was only one shooter. If there was only one shooter and the shooting did not start from the SUV, then the State would have been forced to admit that the GSR found on Wheatt was either a false positive, environmental contamination, or from some other source unrelated to the shooting. As the state appellate court explained when holding that the withheld evidence was material:

> without the connection between the shooter and the Blazer, the gunshot residue evidence presented at trial would have been less significant. Because of Harris's identification of Johnson as the shooter, the state presented a 'two-shooter' theory, involving both Wheatt and Johnson, to correlate with their gunshot residue evidence … But if the shooting did not originate from the appellees' truck, the state's 'two-shooter theory does not make sense. It also calls into question the reliability of the state's gunshot residue evidence and lends credence to the defense's theory of environmental contamination or other sources.

*Id.* at 25–26. In sum, the evidence from the Petty brothers was material because there is a reasonable probability that it would have changed the outcome of the trial or undermined confidence in the verdict.

> **B.    A Reasonable Jury Could Conclude that Derek Bufford's Statement Was Withheld by Defendants Lane, Teel, Perry, Johnstone, and Miklovich.**

The only argument Defendants make about the Bufford statement is that his statement was not withheld by them because the prosecutor disclosed Bufford's *name* in a witness list given to the defense. Dkt. 84 at 11. But the mere disclosure of Bufford's name did not constitute disclosure of the exculpatory information of which he was aware (i.e., that he and his brother Clifton Hudson had recently been threatened by unknown men in a Chevy Cavalier, and that those men were not Plaintiffs). *See* Dkt. 86 at 14–15; Dkt. 79-32 (2/13/95 Lane report) at 2–3. As Plaintiffs and one of their trial counsel testified, they never received the police report on Bufford or the information in that police report. Dkt. 79-38 at 29–30; Dkt. 79-34 (Drucker Aff.) ¶¶ 3, 6–7; Dkt. 79-35 (Wheatt Aff.); Dkt. 79-36 (Glover Aff.); Dkt. 79-37 (Johnson Aff.); Dkt. 79-40 (Drucker Dep.) at 17–19. Moreover, Defendants have presented no evidence on how Horn got Bufford's name. Perry admitted he has no idea how Horn got Bufford's name, or how Horn came to put Bufford's name on the witness list. Dkt. 79-12 at 152. Nor does Perry know anything about what Horn knew about Bufford when Horn put Bufford's name on the list. *Id*. at 152–53. Nor did Perry know if Horn knew of the contents of the report detailing Bufford's statement. *Id*. at 153. And as Horn testified, he would have disclosed exculpatory evidence if he had it, and he agreed that the Bufford information was exculpatory. Dkt. 79-38 at 92, 94–95, 103–05, 115.

Defendants Teel and Lane knew about Bufford's statement; Lane interviewed Bufford and Teel reviewed and signed Lane's report containing Bufford's statement. Dkt. 79-32; Dkt. 79-33 (Teel Dep.) at 29–30. Teel admitted that he did not put the report into the case file, and he

does not know if Lane put the report into the case file. Dkt. 79-33 at 31. Teel did not know

whether Lane's report on Bufford was given to the prosecutor's office. *Id.* at 32–33.

Furthermore, all of the East Cleveland Defendants admitted that the information from Bufford

was apparently exculpatory because it indicated that Hudson had been involved in an ongoing

feud with persons other than Plaintiffs. Dkt. 21 (EC Defs.' Answer) ¶ 107 (admitting paragraphs

107–121 of Complaint); Dkt. 1 (Compl.) ¶ 112. The Defendants also admitted that Lane and Teel

communicated the Bufford information to the other detectives investigating the crime, including

Johnstone, Perry, and Miklovich. Dkt. 21 ¶ 107; Dkt. 1 ¶¶ 115–121; *see also* Dkt. 79-12 at 149

(Perry admitting his answers to the complaint were truthful). Perry also admitted that he read the

other detectives' reports. Dkt. 79-12 at 41. In sum, a reasonable jury could conclude that

Defendants Teel, Lane, Perry, Johnstone, and Miklovich knew of Bufford's exculpatory

statements and withheld it from the prosecutor.

### C.  Defendants Perry, Johnstone, and Miklovich Suppressed the Extent of Their Manipulation of Tamika Harris, and These Facts Were Exculpatory and Material.

Defendants suppressed the extent of their manipulation of Tamika Harris during their

interview of her. Defendants do not address this aspect of Plaintiffs' *Brady* claim. *See* Dkt. 84.

On this basis alone, the court should deny summary judgment on this claim. Even if the court

were to consider it, a reasonable jury could conclude that Defendants suppressed the most

egregious aspects of their interview of Harris, including that: Perry pointed to Johnson's photo;

Miklovich, Johnstone or Perry told Harris that the individuals in the array "did it"; and they told

Harris that the "other two" (Wheatt and Glover) had gunshot residue on them. What was known

at the time of trial was that only Plaintiffs' photos were in the array shown to Tamika Harris.

However, Perry, Miklovich, and Johnstone never disclosed to the prosecutor any of these other

facts. These facts did not come out until Harris recanted her identification of Johnson years after trial. In fact, at Plaintiffs' trial, Perry denied that he told Harris what photo to pick when he showed her the photos of the three Plaintiffs. Ex. 64 at 1023. In Harris's typed statement and in their police report of Harris's interview, Perry, Johnstone, and Miklovich did not include any of the facts about their manipulation of Harris. *See* Dkt. 79-19; Dkt.79- 20 (2/11/95 Perry report). This evidence was impeaching; it could have been used to impeach Harris's identification of Johnson and to cross-examine the Defendants about their interview of Harris and the good faith of their investigation. *Kyles*, 514 U.S. at 445–46 (with the impeachment evidence, the defense could have cross-examined the police and "so have attacked the reliability of the investigation"); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."); *cf. In re Siggers*, 615 F.3d 477, 480 (6th Cir. 2010).

This evidence was material because there is a reasonable probability that it would have undermined confidence in the verdict. Harris was the only eyewitness, and her identification of Johnson was weak to begin with—her initial statement to Lane was that she didn't see the shooter's face. A reasonable jury could find in favor of Plaintiffs and against Defendants Perry, Johnstone, and Miklovich on this claim.

## III.  A Reasonable Jury Could Find in Plaintiffs' Favor on Their Continued Detention without Probable Cause and State Law Malicious Prosecution Claims against Defendants Perry, Johnstone, and Miklovich.

Plaintiffs have a right to be free from continued detention without probable cause under the Fourth Amendment. *Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006); *Sykes v. Anderson*, 625 F.3d 24, 308–09 (6th Cir. 2010); *Manuel v. City of Joliet*, 137 S. Ct. 911

13

(2017). This has sometimes been labeled a § 1983 malicious prosecution claim. *Sykes*, 625 F.3d at 310; *Mills v. Barnard*, __ F.3d __, 2017 WL 3687434, at *3 (6th Cir. Aug. 28, 2017). To succeed on a § 1983 malicious prosecution claim, Plaintiffs must show that (1) a criminal prosecution was initiated against them and Defendants made, influenced, or participated in the prosecution decision; (2) there was no probable cause to support the charges; (3) as a result of the legal proceedings, Plaintiffs suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceedings ended in Plaintiffs' favor. *Miller*, 866 F.3d at 389. Defendants do not argue that there is insufficient evidence on elements (1), (3), or (4).

Defendants argue only that there was probable cause to arrest Plaintiffs. Dkt. 84 at 17–18. This argument fails because a reasonable jury could conclude that at the time Plaintiffs were arrested, there was no probable cause. Plaintiffs were arrested *before Harris even gave her statement to the police purportedly identifying Johnson*. Plaintiffs were arrested in the late evening hours of February 10, and Harris did not pick out Johnson's photo in the photo array until February 11. Dkt. 79-2 (Glover Dep.) at 38–41; Dkt. 79-3 (Wheatt Dep.) at 37–39; Dkt. 79-5 at 764–67, 961–62; Dkt. 79-14 at 96; Dkt. 79-19; *see also* Dkt. 79-24 at 16–17. All Defendants knew at the time they arrested Plaintiffs was that Glover's vehicle had been seen at the scene. "[I]t is well-established that an individual's mere presence at a crime scene does not constitute probable cause for an arrest." *Harris v. Bornhorst*, 513 F.3d 503, 515 (6th Cir. 2008).

Moreover, the question is not whether there was probable cause to *arrest*; it is whether there was probable cause for the *charges*. *Sykes*, 625 F.3d at 308. There was no probable cause for the charges or the prosecution.[8] The only basis for the charges was Harris's identification, but her identification was fabricated by the Defendants, as discussed above.

---

[8] Plaintiffs were indicted by a grand jury. Plaintiffs can overcome the presumption of probable cause created by a grand jury indictment where the three factors set forth in *King v. Harwood*, 852 F.3d 568, 587–88 (6th

Defendants argue that there was probable cause because Plaintiffs were observed driving away from the scene by a witness named Robert Hunt, and a witness named "Jerry Vaught" allegedly identified Johnson as the person who shot Hudson. Dkt. 84 at 17. Defendants have not submitted any evidence in support of these assertions. Nor have they submitted any evidence that this information formed the basis of the charges against Plaintiffs.[9] Defendants' argument could be rejected on these grounds alone. In any event, the statements of witnesses as contained in police reports (which is what Defendant refer to, without attaching as evidence, *see id.*) is hearsay. *Miller*, 35 F.3d at 1091. And, the mere fact that Hunt saw Plaintiffs driving away from the scene of the shooting would not have provided probable cause. *Harris*, 513 F.3d at 515.

Defendants also argue that alleged GSR provided probable cause. Again, they submit no evidence for this argument and provide no evidence that this formed the basis of the charges. The argument should be rejected on these grounds alone. Even if the court were to consider it, Defendants have cited no case for the proposition that the mere presence of material "consistent with GSR" would have provided probable cause to charge Plaintiffs for the murder of Clifton Hudson. (Furthermore, as discussed below, a reasonable jury could conclude that the Defendants

Cir. 2017), have been met. *See also Miller*, 866 F.3d at 391. Defendants do not argue that Plaintiffs have not met the *King* factors. *See* Dkt. 84 at 17–18. Because Defendants have failed to make any argument in this regard, the court should simply look to whether there was any other evidence in the record supporting probable cause for the prosecutions. *Miller*, 866 F.3d at 392. (Even if the court were to consider the *King* factors, Plaintiffs have satisfied them. First, Defendants either knowingly or recklessly made false statements in their investigative reports or falsified or fabricated evidence relating to Tamika Harris. Harris's identification of Johnson was falsified or fabricated because of Defendants' unduly suggestive photo array. Defendants not only showed her only the photos of the Plaintiffs, but Perry put his hand on Johnson's photo and Defendants made suggestive comments to her. Dkt. 79-7 at 31, 43; Dkt. 79-8 at 21, 26. Defendants did this even after they knew Harris did not see the shooter's face. Dkt. 79-7 at 39. Furthermore, Defendants falsified Harris's typed statement as well as their police report of Harris's interview. Harris told the police at the time that she only saw the shooter come from behind the SUV, not that he got out of the SUV. Dkt. 79-8 at 46. But Perry's report and Harris's statement typed by Perry claims that Harris said that she saw the shooter get out and get back into the SUV. Dkts. 79-11, 79-20. Second, these false statements and evidence relating to Harris, together with the concomitant misleading omissions, were material to the prosecution of Plaintiffs. There was no evidence implicating Plaintiffs in the shooting other than Harris's identification and statements. Third, the false statements and evidence do not consist solely of grand jury testimony or preparation for that testimony. The manipulation of Harris occurred at the police station, not in front of a grand jury, and the police reports relating to Harris were falsified.)

[9] For his part, Perry does not remember what probable cause there was for arresting Plaintiffs. Dkt. 79-12 at 50–51.

15

planted the gloves that were allegedly found in Eugene Johnson's jacket pocket. If that evidence were fabricated by Defendants, it could not provide probable cause.)

Finally, Defendants argue there was probable cause because Johnson was wearing "the same clothes" that Harris described the shooter as wearing. Dkt. 84 at 18. This too, is insufficient for probable cause. Defendants have cited no cases supporting their argument. Harris testified only that the shooter was wearing a "hoodie with a Nautica or Tommy Hilfiger type bubble coat on over that," "[i]t was the style back then," and it was a common style. Dkt. 79-8 at 13–14, 71–72. She could not say that Johnson was wearing the "exact same coat" that the shooter was wearing, only that it could be "similar." *Id.* at 71. The fact that Johnson was wearing a coat of a common style and similar in appearance to what Harris described the shooter as wearing did not constitute probable cause to charge Plaintiffs for the murder of Clifton Hudson.

In sum, there is sufficient evidence for a reasonable jury to conclude that there was no probable cause for Plaintiffs' prosecution. "In a § 1983 action, the existence of probable cause is a question of fact." *Gregory*, 444 F.3d at 743. A jury must decide Plaintiffs' claim for continued detention without probable cause (Count II).

Likewise, the only argument Defendants make for dismissal of Plaintiffs' state law malicious prosecution claim (Count VI) is that there was probable cause. *See* Dkt. 84 at 16–18. Because a reasonable jury could find no probable cause, this claim must proceed to trial.

## IV.    A Reasonable Jury Could Find for Plaintiffs on Their Fabrication of Evidence Claim against Defendants Perry, Johnstone, and Miklovich.

"It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory*, 444 F.3d at 737; *Spurlock v. Satterfield*, 167 F.3d 995, 998–99, 1005–06 (6th Cir. 1999); *Webb v. United States*, 789 F.3d 647, 667–70 (6th Cir.

16

2015). When the police fabricate evidence, they are liable if that fabrication causes any deprivation of liberty, whatever form the fabricated evidence takes, and whether it is presented at trial or is used to bring charges or to help indict. *See Gregory*, 444 F.3d at 741 (holding that officer's investigatory notes "were the result of pretrial fabrication efforts by [the officers]," and comprise[d] part of the documentary record before the prosecution and defense and affected the course of the criminal proceedings independent of any testimony to the notes' contents. … Their very existence, even if not introduced as evidence at trial, affected Plaintiff's criminal prosecution independent of the officers' testimony.); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 289, 294 n.19 (3d Cir. 2014) (defendant has suffered an injury when fabricated evidence is used to initiate a prosecution or obtain criminal charges); *Avery v. City of Milwaukee*, 847 F.3d 433, 441–42 (7th Cir. 2017) (due process violated when fabricated evidence introduced at trial through police testimony).

Defendants do not move for summary judgment on Plaintiffs' fabrication of evidence claim (*see* Dkt. 1 ¶ 170). *See* Dkt. 84. Thus, this claim should proceed to trial. There is sufficient evidence for a reasonable jury to conclude that Defendants Perry, Johnstone, and Miklovich fabricated evidence relating to Harris' identification of Johnson, including her typed statement, Perry's police report, and Harris's identification of Johnson at trial.[10] Dkt. 79-19; Dkt. 79-20; Dkt. 79-5 at 826. Harris told the police at the time that she only saw the shooter come from behind the SUV, not that he got out of the SUV. Dkt. 79-8 at 46. But Perry's report and Harris's statement typed by Perry claims that Harris said that she saw the shooter get out and get back into the SUV. Dkts. 79-11, 79-20. A jury could reasonably conclude that these acts of fabrication caused Plaintiffs to be charged, prosecuted, and convicted. Not only did Harris identify Johnson

---

[10] Perry typed and signed the statement that Harris signed dated 2/11/95. Dkt. 79-12 at 42. Perry also wrote a report summarizing his interview with Harris. *Id.* at 54.

in court, Dkt. 79-5 at 826, but both Harris and Perry testified to Harris's earlier identification of Johnson in the photo array, *id.* at 839–41, 964. Harris now says that she identified Johnson in court only because she had seen the photo of him that the police showed her. Dkt. 79-7 at 20–21. Thus, Harris's fabricated identification of Johnson was used against the Plaintiffs at their trial, which resulted in their wrongful convictions.

There is also sufficient evidence for a reasonable jury to conclude that Defendant Perry planted the glove with purported GSR in Johnson's jacket pocket. Johnson testified that he never wore gloves, and that the gloves supposedly found in his jacket pocket were not his. Ex. 66 (Johnson Dep.) at 63–65. The gloves were not inventoried by Defendant Perry on February 11, 1995 when he inventoried Johnson's clothing, including a "black hooded sweatshirt" and a "Nautica green/purple jacket." Ex. 67 (Property log book). Perry took Johnson's jacket from him when he arrested Johnson, and he claimed to have found "some gloves in the pocket." Ex. 64 at 957. According to Plaintiffs' police practices expert Timothy Longo, the gloves should have been logged at the time of collection, and "[t]he fact that the gloves were not logged at the time of collection suggests that they were not in Johnson's jacket pocket at the time." Dkt. 79-24 at 25 (¶ 197). A reasonable jury could find in Plaintiffs' favor on this claim.

**V.    A Reasonable Jury Could Find for Plaintiffs on Their Denial of Access to Courts Claim against Defendants Dunn and Teel.**

In order to prevail on this claim, Plaintiffs must prove: (1) a non-frivolous underlying claim; (2) obstructive actions by Defendant Dunn; (3) substantial prejudice to the underlying claim that cannot be remedied by the state court; and (4) a request for relief which the plaintiff would have sought on the underlying claim and is not otherwise unattainable. *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013). For the reasons discussed in Plaintiffs' Joint Motion, elements (1), (3), and (4) are undisputed. Dkt. 86 at 26–29. Plaintiffs incorporate those

arguments by reference. The only question is whether there is sufficient evidence that Defendants Dunn and Teel committed obstructive actions. The answer to that question is yes.

Then-Mayor Onunwor was planning to release the police reports in response to the public records request. Dkt. 79-47 ¶¶ 4–5. Before that occurred, Dunn called Naiman at the CCPO and told her about the public records request. Dkt. 79-50 at 19, 36–37, 47–48. Dunn told Naiman that the mayor was going to turn the records over to the mother of a defendant. *Id.* at 37–38, 40. Naiman then wrote the June 24, 1998 letter to the City directing the City not to disclose the file and directing it to turn over the file and all copies to the CCPO. *Id.* at 37; Dkt. 79-51. Dunn testified that he had no role in dealing with public records requests for the City in 1998. Dkt. 79-62 (Dunn Dep.) at 16. Dunn delivered the file to the CCPO. Dkt. 79-53 (Dunn's interrogatory answers) at 11. Dunn also admitted that if Defendant Teel, who was an assistant Safety Director in 1998, had told him to deliver a file to the CCPO, he would have done so. Dkt. 79-62 at 34, 37. Dunn did not question the accuracy of the receipt from CCPO indicating that he delivered the file, but he did not remember doing so. *Id.* at 37; Dkt. 79-54 (6/26/98 CCPO receipt). Teel faxed the June 24, 1998 letter to the requestor. Ex. 68 (Teel fax). At his deposition, Teel claimed he didn't recall this fax. Dkt. 79-33 (Teel Dep.) at 33–34, 40.

A reasonable jury could find that Dunn and Teel's actions were obstructive. According to Naiman, Dunn called her with the concern that the mayor was going to release the file; as a result of that conversation, Naiman sent the letter to the City which caused the Mayor not to release the records. A reasonable jury could also conclude that Teel—who was involved in the underlying investigation, and knew about and suppressed the exculpatory police reports prior to trial— directed Dunn to obtain a letter from Naiman (a prosecutor who had a close relationship with the police, *see* Dkt. 79-50 at 33–35) preventing the release of the file.

19

Defendants only argument for dismissal of this claim is that the file was exempt from disclosure under *State ex rel. Steckman v. Jackson*, 639 N.E.2d 83 (Ohio 1994). Dkt. 84 at 18–19. But there is no evidence that the City claimed any exemption at the time; to the contrary, Onunwor was going to release the file, and he would have done so if it had not been for Naiman and Marino's letter, which a reasonable jury could determine was obtained by Defendants Teel and Dunn because they knew there was exculpatory evidence in it that they did not want disclosed.[11]

Thus, a reasonable jury could find in Plaintiffs' favor against Defendants Teel and Dunn on their denial of access to courts claim (Count III).

## VI.  Plaintiffs' Conspiracy, Failure to Intervene, Intentional Infliction of Emotional Distress, and *Respondeat Superior* Claims Should Not Be Dismissed.

Defendants fail to address Plaintiffs' federal and state law conspiracy or failure to intervene claims (Counts IV, V, VIII). Defendants make no argument for dismissal of Plaintiffs' intentional infliction of emotional distress (Count VII) and *respondeat superior* (Count X) claims. *See* Dkt. 84 at 20. This lack of argument results in waiver. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). Thus, these claims should not be dismissed.

## CONCLUSION

For the foregoing reasons, the court should deny Defendants' Motion in part. Plaintiffs do not oppose the dismissal of Defendant John Bradford, the Defendant City on the *Monell* claims, or the state law tortious interference claim. Plaintiffs do not oppose the dismissal of their indemnification claim without prejudice as premature since no judgment has been entered yet. *Ayers v. City of Cleveland*, 2013 WL 775359, at *16 (N.D. Ohio Feb. 25, 2013) (Gwin, J.).

---

[11] Defendants' argument that the CCPO acted as "counsel" for the City or that the City lost the authority to do anything with the file after bindover is plainly erroneous. *See* Dkt. 84 at 19. The CCPO was responsible for prosecution of felonies in the County, but how the City would respond to a public records request had nothing to do with that.  *See* Dkt. 79-55; O.R.C. §§ 309.08, 309.09.

Respectfully submitted,

s/ Elizabeth Wang

Michael Kanovitz                         Elizabeth Wang
LOEVY & LOEVY                        LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.           2060 Broadway, Ste. 460
Chicago, IL 60607                       Boulder, CO 80302
O: (312) 243-5900                       O: (720) 328-5642
mike@loevy.com                        elizabethw@loevy.com
*Counsel for Plaintiffs Derrick Wheatt and Laurese Glover*

s/ Michael B. Pasternak
Michael B. Pasternak                    Brett Murner
Park Center II, Suite 411               208 North Main Street
3681 South Green Road                 Wellington, OH  44090
Beachwood, OH  44122                 O: (440) 647-9505
O: (216) 360-8500                       bmurner@yahoo.com
Mpasternak1@msn.com
*Counsel for Plaintiff Eugene Johnson*

## CERTIFICATE OF SERVICE

I, Elizabeth Wang, an attorney, hereby certify that on October 2, 2017, I served via CM/ECF the foregoing Plaintiffs' Joint Response to the East Cleveland Defendants' Motion for Summary Judgment, which delivered it to all counsel of record via electronic service.

s/ Elizabeth Wang
Attorney for Plaintiff

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Memorandum complies with the 20-page limitation for dispositive motions in Standard Track cases.

s/ Elizabeth Wang

21