UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

-------------------------------------------------------
                                              :
DERRICK WHEATT, et al.,                       :        CASE NO. 1:17-CV-377
                                              :        consolidated with
            Plaintiffs,                       :        CASE NO. 1:17-CV-611
                                              :
v.                                            :        OPINION & ORDER
                                              :        [Resolving Doc. Nos. 77, 78, 84, 86, 87, 97,
                                              :         105]
CITY OF EAST CLEVELAND, et al.,               :
                                              :
            Defendants.                       :
                                              :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

        In this 42 U.S.C. § 1983 action, all parties move for summary judgment.  Plaintiffs

Derrick Wheatt, Laurese Glover, and Eugene Johnson seek partial summary judgment against

Defendants Perry, Johnstone, and Miklovich, on their Fourteenth Amendment due process claim

for the use of unduly suggestive identification techniques, and against Defendant Naiman on

their denial of access to courts claim.[1]

        Defendants Dunn, Naiman, Marino, and Cuyahoga County (hereinafter the "County

Defendants") seek summary judgment on all of Plaintiffs' claims against them.[2]  Similarly,

Defendants Dunn, Johnstone, Lane, Miklovich, Perry, Teel, Bradford, and the City of East

Cleveland (hereinafter the "City Defendants") also seek summary judgment on all of Plaintiffs'

claims.[3]

---

[1] Doc. 78; Doc. 86 (amended motion). The City Defendants oppose. Doc. 94. The County Defendants
oppose. Doc. 95. Plaintiffs reply to the City Defendants, Doc. 104, and to the County Defendants. Doc.
106.
[2] Doc. 87. Plaintiffs oppose. Doc. 96. The County Defendants Reply. Doc. 107. The County Defendants
also filed a motion to exceed the page limitations in their brief. Doc. 77. The Court **DENIES** this motion
as moot.
[3] Doc. 84. Plaintiffs oppose. Doc. 93.

The City Defendants have also filed a "pro se" brief asserting qualified immunity.[4]

For the following reasons, the Court **DENIES** Plaintiffs' motion for summary judgment. The Court **DENIES** the County Defendants' motion for summary judgment on Plaintiffs' access to courts claim.

The Court **GRANTS IN PART and DENIES IN PART** the City Defendants' motion for summary judgment. The Court also **GRANTS** Plaintiffs' motion to strike the City Defendants' "pro se" brief.

Finally, the Court **GRANTS** Defendants' motions for summary judgment on Plaintiffs' conceded claims.

## I. Background

This case follows Derrick Wheatt's, Laurese Glover's, and Eugene Johnson's overturned convictions for the 1995 murder of Clifton Hudson.[5] Plaintiffs allege that they were wrongfully convicted because the City Defendants failed to disclose exculpatory evidence. Plaintiffs also allege that, two years after their convictions, the County Defendants obstructed Plaintiffs' attempts to obtain this exculpatory evidence, to prevent Plaintiffs from obtaining exculpatory evidence that could show they were not guilty and to ensure that they would remain imprisoned.

**A. Clifton Hudson's Murder and Plaintiffs' Conviction**

On February 10, 1995, 19 year-old Clifton Hudson was shot and killed on Strathmore Avenue in East Cleveland, Ohio.[6] At the time of the shooting, Plaintiffs were in a black GMC SUV next to a post office on Strathmore.[7] Plaintiffs say it was happenstance that they were in

---

[4] Doc. 97. Plaintiffs move to strike. Doc. 105.
[5] The Court has endeavored to note whenever facts as stated in this background section are disputed by the parties. Nevertheless, nothing in this section should be construed as a finding of fact by the Court.
[6] Doc. 79-1 at 10 (page numbers refer to deposition page numbers).
[7] *Id.* at 31-32.

the area of the killing and say they had nothing to do with the killing. The post office is on the southeast side of a bridge on Strathmore Avenue.[8]

Tamika Harris, who was 14 years old at the time, witnessed the shooting while hiding behind this bridge.[9] She saw Plaintiffs' SUV. She also saw the shooter.[10] Harris described the shooter as a black male, 5'7" or taller, and wearing what she described as a red and blue Tommy Hilfiger-style jacket.[11]

Officers connected the GMC SUV to Plaintiffs, and arrested Plaintiffs later that night.[12] They also impounded Plaintiffs' vehicle.[13] When he was arrested, Plaintiff Johnson had a jacket similar to the one Harris described.[14]

During their investigation of the crime, officers interviewed or received statements from numerous people, including Derek Bufford, who was victim Clifton Hudson's brother, and the Petty brothers.[15] The Petty brothers were eight and ten years old at the time of the shooting. According to their statements, one or both of them witnessed the shooting.[16]

Plaintiffs contend that Defendants failed to provide them exculpatory evidence. For example, Derek Bufford, the victim's brother, gave police a statement that in the weeks before Hudson's murder, both he and his brother were approached and threatened by men with guns.[17] Bufford stated that the men who approached him and his brother with guns had driven a gray

---

[8] *See* Doc. 79-4.
[9] Doc. 79-7 at 8-15 (page numbers refer to pages of the trial transcript).
[10] *Id.*
[11] Doc. 79-11.
[12] Doc. 79-12 at 50.
[13] Doc. 79-5 at 964.
[14] *Id.* at 962-63.
[15] *See, e.g.*, Docs. 79-28, 79-32, 93-3.
[16] The record is unclear on whether Eddie Petty, Gary Petty, or both witnessed the shooting.
[17] Doc. 79-32.

Chevrolet Cavalier.[18]  Police showed Bufford pictures of Plaintiffs and pictures of their GMC.

Bufford did not identify either Plaintiffs or their GMC as involved with the earlier threat.[19]

In the days after the shooting, the Petty brothers' mother, Monica Salters, called the

police and told them that her son Eddie Dante Petty saw the shooting. [20]  She stated that her son

saw the shooter come out of the post office parking lot, walk towards the victim, and shoot

him.[21]  Salters also said that her son had seen the shooter before, and that the shooter might be an

older brother of one of Eddie Petty's classmates.[22]  After he saw the shooting, Eddie ran home

and saw his brother Gary shoveling snow.[23]  The report with Salters' statement describing her

son's statement that he had earlier seen the shooter and that the shooter could be an older brother

of a classmate was not immediately placed into the police file.[24]

After searching for Eddie Petty for two days, officers found and interviewed his brother,

Gary Petty.[25]  Gary stated that he saw the shooter exit the post office parking lot driveway, walk

towards the victim, and shoot him.[26]  Gary said that the victim was dark-skinned and about 5'5"

tall.[27]  After witnessing the shooting, Gary Petty ran home to tell his mother about what he saw.[28]

The police also obtained an identification of the shooter from Tamika Harris.  The police

showed Harris only three pictures, one each of Plaintiffs Wheatt, Glover, and Johnson.[29]  Out of

---

[18] *Id.*
[19] *Id.*
[20] Doc. 79-28.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] Doc. 79-27 at 30.
[25] It is possible that officers actually found and interviewed Eddie, but accidentally wrote down Gary's name. *See* Doc. 79-23 at 31, 33-34, 66.
[26] Doc. 93-3.
[27] *Id.*
[28] *Id.*
[29] *See* Doc. 79-18.

these pictures, Harris identified Johnson as the shooter.[30]  Harris also identified Plaintiffs' GMC

as the vehicle she saw the day of the shooting.[31]

In January 1996, a jury convicted Plaintiffs of murdering Clifton Hudson.  During the

trial, Prosecutor Michael Horn used Tamika Harris's testimony to identify Plaintiffs as involved

with the killing.  Ohio buttressed Harris's testimony with evidence that Harris earlier identified

Plaintiffs in a photo array.

Harris testified that she saw Plaintiff Johnson walk up behind Clifton Hudson on

Strathmore Avenue and shoot him.[32]  Then, Plaintiffs' black GMC came towards her, turned off

of Strathmore onto another street, and then turned again out of her sight.[33]  At about the same

time, she stated that she saw Plaintiff Johnson run past her towards the GMC.[34]

She said that she could see the shooter's face enough to identify him, and saw his

clothing.[35]  She also said that she could see two people in the GMC, but could not identify

them.[36]  Harris also identified Johnson in open court.[37]

Prosecutor Horn also presented testimony from a forensic expert about gunshot residue

found on Plaintiffs' hands, on Plaintiffs' GMC, and on gloves purportedly belonging to Plaintiff

Johnson.[38]  Neither Bufford nor the Petty brothers testified at the trial.

---

[30] Doc. 79-5 at 962.

[31] *Id.* at 964.

[32] Doc. 79-5 at 819-39.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] The prosecution and defense also presented other evidence and witnesses not relevant to deciding the present motion.

**B. The 1998 Public Records Request**

In June 1998, Plaintiffs' convictions were final, and they had completed all direct appeals. One of Plaintiffs' attorneys began investigating possible post-conviction relief.[39] As part of this investigation, he contacted then-Mayor of East Cleveland Emmanuel Onunwor about obtaining the police file in the case through a public records request.[40]

Mayor Onunwor was willing to release the record, as there had been community concern that Plaintiffs had been wrongly convicted.[41] Before he released the police file, however, he received a letter from the Cuyahoga County Prosecutors Office ("Cuyahoga Prosecutor's Office"). At the time the Cuyahoga Prosecutor's Office wrote the letter, all direct appeals had finished and no post-trial petitions had been filed.

The Cuyahoga Prosecutor's Office prosecuted felonies occurring within East Cleveland, and had prosecuted Plaintiffs' case. The Cuyahoga Prosecutor's Office's letter to Mayor Onunwor stated that the police file was "not a public record" and that releasing the file "could constitute a wilful [sic] violation of the law."[42] The letter also "directed" the city to turn over the police file to the Cuyahoga Prosecutor's Office investigator who delivered the letter, along with "any and all copies [of the record] which exist elsewhere, including, but not limited to, the Records Room of East Cleveland."[43] The city was told to do all of this "forthwith."[44]

Defendants Marino and Naiman signed this letter and addressed it to Defendant Dunn and the East Cleveland Police Department.[45] Both Naiman and Marino were Cuyahoga

---

[39] *See* Doc. 79-49.
[40] *Id.*
[41] Doc. 79-47.
[42] Doc. 79-51.
[43] *Id.*
[44] *Id.*
[45] *Id.*

Prosecutor's Office prosecutors, but neither worked on or supervised the Clifton Hudson murder case before or after sending this letter.

They drafted this letter because Defendant Naiman received a call from someone in the East Cleveland Police Department stating that Mayor Onunwor was going to release the police file.[46]  Naiman states that she viewed Plaintiffs' attempts to get the file as an improper discovery request according to the law at the time.[47]

She says that she drafted this letter after consulting with both someone in the Cuyahoga Prosecutor's Office appeals unit and Defendant Marino.[48]  She believes she was warned by East Cleveland Police Officer Dunn that Mayor Onunwor was considering releasing the investigatory file, and she believes she consulted with someone in the Cuyahoga Prosecutor's Office appeals unit.[49]  Defendant Marino was a supervisor in the Cuyahoga Prosecutor's Office at the time, although he was not Defendant Naiman's direct supervisor.

After receiving the letter, the city gave the file to the Cuyahoga Prosecutor's Office and refused to release the file to Plaintiffs' attorney.  Apparently, the city retained a file copy.

**C. Plaintiffs' Successful Motion for a New Trial**

In 2004, Tamika Harris recanted her prior testimony.[50]  She stated that she never saw the shooter clearly, and could only identify him by his jacket.[51]  She identified Plaintiff Johnson only because of the jacket he wore in his photo and because one of the officers showing her the photo directed Harris to Johnson's photo while she was picking.[52]

---

[46] Naiman believes that she spoke to Defendant Dunn in this call, but she bases that belief on the fact that the letter is addressed to him. *See generally* Doc. 79-50.
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] Doc. 79-22.
[51] *Id.*
[52] *See* Doc. 79-8.

She also stated that at the time of the photo identification, the officers identified the men in the photos as "suspects" and asked her to pick the shooter.[53]  Once she picked Johnson's photo, the officers told her that they had already arrested the men in the photos, and that the men had gunshot residue on them when they were arrested.[54]

By 2013, the Ohio Innocence Project had taken an interest in Plaintiffs' case.  In that year, they obtained the East Cleveland Police Department investigation file through a public records request.

Based on materials in that file, Plaintiffs alleged that at the trial stage, the State had withheld potentially exculpatory evidence, including statements by Derek Bufford and the Petty brothers.  An Ohio trial court accepted the Plaintiffs' argument, overturned Plaintiffs' convictions, and awarded them a new trial.  The Ohio appellate courts upheld that award of a new trial on appeal.

***

Plaintiffs now allege that the City Defendants withheld exculpatory evidence.  This exculpatory evidence includes the statements by the Petty brothers and Derek Bufford, as well as the suggestive procedures that led to Tamika Harris's identification of Plaintiff Johnson.

Plaintiffs also allege that the City Defendants fabricated evidence, including the glove allegedly belonging to Plaintiff Johnson and some statements in the police reports.  Further, Plaintiffs allege that the identification process used to produce Tamika Harris's identification of Plaintiffs was unconstitutionally suggestive.

Finally, Plaintiffs allege that the County Defendants violated their constitutional right of access to the courts by obstructing their 1998 request for access to the East Cleveland Police

---

[53] *Id.*
[54] *Id*.

Department's police file.[55]  Plaintiffs allege that they would have been exonerated earlier if the

County Defendants had not wrongly interfered with their access to public records.

## II. Legal Standard

Summary judgment is appropriate where the evidence submitted shows "that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."[56]  The moving party has the initial burden of showing the absence of a genuine

issue of material fact as to an essential element of the non-moving party's case.[57]  A fact is

material if its resolution will affect the outcome of the lawsuit.[58]

The moving party meets its burden by "informing the district court of the basis for its

motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact."[59]  However, the moving party is under no "express

or implied" duty to "support its motion with affidavits or other similar materials *negating* the

opponent's claim."[60]

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to

set forth specific facts showing a triable issue.[61]  It is not sufficient for the nonmoving party

merely to show that there is some existence of doubt as to the material facts.[62]  Nor can the

nonmoving party "rest upon the mere allegations or denials of the adverse party's pleading."[63]

---

[55] Plaintiffs bring other claims related to these alleged bad acts, but Plaintiffs either concede those claims
or Defendants do not argue against them on summary judgment in more than a cursory fashion.
[56] Fed. R. Civ. P. 56(c).
[57] *Waters v. City of Morristown,* 242 F.3d 353, 358 (6th Cir. 2001).
[58] *Daughenbaugh v. City of Tifin,* 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).
[59] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).
[60] *Id.*
[61] *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).
[62] *Id.*
[63] Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party.[64] "The disputed issue does not have to be resolved conclusively in favor of the nonmoving party, but that party is required to present significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial."[65] Ultimately, the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[66]

On cross motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."[67]

### III. Analysis

**A. County Defendants' Motion for Summary Judgment**

The County Defendants argue that they are entitled to absolute immunity, or in the alternative, qualified immunity.

*1. Plaintiffs' Conceded Claims*

As an initial matter, Plaintiffs do not contest any of their claims against the County Defendants except for their access to courts claim.[68]

---

[64] *National Enters., Inc. v. Smith,* 114 F.3d 561, 563 (6th Cir. 1997).
[65] *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968)); *see also Celotex,* 477 U.S. at 322.
[66] *Terry Barr Sales Agency, Inc. v. All-Lock Co.,* 96 F.3d 174, 178 (6th Cir. 1996) (citation omitted).
[67] *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 592 (6th Cir. 2001) (quoting *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991)).
[68] Doc. 96 at 20.

*2. Absolute Immunity*

Government officers are absolutely immune from suit when they perform functions "intimately associated with the judicial phase of the criminal process."[69]  This immunity extends to a prosecutor who "acts 'within the scope of his duties in initiating and pursuing a criminal prosecution.'"[70]  The party claiming immunity has the burden of proving that defense.[71]

The Sixth Circuit utilizes a functional approach to determine whether a prosecutor's actions receive absolute immunity.[72]  Under this approach, the Court looks "to 'the nature of the function performed, not the identity of the actor who performed it' when assessing whether conduct is prosecutorial, and thus absolutely protected."[73]

Courts have previously found that absolute immunity applies to functions including: appearing in court to support an application for a search warrant; presenting evidence at a probable cause hearing; preparing and filing documents to obtain an arrest warrant; evaluating and presenting evidence at trial or before a grand jury; and preparing witnesses for trial, or even eliciting false testimony from a witness.[74]  Absolute immunity shields these actions, even if done maliciously, to serve the broader "policy of protecting the judicial process."[75]

But prosecutors do not receive absolute immunity for every action that they take.  When a prosecutor performs an investigative or administrative function, only qualified immunity is available.[76]

---

[69] *Imbler v. Pachtman,* 424 U.S. 409, 430 (1976).
[70] *Adams v. Hanson,* 656 F.3d 397, 401(6th Cir. 2011)  (quoting *Imbler,* 424 U.S. at 410).
[71] *Id.* at 401 (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)).
[72] *Id.*
[73] *Id.* at 402 (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993)).
[74] *Id.* (collecting cases).
[75] *Burns,* 500 U.S. at 492.
[76] *Adams,* 656 F.3d at 402.

For example, giving police legal advice during a pretrial investigation,[77] conspiring to fabricate evidence before convening a grand jury,[78] making false statements at a press conference,[79] or "acting as a complaining witness by making sworn statements to the court in support of a criminal complaint," are all actions that can only receive qualified immunity.[80]

Ultimately, the "critical inquiry" for absolute immunity in the Sixth Circuit is "how closely related is the prosecutor's challenged activity to his *role as an advocate* intimately associated with the judicial phase of the criminal process."[81]  For this reason, courts must "identify precisely the wrongful acts" a prosecutor has allegedly done and "classify those acts according to their function."[82]

 Here, Defendants Naiman and Marino, both Cuyahoga Prosecutor's Office prosecutors, sent a letter to the East Cleveland Police Department and the City of East Cleveland regarding a public records request received by the City of East Cleveland.[83]  They allegedly did this at Defendant Dunn's request.  That public records request sought the East Cleveland Police Department's file on the Plaintiffs' case.[84]

Naiman and Marino's letter stated that it was their position that the police file was not a public record and therefore that "any release could constitute a wilful [sic] violation of the law."[85]  The letter went on to "direct[]" the city to turn over the entire file and "any and all copies [of the file] which exist elsewhere" to the Cuyahoga Prosecutor's Office "forthwith."[86]

---

[77] *Burns*, 500 U.S. at 494-96.
[78] *Buckley*, 509 U.S. at 274-76.
[79] *Id.* at 276-78.
[80] *Id.* (citing *Kalina v. Fletcher*, 522 U.S. 118, 129-31 (1997)).
[81] *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (emphasis in original).
[82] *Adams*, 656 F.3d at 403.
[83] Doc. 79-51.
[84] *Id.*
[85] *Id.*
[86] *Id.*

At the time Defendants sent this letter, the trial and direct appeals of all three Plaintiffs were completed, and no Plaintiff had filed a petition for post-conviction relief. There was no ongoing litigation involving Plaintiffs. Indeed, if any future litigation involving the file happened, Plaintiffs, as opposed to the Cuyahoga Prosecutor's Office, had to initiate it.

Plaintiff Wheatt's attorney made the public records request as part of an investigation to support potential post-conviction relief.[87] Defendant Naiman was told by an East Cleveland police officer that the mayor of East Cleveland was going to turn over the file to one of Plaintiffs' mothers.[88]

According to Defendant Naiman, her interpretation of *State ex rel. Steckman v. Jackson*,[89] motivated the position she and Defendant Marino took in the letter.[90] She states that she believed that the public records request for the police file was an impermissible attempt to skirt the criminal discovery rules.

As an initial matter, the County Defendants spend a significant amount of words in their summary judgment motion arguing that Defendant Naiman's interpretation of *Steckman* was correct. It was not.

*Steckman* held that police files qualified as an exemption from the Ohio public records law. For that reason, a government entity that received a public records request was not *required* to turn over a police file. *Steckman*, however, said nothing about whether a city *could* turn over a public records request for a police file if the political subdivision wanted to do so. *Steckman*

---

[87] *See* Doc. 79-49.
[88] Doc. 79-50 at 37-38, 40.
[89] 639 N.E.2d 83 (1994).
[90] *See generally* Doc. 79-50.

dealt solely with the question of whether a petitioner whose records request was denied could use the *mandamus* remedy to force a government entity to turn over those files.[91]

Even when an Ohio appellate court extended *Steckman* to hold that a petitioner who obtained materials through a public records request could not use those materials to support post-conviction relief, there was no indication that the government entity erred by voluntarily turning over those files.[92] Therefore, *Steckman* did not prevent East Cleveland from voluntarily releasing the police file at issue here.

Regardless of the correctness of their interpretation of *Steckman*, the County Defendants are not entitled to absolute immunity for their actions. Numerous factors counsel in favor of finding these actions outside the scope of absolute immunity.

First, absolute immunity applies only when a prosecutor acts as an advocate for the state within the judicial phase of the criminal process. Here, Defendants acted wholly outside of the judicial phase. Their actions therefore would not be "subjected to the 'crucible of the judicial process.'"[93]

When the city received the request for the police file, there were no ongoing judicial proceedings. Additionally, the Cuyahoga Prosecutor's Office had no ability to initiate further proceedings in this case. The Plaintiffs complain only about Defendants' actions during Plaintiffs' post-conviction investigation.

Beyond this, Cuyahoga County had no apparent interest in defeating the Plaintiffs' public records request. Cuyahoga County and East Cleveland are separate political subdivisions and Cuyahoga County had no reason to interfere with that city's police file records. Defendant

---

[91] *See generally id.*
[92] *See State v. Walker*, 657 N.E.2d 798 (Ohio Ct. App. 1995).
[93] *Burns*, 500 U.S. at 496 (citing *Imbler*, 424 U.S. at 440 (White, J., concurring)).

Marino has stated that the Cuyahoga Prosecutor's Office kept its own copies of the files from cases it prosecuted, and that the prosecutors' files generally contained all of the information in the police file.[94] The prosecutors' only apparent interest was to defeat review of the facts supporting the prosecution.

While no case is directly on point, the Court finds *Burns v. Reed* instructive.[95] There, the Court held that prosecutors do not receive absolute immunity when they provide legal advice to police during the initial investigatory phase of a criminal proceeding.[96]

In *Burns,* the Court held that prosecutors had no absolute immunity. Instead, prosecutors were limited to seeking qualified immunity for four reasons. First, there was no common law history of absolute immunity for prosecutors providing legal advice to police. Second, in the scenario in *Burns* there was minimal risk of vexatious litigation against prosecutors.[97]

Third, qualified immunity was sufficiently strong to avoid discouraging prosecutors from performing their duties, and it would be "incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice."[98] Finally, there was a minimized chance that the judicial process would be available to "restrain out-of-court activities by a prosecutor that occur prior to the initiation of a prosecution."[99]

---

[94] Doc. 79-52 at 41-44.
[95] 500 U.S. 478 (1991).
[96] *Id.* at 492-96.
[97] *See also Buckley*, 509 U.S. 259 (declining to extend absolute immunity with respect to claims that prosecutors had fabricated evidence during the preliminary investigation of a crime)
[98] *Id.* at 495.
[99] *Id.*

The same reasoning suggests that Defendants Marino, Naiman, and Dunn should not receive absolute immunity. As an initial matter, no party suggests that there is a relevant common law history of absolute immunity.

There is also minimal risk of vexatious litigation. Neither party has presented any evidence suggesting that the Cuyahoga Prosecutor's Office, either by law or by custom, provided legal advice to either East Cleveland or any other municipalities on how to deal with public records requests in any instance but this one. Both East Cleveland and Cuyahoga County are independent Ohio political subdivisions. Neither reports to nor controls the other.[100]

Indeed, in their combined fifty-eight years of prosecutorial experience, neither Naiman nor Marino could remember sending anything like this letter before or after this instance.[101] The Court finds that litigation arising from this seemingly once-in-a-career scenario would not subject the judicial process to such intense "harassment and intimidation associated with litigation" that it merits extending absolute immunity.[102]

Additionally, qualified immunity is sufficiently strong to protect prosecutors who face scenarios like this one. As the Supreme Court noted in *Malley v. Briggs*, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[103] The rarity of this situation suggests that qualified immunity would shield a wide range of responses, as prosecutors "of reasonable competence could disagree" on what action (if any) a prosecutor should take.[104]

---

[100] *See* Doc. 79-52 at 16.
[101] *See* Doc. 79-50 at 66-68; Doc. 79-52 at 44.
[102] *Id.*
[103] 475 U.S. 335, 341 (1986).
[104] *Id.*

Finally, and perhaps most importantly, there were no active judicial proceedings when Defendants sent this letter. As previously mentioned, all direct appeals were finished, and no post-conviction proceedings had begun. As such, the judicial process would not "restrain" Defendants' "out-of-court activities" that were unrelated to a legitimate prosecutorial function.[105]

This is especially so because neither Defendant Naiman nor Defendant Marino had any involvement in the trial, direct appeal, or post-conviction phases of Plaintiffs' cases. Defendants also did not consult the case's trial or post-conviction prosecutors about this letter. Defendants only connection to Plaintiffs arose because of this letter.

Indeed, Defendants Naiman and Marino give no plausible explanation why they interjected themselves into Plaintiffs public records request. All of these facts further minimized the chances of the judicial process reviewing Defendants' legitimate prosecutorial actions.

For these reasons, Defendants are not entitled to absolute immunity.

*2. Qualified Immunity*

Government officers are entitled to qualified immunity for their actions unless plaintiffs satisfy a two-prong test. First, plaintiffs must show that "the facts alleged show the officer's conduct violated a constitutional right."[106] Second, plaintiffs must prove that the violated constitutional right was "clearly established."[107] Courts do not have to decide these prongs in a specific order.[108]

---

[105] *Burns*, 500 U.S. at 495.
[106] *See France v. Lucas*, 836 F.3d 612, 625 (6th Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).
[107] *Id.*
[108] *See Pearson v. Callahan*, 555 U.S. 223, 236-42 (2009).

### a. Whether Plaintiffs' Right to Access the Courts Was Clearly Established in 1998

Courts must take care not to define "clearly established" at a high level of generality.[109] For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate."[110] There does not, however, need to be "a case directly on point."[111]

Plaintiffs allege that Defendants violated their clearly established right to access the courts. They allege a backwards-looking access to courts claim, which means that Defendants took some deceptive action in the past that obstructed their ability to vindicate their rights in state court.[112]

As evidence that this right was clearly established before 1998, when Plaintiffs' counsel issued its East Cleveland records request, Plaintiffs point to *Swekel v. City of River Rouge*, a 1997 Sixth Circuit decision.[113] In *Swekel*, a woman accused a number of government defendants of violating her right to access the courts by "covering-up for a high-ranking police officer and his son."[114]

The Sixth Circuit stated that "'[i]t is beyond dispute that the right of access to the courts is a fundamental right protected by the Constitution.'"[115] Beyond this general statement, the Sixth Circuit also concluded that "if a party engages in actions that effectively cover-up evidence and this action renders a plaintiff's state court remedy ineffective, they have violated his right of access to the courts."[116]

---

[109] *See White v. Pauly*, 137 S.Ct. 548, 551-52 (2017).
[110] *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015).
[111] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).
[112] *See Flagg v. City of Detroit*, 715 F.3d 165, 173-74 (6th Cir. 2013).
[113] 119 F.3d 1259 (6th Cir. 1997).
[114] *Id.* at 1261.
[115] *Id.* at 1262 (quoting *Graham v. Nat. Collegiate Athletic Ass'n*, 804 F.2d 953, 959 (6th Cir. 1986)).
[116] *Id.*

As such, at the time of the events at issue here, the County Defendants should have been aware that taking an action that obstructed Plaintiffs' access to adequate state court remedies was a constitutional violation; that the Sixth Circuit considered that prosecutors and police officers alike could violate this right;[117] and that this right was firmly established in the Sixth Circuit. The Court therefore finds that Plaintiffs' right to access the courts was clearly established by 1998.

### b. Whether Defendants Violated Plaintiffs' Clearly Established Right

When determining whether a constitutional violation occurred on a motion for summary judgment, the Court "assume[s] the truth of all record-supported allegations by the non-movant."[118] If, in this favorable light, a plaintiff's allegations would support a constitutional violation, dismissal on qualified immunity grounds is improper.[119]

In order to sustain their access to courts claim, Plaintiffs must prove that they had: "(1) a non-frivolous underlying claim;" that "(2) obstructive actions [were taken] by state actors;" that those obstructive actions caused "(3) substantial prejudice to the underlying claim that cannot be remedied by the state court . . . ; and (4) a request for relief which the plaintiff would have sought on the underlying claim and is now otherwise unattainable."[120]

---

[117] In *Swekel*, the Sixth Circuit discusses *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983) at length. That case involved an access to the courts claim alleging that prosecutors covered up evidence of a murder in an attempt to protect another prosecutor. *Id.* at 969-70. The discussion of this case in *Swekel* would make a reader aware that prosecutors were not an exception to *Swekel*'s otherwise general discussion of state actors.

[118] *Bays v. Montmorency County*, 2017 WL 4700644, at *2 (6th Cir. 2017) (citing *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2017 (2014)).

[119] *See Smith v. City of Troy, Ohio*, 2017 WL 4931961, at *3 (6th Cir. 2017).

[120] *Flagg*, 715 F.3d at 174 (alterations, citations, and internal quotation marks omitted).

Regarding the first part of this test, the parties do not dispute that Plaintiffs' underlying *Brady* claim was non-frivolous. The belatedly disclosed East Cleveland police investigatory files ultimately freed Plaintiffs from prison.

Similarly, Plaintiffs have provided sufficient evidence to defeat summary judgment on the third prong, whether Defendants' actions substantially prejudiced their underlying claim. As previously noted, Plaintiffs sought post-conviction relief for years, but were only successful after the police file at issue was disclosed.[121]

Defendants argue that Plaintiffs could have challenged the denial of the public records request in 1998. Essentially, Defendants argue that even if they were a but-for cause of Plaintiffs' injury, Plaintiffs' counsel's failure to challenge the 1998 public records request denial was an intervening act that cut off the chain of proximate causation.

When viewing the evidence in the light most favorable to Plaintiffs, this argument fails because "the § 1983 proximate-cause question [is] a matter of foreseeability."[122] Ultimately, a court must ask "whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct."[123]

Defendants knew that someone sought this police file in order to investigate a potential wrongful conviction.[124] It follows that if East Cleveland followed the prosecutors' directive to make the investigatory files unavailable, Defendants would either delay Plaintiffs obtaining relief, or prevent relief altogether. Defendants Dunn, Naiman and Marino could foresee that they

---

[121] *See, e.g.*, *State v. Wheatt*, 2000 WL 1594101 (Ohio Ct. App. Oct. 26, 2000); *State v. Wheatt*, 2006 WL 439850 (Ohio Ct. App. Feb. 23, 2006); *State v. Wheat*, 2010 WL 3442286 (Ohio Ct. App. Sept. 2, 2010); *State v. Glover*, 2010 WL 3442274 (Ohio Ct. App. Sept. 2, 2010); *State v. Johnson*, 2005 WL 1707012 (Ohio Ct. App. July 21, 2005); *State v. Johnson*, 2010 WL 3442282 (Ohio Ct. App. Sept. 2, 2010).
[122] *Powers v. Hamilton County Public Defender Com'n*, 501 F.3d 592, 609 (6th Cir. 2007).
[123] *Id.*
[124] *See* Doc. 79-50.

-20-

would delay Plaintiffs' access to the *Brady* material. Therefore, there is sufficient evidence for a jury to conclude that continued imprisonment was a foreseeable consequence of Defendants' actions.

Plaintiffs have also defeated Defendants' motion for summary judgment on the fourth prong. But for Defendants' conversion of the East Cleveland investigatory records, Plaintiffs argue, they would not have suffered an additional seventeen years imprisonment.

Plaintiffs show that they sought post-conviction relief for years, but only obtained a new trial once East Cleveland released the police file. Because they cannot travel back in time to secure their earlier release, they instead seek damages.[125] This is "a request for relief [that] is now otherwise unattainable."[126]

The County Defendants argue that because Plaintiffs seek damages as a remedy for both their access to courts claim and their other constitutional tort claims, the access to court claim must fail.[127] Plaintiffs do seek damages both on their access to courts claim against the County Defendants, and on their other claims against the City Defendants. That is not, however, a sufficient reason to dismiss the access to courts claim as to the County Defendants.

The reasons for this are two-fold. First, the County Defendants' actions constituting a denial of access to the courts were sufficiently distinct from the City Defendants' actions that led to Plaintiffs' original imprisonment. This means that the damage flowing from this denial of

---

[125] Defendant Naiman argues that because Plaintiffs allege other damages actions, they cannot also allege a denial of access claim. Doc. 87 at 17-18. The Court has previously addressed this issue in deciding the City Defendants' Motion to Dismiss, and Defendant Naiman has not provided sufficient reason to reconsider that ruling. *See* Doc. 40 at 17.

[126] *Flagg*, 715 F.3d at 174. Defendants' argument that they did not prevent Plaintiffs from filing post-conviction relief fails. A state actor can deny access to the courts by concealing or destroying evidence, thereby making any search for court-ordered relief ineffective. *See Swekel*, 119 F.3d at 1262 ("Access to courts does not only protect one's right to physically enter the courthouse halls, but also insures that the access to courts will be 'adequate, effective and meaningful.'").

[127] *See Christopher v. Harbury*, 536 U.S. 403, 420-22 (2002) (denying an access to courts claim in part because plaintiff sought damages on both her access to courts claim and her other tort claims).

-21-

access is distinct from the damage caused by the City Defendants' other allegedly unconstitutional actions.

Second, and relatedly, Plaintiffs have no alternate claim that could entitle them to relief for the County Defendants' actions against them. No court has said that a plaintiff fails to state a claim for access to the courts simply because some other government agent has also violated the plaintiff's constitutional rights in a separate, albeit related, episode.

The parties primarily dispute the second prong, whether Defendants' actions were obstructive. Viewing the record evidence in the light most favorable to Plaintiffs, the County Defendants' actions were obstructive, and the County Defendants took those actions intending to obstruct Plaintiffs' access to courts.[128]

Plaintiffs have presented evidence that would allow a reasonable jury to find that Defendants Dunn, Naiman, and Marino gave East Cleveland the 1998 police file demand letter intending to obstruct Plaintiffs' access to the courts. This evidence includes Naiman and Marino's lack of involvement with the criminal case; the Cuyahoga Prosecutor's Office letter's demand to turn over all copies of the file, seemingly in violation of Ohio statutory law;[129] and Marino's recent admission that East Cleveland's investigatory file production to Plaintiffs would not be a "willful violation of the law."[130] Additionally, a reasonable jury could find that Defendant Dunn was the person from the East Cleveland Police Department who called Naiman

---

[128] *See* *Swekel*, 119 F.3d at 1262-63 (supporting a constitutional violation when "state officials wrongfully and intentionally conceal information crucial to a person's ability to obtain redress through the courts, and do so for the purpose of frustrating that right").

[129] *See* Ohio Rev. Code Ann. § 149.351 (West 2011) ("All records are the property of the public office concerned and shall not be removed . . . in whole or in part, except as provided by law or under [specific rules established elsewhere in the] Revised Code.").

[130] *See* Doc. 52 at 33-35.

and instructed her to write the letter or take some other similarly obstructive action.[131]  These circumstances surrounding the letter could suggest that Defendants' purpose was obstruction, and not the lawful protection of evidentiary procedures that Defendant Naiman claims.

A number of additional factors weigh against finding qualified immunity.  Most centrally, after the direct appeal, Cuyahoga County had no federal habeas case responsibility for Plaintiffs' cases.  The Ohio Attorney General represents Ohio with regard to all federal post-conviction cases.[132]

Cuyahoga County would defend state court post-conviction petitions, as they did here.  However, Plaintiffs had not filed any state or federal post-conviction petitions when Naiman told East Cleveland to give all police investigation files to the Cuyahoga Prosecutor's Office.  Even beyond this, Naiman had no personal responsibility for any ongoing state post-conviction cases.

A public official performing a discretionary function enjoys qualified immunity in a civil action for damages, provided his or her conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known.[133]  But, qualified immunity protects "only actions taken pursuant to discretionary functions."[134]

To satisfy the discretionary function requirement, the government official must have been performing a function falling within his legitimate job description.[135]  For example, in *In re*

---

[131] *See generally* Doc. 79-50 (noting that Naiman believes Dunn is the person who called her about the public records request and discussing the call).

[132] *See, e.g.*, Ohio Rev. Code Ann § 309.08 (West 2007) (limiting county prosecutors' jurisdiction to "the probate court, court of common pleas, and court of appeals").

[133] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[134] *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001), quoting *F.E. Trotter, Inc. v. Watkins*, 869 F.2d 1312, 1314 (9th Cir.1989).

[135] *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004).

*Allen*, the Fourth Circuit looked to whether a reasonable official in the defendant's position would have known that his actions were beyond the scope of his official duties.[136]

Against this backdrop, Defendant Naiman's injection into Plaintiffs' public records request was beyond her or the Cuyahoga Prosecutor's Office's duties.[137]  The intercession to block Plaintiffs' access to records only marginally related to these Defendants' official duties.

For these reasons, this Court finds the County defendants are not entitled to qualified immunity.  While they can argue that their acts did not proximately damage Plaintiffs, the Court finds they are neither absolutely immune nor qualifiedly immune.

For these reasons, the Court **DENIES** the County Defendants' motion for summary judgment.

## B. Plaintiffs' Motion for Partial Summary Judgment

*1. Access to Courts Claim against Defendant Naiman*

Plaintiffs seek summary judgment against Defendant Naiman on their access to courts claim.  Because the Court decides that Defendant Naiman is entitled to neither absolute nor qualified immunity, [138] the Court only addresses the merits of Plaintiffs' access to courts claim here.  For the following reasons, the Court **DENIES** Plaintiffs' motion.

As detailed above, an access to courts claim requires Plaintiffs prove (1) that they possessed a non-frivolous underlying claim; (2) obstructive actions by Defendant Naiman; (3) substantial prejudice to the underlying claim that the state court cannot remedy; and (4) a request for relief that Plaintiffs would have sought that is now unattainable.[139]

---

[136] *In re Allen*, 106 F.3d 582, 595 (4th Cir. 1997).
[137] *See* Ohio Rev. Code Ann. § 309.09 (West 2013) (exempting county prosecutors from their duty to "advise or defend" a township when that township has its own law director).
[138] *See* Part III.A.3 *supra*.
[139] *Flagg*, 715 F.3d at 174.

Plaintiffs' underlying claim is non-frivolous. The *Brady* violation that underlies their access to courts claim was successful once they received the police file in 2013.

Naiman's argument that this claim is not cognizable in the context of an access to courts claim fails. Access to courts jurisprudence originally developed in the context of prisoners' rights, including prisoners seeking habeas relief.[140] Plaintiffs similarly allege that Naiman obstructed their petition for state habeas relief.

There is a genuine dispute over whether Naiman's actions substantively prejudiced Plaintiffs' underlying claim. Defendant Naiman argues that any prejudice her letter caused to Plaintiffs' claim was minimal, because Plaintiffs did not challenge East Cleveland's denial of their public records request. Had they challenged this denial, Naiman argues, there may have been minimal or no delay in the file's release.

Naiman is correct that Plaintiffs could have brought a *mandamus* action seeking to force the police file's release. That action, however, would have probably been unsuccessful. As Naiman points out in her own motion for summary judgment, a city was allowed but not required to turn over a police file because of *Steckman*.

Additionally, Naiman's letter sought all copies of the police file from the city. If East Cleveland had fully complied with the directive in her letter, there would no longer be a police file that the city could turn over. However, East Cleveland obviously did not fully comply with the letter, as they retained a copy of the investigatory file that they released to Plaintiffs in 2013.

Further, the Court recognizes that a *mandamus* action to release the file may have uncovered any potentially wrongful acts by Defendants, thereby speeding up Plaintiffs' habeas relief. Regardless, it is clear that after Defendant Naiman took custody of the East Cleveland

---

[140] *See Bounds v. Smith*, 430 U.S. 817, 821-22 (1977) (citing *Ex parte Hull*, 312 U.S. 546 (1941)).

investigatory file and directed East Cleveland not to provide the file to Plaintiff, the chances of Plaintiffs obtaining relief decreased.

Defendant Naiman argues that her letter was not the cause of Plaintiffs' harm. In her telling, her letter simply informed East Cleveland of the County Prosecutors' position that the police file was not a public record.

If this argument is accepted, East Cleveland changed its own position on whether to release the file. East Cleveland then gave a copy of the file to the County Prosecutors and chose not to release any of its other copies of the file to Plaintiffs' counsel. As previously discussed, East Cleveland was not required to release the file and so was legally allowed to make this choice. Plaintiffs' counsel received a copy of Defendant Naiman's letter,[141] and could have challenged East Cleveland's denial at that time. If East Cleveland wanted to change its position again and release the file, it could have.

On this view of the facts, Defendant's letter was not the cause of Plaintiffs' issues. Instead, the prejudice to Plaintiffs' underlying claim was caused by East Cleveland's adoption of Defendant Naiman's position towards releasing the file, and Plaintiffs' counsel's failure to challenge East Cleveland's changed position.[142]

Indeed, Defendant Naiman contends that she only requested the file in order to preserve it for a possible release through proper evidentiary procedures. Assuming that Naiman's contention is true, she would have produced the copy of the file she received from East Cleveland if Plaintiffs attempted to get the file through the courts.

---

[141] *See* Doc. 93-6.
[142] *Cf. Swekel*, 119 F.3d at 1264 (noting that Swekel "never presented evidence that the state could not adequately address" the problems stemming from the allegedly covered-up evidence).

While Defendant Naiman makes this argument, contrary evidence exists to suggest her actions impeded the release of Brady materials that led to Plaintiffs' release. Therefore, the Court finds a dispute of material fact over whether Defendant Naiman substantially prejudiced Plaintiffs' underlying claim.

As a matter of law, Plaintiffs do clearly request relief that is now unattainable. Assuming that the release of the police file in 1998 would have had the same effect that it did in 2013, Plaintiffs would have spent over a decade less in prison had East Cleveland released the file in 1998.[143] They cannot now seek the return of that time, and so they seek damages. As previously discussed, the fact that Plaintiffs also seek damages from other actors for those actors' constitutional torts does not defeat their access to courts claim.

Finally, there is a material factual dispute about the fourth prong of the Sixth Circuit's test for a denial of access to the courts, whether Defendant Naiman's actions were obstructive. Defendant Naiman puts forward evidence that she intended to enforce her good-faith interpretation of the law, and did not intend to obstruct Plaintiffs.

Plaintiffs argue that several factors mitigate against this argument. First, Defendant Naiman had no responsibility for the Plaintiffs trial, appeal, or state or federal post-conviction cases. Second, the public records request went to East Cleveland, not to Cuyahoga County or the Cuyahoga County Prosecutor's Office. As an independent political subdivision, East Cleveland does not report to and is not controlled by the Cuyahoga County Prosecutor's Office.[144]

As members of the Cuyahoga County Prosecutor's Office, Naiman and Marino had no reason to involve themselves with the record request. This is especially so because Defendant

---

[143] Defendant Naiman has presented no facts suggesting that release of the file in 1998 would have led to a different result from the one that occurred in 2013.
[144] *See* Doc. 79-52 at 16 (stating that the Cuyahoga County Prosecutors "didn't have jurisdiction over any cities").

Marino has stated that the Cuyahoga Prosecutor's Office kept its own copy of case files, which generally included all of the information in a police file.[145]

Naiman, however, has stated under oath that when she wrote the 1998 letter, she was attempting to prevent a subversion of the evidence rules.[146] She attempts an explanation: the East Cleveland Police Department did the investigation; the County Prosecutor's Office prosecuted the killing and received access to the police file to put the prosecution together; and even though the prosecution was long finished and the Prosecutor's Office had no ongoing responsibility for the case, the Prosecutor's Office needed to control the discovery of the East Cleveland file.

She further attested that before she wrote the letter, she sought advice from both a prosecutor in the Cuyahoga Prosecutor's Office appeals unit and Defendant Marino.[147] Finally, she states that her sole purpose in seeking the file from the city was to "protect the integrity" of the file for production through the evidence rules, instead of through a public records request.[148]

The Court finds that there are sufficient material factual disputes to preclude summary judgment. For these reasons, the Court **DENIES** Plaintiffs' motion for summary judgment as to Defendant Naiman.

*2. Impermissibly Suggestive Photo Array*

Plaintiffs also seek summary judgment against City Defendants Perry, Johnstone, and Miklovich. Plaintiffs argue that these Defendants used an unduly suggestive pre-trial identification procedure in order to get Tamika Harris to identify Plaintiffs. Plaintiffs argue that this procedure violated their Fourteenth Amendment due process rights.

---

[145] *See id.* at 41-44.
[146] *See* Doc. 79-50 at 101.
[147] *Id.* at 41.
[148] *Id.* at 42.

In order to violate a person's due process rights, an identification procedure must be "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law."[149]  Using evidence from a suggestive identification procedure does not violate the due process clause if the identification is reliable in spite of the procedure's suggestiveness.[150]

An identification procedure only violates due process rights if it produces evidence used at trial.[151]  Plaintiffs have satisfied this requirement because Tamika Harris testified at trial about her earlier pre-trial identification of Plaintiff Johnson.[152]  The Cuyahoga County prosecution team also used that identification against Plaintiffs Wheatt and Glover.[153]

The City Defendants argue that a due process violation occurs only when there was some effort to mislead the trial judge or prosecutor.  This argument fails.  The Sixth Circuit has previously rejected essentially this exact argument.[154]  Beyond this, there is a dispute of material fact about whether Defendants disclosed the procedure's full suggestiveness, as later described by Tamika Harris.[155]

Whether an identification procedure is unduly suggestive ultimately depends on evaluating the totality of the circumstances.[156]  Likewise, to determine whether an identification is otherwise reliable, the Sixth Circuit relies on the five factors set forth in *Manson v. Brathwaite*.[157]  But, the Sixth Circuit has also considered other potentially relevant facts outside

---

[149] *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)).

[150] *Id.*

[151] *See Gregory v. City of Louisville*, 444 F.3d 725, 746 (6th Cir. 2006).

[152] *See* Doc. 79-5 at 840-41, 960-61 (page numbers refer to pages of trial transcript).

[153] *Id.*

[154] *See Gregory*, 444 F.3d at 747.

[155] *See* Doc. 79-22 (2004 Harris Affidavit).

[156] *See Gregory*, 444 F.3d at 746.

[157] 432 U.S. 107 (1977). These five factors are: "(1) the witness' opportunity to view the suspect; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the

of those factors.[158]  This consideration of other factors turns the inquiry into what is essentially a totality of the circumstances test.

Here, there are sufficient disputed and material facts about both the suggestiveness of the procedure and the reliability of Harris's identification to stop summary judgment on this claim.

Plaintiffs argue that showing Harris only pictures of Plaintiffs, regardless of any other alleged suggestive acts, was unduly suggestive as a matter of law.[159]  They analogize this process to a "show up," where a witness is only shown one picture and asked if that is the person he or she saw.

This argument fails.  Plaintiffs do not cite to any case where a court has found this particular practice as always unduly suggestive as a matter of law.  Indeed, even a one-picture show up may be proper in some circumstances.[160]  Any other facts about the photos, such as the presence of lockers behind Plaintiffs,[161] do not make the question of suggestiveness indisputable.

Similarly, the question of reliability turns on a number of disputed facts.  Most prominent among these is Harris's conflicting testimony.  During the initial trial, Harris testified in rather extensive detail about her memory of the shooting and her observations from that day.[162]  This testimony suggests that regardless of the identification procedure used by Defendants, Harris's identification may have been reliable.  Although Harris later recanted this testimony, it is the jury's, and not the Court's, role to determine how to weigh her competing statements.

---

level of certainty demonstrated by the witness at the time of the identification; and (5) the time between the crime and the identification." *Haliym*, 492 F.3d at 704.
[158] *See id.* at 706-07.
[159] Plaintiffs concede that there is a dispute of fact about whether an officer suggested that Harris pick out Johnson by holding his hand over Johnson's photo.
[160] *See United States v. Nobles*, 322 F. App'x 96, 98 (3rd Cir. 2009) (citing *Manson*, 432 U.S. at 106).
[161] *See* Doc. 79-18.
[162] *See* Doc. 79-5 at 814-92.

Because there are material facts in dispute, the Court **DENIES** Plaintiffs' motion for summary judgment on their due process claim.

### C. East Cleveland Defendants' Motion for Summary Judgment

*1. Qualified and Statutory Immunity*

The City Defendants have waived the defenses of qualified and statutory immunity. The Court does not lightly find waiver in this instance.

Defendants mentioned qualified and statutory immunity as a possible defense in their answer.[163] However, in fully briefing their motion to dismiss, their summary judgment motion, and their opposition to Plaintiffs' motion for summary judgment, the City Defendants did not mention immunity. Indeed, in all of the aforementioned motions, neither the word "qualified" nor the word "immunity" appears at all.

Defendants' only substantive mention of qualified immunity appeared in a filing titled: "Notice of East Cleveland Law Enforcement Defendants Pro Se Desire to Emphasize a Qualified Immunity Defense as in an Anders Type Brief as Applied to a Civil Matter."[164] Although it is titled as a "pro se" brief, the City Defendants' attorney signed and filed it.[165] The Court strikes this brief as improperly filed, and does not consider it on the merits.

Even if the Court were to consider this filing as a reply supporting Defendants' motion for summary judgment, which it was not, it would not impact the Court's decision. A party cannot raise new arguments in a reply brief, let alone raise affirmative defenses for the first time.[166]

---

[163] Doc. 21 at 27.
[164] Doc. 97. Plaintiffs moved to strike this filing as improper. Doc. 105.
[165] *See* Doc. 97 at 5.
[166] *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). Although the Court finds the issue of immunity waived, the Court notes that even if there was no waiver, the City Defendants' arguments for qualified immunity in this filing are totally meritless. The cases cited by Defendants in this

For these reasons, the Court **STRIKES** Defendants' "pro se" filing and finds that Defendants have waived the qualified and statutory immunity defenses.

*2. City Defendants' Summary Judgment Motion on the Merits*

Plaintiffs bring a number of claims that stem from Defendant Officers' alleged use of an unduly suggestive identification procedure and withholding of exculpatory evidence. These claims include denial of due process, continued detention without probable cause, failure to intervene, conspiracy, federal and state malicious prosecution, and intentional infliction of emotional distress. The City Defendants seek summary judgment against Plaintiffs on all of these claims.

### a. Unduly Suggestive Identification Procedures[167]

As the Court discussed previously in deciding Plaintiffs' motion for summary judgment on their due process claim, there are material factual disputes surrounding the identification procedure that led to Tamika Harris identifying Plaintiffs. These disputes involve both the suggestiveness of the identification procedure Defendants used and the reliability of Harris's identification. For that reason, the Court **DENIES** the City Defendants' motion for summary judgment on Plaintiffs' claims relating to this identification.

---

filing, *Pearson v. Callahan*, 555 U.S. 223 (2009), and *Ziglar v. Abassi*, 137 S.Ct. 1843 (2017), are so disconnected from determining qualified immunity here that Defendants' arguments are virtually nonsensical. Therefore, even if the Court considered the issue of qualified immunity on the merits, Defendants' arguments would fail. They would also waive any other arguments they could make to rebut Plaintiffs' contention that they do not have qualified immunity because they did not raise them in this initial "brief."

[167] Plaintiffs only seek to sustain their unduly suggestive identification claim against Defendants Perry, Johnstone, and Miklovich.

### b. Withholding Exculpatory Evidence[168]

The City Defendants argue that Defendant Officers turned over evidence regarding the Petty brothers and Derek Bufford to the trial prosecutor, Michael Horn. They also argue that even if the officers had not turned over this evidence, it was not exculpatory.

Drawing all reasonable inferences in favor of the non-movant Plaintiffs, both of these arguments fail. Regarding Derek Bufford, Defendants have proved that Prosecutor Horn was aware of Bufford's existence, as Bufford was listed as a potential government witness. What remains unclear, however, is whether the Defendant Officers ever told Prosecutor Horn about Bufford's exculpatory statements.

On the same document listing potential government witnesses, Horn checked a box stating that he had no potentially exculpatory information to turn over to Plaintiffs. He has since testified that if he had any exculpatory information, he would have turned it over to Plaintiffs, and that he found Bufford's statement exculpatory.[169] Therefore, there is a genuine dispute of material fact about whether Trial Prosecutor Horn was ever made aware of Derek Bufford's potentially exculpatory statements.

Similarly, it is not clear whether Defendant Officers ever made Horn aware of the Petty brothers' statements. Neither Petty brother was on the prosecution's original trial witness list. Further, Prosecutor Horn could not recall ever seeing the Pettys' statements before the original trial.[170]

Defendants' argue that a police report containing both the names of Lee Malone, whose name was included on the prosecution's witness list, and Eddie Petty shows that Horn knew

---

[168] Plaintiffs seek to sustain their suppression of evidence claim against all City Defendants, but only seek to sustain their fabrication of evidence claim against Defendants Perry, Johnstone, and Miklovich.
[169] *See* Doc. 79-38 at 92, 94-95, 103-05, 115-17.
[170] *Id.* at 115, 131.

about the Pettys and their statements. The existence of this police report is not sufficient to obtain summary judgment.[171] Defendants provide no evidence that Horn learned of Malone through this report, and the report contains no mention of who Eddie Petty was.[172] This report simply states that officers did *not* talk to Eddie and left a card at his residence.[173]

Defendants have also not proven that there are no disputes of material fact about the exculpatory nature of any of the allegedly withheld statements. Exculpatory evidence is evidence that is "favorable to an accused . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal."[174] When drawing reasonable inferences in favor of the Plaintiffs, the Petty brothers' statements are not so wildly inconsistent as to wholly discredit them. Bufford's statement is also potentially material and exculpatory when read in a light favorable to Plaintiffs.

Indeed, one of the major inconsistencies in the Petty brothers' statements – that Eddie Petty says that he ran home after witnessing the shooting and saw Gary Petty shoveling snow, while Gary says that he ran home after witnessing the shooting – can be explained by the fact that the officer who took the statement may have written down the wrong brother's name.[175] Additionally, the brothers' statements both offered a perspective on the shooting that no other witness had. Because they allegedly saw that the shooter originated from the post office, and not Plaintiffs' vehicle, their statements undermined the prosecution's theory of the case.

---

[171] Doc. 101-6.
[172] *Id.*
[173] *Id.*
[174] *United States v. Bagley*, 473 U.S. 667, 676 (1985) (internal citations and quotation marks omitted).
[175] Defendant Miklovich could not rule out that he did not make this mistake, since officers spent several days searching for Eddie Petty, but the ultimate statement they received was allegedly from Gary. *See* Doc. 79-23 at 65-66.

A reasonable jury could also find Bufford's statement exculpatory. Bufford stated that in the weeks before the murder at issue here, both he and his brother (Clifton Hudson, the victim here) had been approached, threatened, and even shot towards with guns by persons other than Plaintiffs.[176]

In Bufford's case, those men with guns drove a gray Chevrolet Cavalier.[177] Plaintiffs have no known connection to a gray Cavalier. Further, when asked by police, Bufford could not identify either Plaintiffs, or the black GMC that Plaintiffs drove at the time of Hudson's murder.[178] That people, seemingly unconnected to Plaintiffs, had threatened and shot at the victim and his brother in the recent past could make a difference to a reasonable jury.

For these reasons, the Court **DENIES** Defendants' motion for summary judgment on Plaintiffs' claims related to withholding exculpatory evidence.

### c. The Existence of Probable Cause[179]

The City Defendants argue that Plaintiffs' malicious prosecution and continued detention without probable cause claims must be dismissed. They argue that probable cause existed to arrest and charge Plaintiffs.

Defendants' only record citation for this argument is to a police report containing the statements of Robert Hunt and Jerry Vaughn.[180] The statements by these two men are hearsay, and are not in a form that the Court may consider on summary judgment.[181]

---

[176] Doc. 79-32.

[177] *Id.*

[178] *Id.*

[179] Plaintiffs only attempt to sustain their continued detention without probable cause and state law malicious prosecution claims against Defendants Perry, Johnstone, and Miklovich.

[180] Doc. 101-2.

[181] *See Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) ("It is well established that a court may not consider hearsay when deciding a summary judgment motion.").

Defendants also state four additional facts suggesting probable cause.  Defendants state that Plaintiffs admitted to being together at the scene of the crime, that gunshot residue evidence was found on Plaintiffs and their vehicle, that Tamika Harris's testimony placed their vehicle near the scene of the crime, and that the clothes Plaintiff Johnson was wearing when he was arrested were similar to the clothes Tamika Harris said the shooter wore.

All of these facts may be true and supported by the record,[182] but when considered in the light of Plaintiffs' evidence, they do not so firmly establish probable cause as to merit summary judgment.  Plaintiffs have provided evidence that Johnson's outfit was common because it was the popular style of the time.[183]

Additionally, Plaintiffs have provided evidence that the gunshot residue evidence may have been not only faulty, but planted by Defendants.[184]  Plaintiffs simply being present at the scene does not establish probable cause.

Finally, as previously discussed, there is sufficient evidence for a reasonable jury to believe that Defendants obtained Tamika Harris's identification of Plaintiffs through unconstitutionally suggestive procedures.  Each of these facts show that there is a genuine dispute of material fact on the issue of probable cause.

For these reasons, the Court **DENIES** Defendant's motion for summary judgment on Plaintiffs' malicious prosecution and continued detention without probable cause claims.

---

[182] Though these facts may be supported by the record, the Court notes that Defendants have provided no record citation for them.
[183] *See* Doc. 79-8 at 13-14 (noting that the shooter's "Nautica or Tommy Hilfiger type bubble coat" was "the style back then").
[184] *See* Doc. 93-4 at 63-66 (Plaintiff Johnson stating that the gloves allegedly found in his pocket did not belong to him) (page numbers of deposition transcript); Doc. 93-5 (noting that no gloves are listed on the property log book for Plaintiffs' arrest).

### d. Access to the Courts[185]

The City Defendants urge that *Steckman*[186] legally prohibited them from releasing the police file in response to the 1998 public records request. Because of this prohibition, they argue, nothing any City Defendant did in response to that request denied Plaintiffs' access to the courts.

As the Court previously discussed in responding to the County Defendants' interpretation of *Steckman*, this was not true. *Steckman* held that a government entity did not have to release its police files. No case or statute cited by any Defendant has suggested that *Steckman*, or any other decision by an Ohio court, restrained a municipality from voluntarily releasing its own police files.

Beyond this, however, Plaintiffs have not produced sufficient material facts to suggest that Defendant Teel violated their right to access the courts. The only evidence connecting this defendant to the 1998 public records request is the fact that Teel faxed the letter to the police file's requestor,[187] and that he had some supervisory authority over Defendant Dunn.[188]

Teel may have been aware of all of the evidence in the police file, but the facts only show that he received Naiman and Marino's potentially obstructive letter, not that he helped produce it. Even drawing all reasonable inferences in favor of Plaintiffs, these minimal connections are not sufficient to rise to the level of a genuine dispute of material fact about a constitutional violation.

---

[185] Plaintiffs only sustain their denial of access to courts claim against City Defendants Dunn and Teel. The Court previously discussed Plaintiffs' claim against Dunn in Part III.A.2.b, as he is also a County Defendant for the purposes of this claim.

[186] 639 N.E.2d 83 (Ohio 1994).

[187] *See* Doc. 93-6.

[188] *See* Doc. 79-62 at 9.

The Court therefore **GRANTS** Defendants' summary judgment motion as to Plaintiffs' access to courts claims against Defendant Teel.[189]

### D. Plaintiffs' Conceded Claims

Plaintiffs do not challenge Defendants' summary judgment motions on a number of claims. The Court therefore dismisses those claims.

All claims against Defendant John Bradford are dismissed. All claims against the County Defendants, with the exception of Plaintiffs' access to courts claim, are dismissed. Plaintiffs' *Monell* claims against the City of East Cleveland are dismissed. Plaintiffs' state law tortious interference claim is dismissed. The Court also dismisses without prejudice Plaintiffs' indemnification claim, as that claim is not yet ripe.

### IV. Conclusion

For the preceding reasons, the Court **DENIES** the County Defendants' motion for summary judgment as to Plaintiffs' access to court claim. The Court **GRANTS** the County Defendants' motion for summary judgment as to Plaintiffs' conceded claims.

The Court **DENIES** Plaintiffs' motion for partial summary judgment.

The Court **GRANTS** the City Defendants' motion for summary judgment on Plaintiffs' access to courts claim against Defendant Teel, and on Plaintiffs' conceded claims. The Court **DENIES** the City Defendants' motion for summary judgment on all other claims.

---

[189] The City Defendants seek summary judgment on all of Plaintiffs' claims against them. They provide no argument nor evidence, however, about any of Plaintiffs' claims not discussed above. As such, the Court **DENIES** Defendant's motion for summary judgment on Plaintiffs' remaining claims.

The Court **GRANTS** Plaintiffs' motion to strike the City Defendants' "pro se" brief.

IT IS SO ORDERED.


Dated: November 9, 2017                        s/        *James S. Gwin*
                                               JAMES S. GWIN
                                               UNITED STATES DISTRICT JUDGE